**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| TIFFANY A. VOLE, | ) | |
| | ) | |
| | ) | |
| Plaintiffs, | ) | No.    25-cv-15100 |
| | ) | |
| vs. | ) | |
| | ) | |
| ANTHONIO VOLE, JACOB F. McBRIDE, | ) | |
| RIVERSIDE MANAGEMENT & LEASING | ) | |
| CORPORATION, BRIAN BAVARO, MID | ) | |
| AMERICAN RESTORATION SERVICES INC., | ) | |
| LAWRENCE GEMPP, EDWARD MACEK & | ) | |
| DOLORES ANN MARIE VOLE, ROBERT VOLE, | ) | |
| PETER VOLE III | ) | |
| | ) | |
| Defendants. | ) | |

**AMENDED COMPLAINT**

NOW COME the PLAINTIFFS, TIFFANY A. VOLE, in her individual capacity by and

through her attorney, FABIAN J. ROSATI, ESQ., and complaining of DEFENDANTS,

ANTHONIO VOLE, DOLORES ANN MARIE VOLE, PETER VOLE III, ROBERT VOLE

JACOB F. McBRIDE, RIVERSIDE MANAGEMENT & LEASING CORPORATION, BRIAN

BAVARO, MID AMERICAN RESTORATION SERVICES, INC, EDWARD MACEK and

LAWRENCE GEMPP allege as follows

## Introduction

1. During his lifetime Peter Vole Jr., was a well-known and respected businessman

who owned and managed dozens of real estate properties in and around Lake County,

Illinois through VIP Holding Company ("VIP"), the company he founded in 1967. Peter

Vole Jr., named his daughter, Plaintiff, Tiffany Vole as the co-trustee of the living trust

1

agreement he executed on April 6, 2021, (the "Trust") as Executor of his Estate (the "Will")

as restated in April 2022 in "The Second Amendment and Restatement of the Living Trust

Agreement of Peter Vole Jr. Dated October 30th 2017.

## Parties

1.  Plaintiff, Tiffany A. Vole ("Plaintiff") is the daughter of the late Peter Vole Jr.

("Decedent"). Plaintiff is a 25% shareholder of V.I.P. Holding Company ("VIP") in her

individual capacity. She also serves as the sole Trustee of the "Second Amendment and

Restatement of The Living Trust Agreement of Peter Vole, Jr. Dated October 30, 2017"

(the "Trust"), which owns an additional 50% interest in VIP. In her dual roles as an

individual shareholder and Trustee, Tiffany controls a combined 75% of VIP shares. She

has been the President, Secretary and Director of VIP since October 2023. Prior to that

Tiffany served as Secretary and Treasurer of VIP since November 2021 and has been an

exclusive independent contractor for VIP since January 1, 2020. Tiffany has also served as

Successor Trustee and Co-Trustee of the Living Trust of Peter Vole, Jr. In these capacities,

she has been involved in the management and oversight of insurance claims related to

properties owned by both the trust and decedent including properties located in Antioch

and Lincolnshire, Illinois.

2.  Defendant Anthonio P. Vole ("Anthonio") is a 25% shareholder of VIP Holding

Company in his individual capacity. He is also a 50% beneficiary of the Trust, which holds

a 50% interest in VIP. Through his beneficiary status in the Trust, Anthonio has an indirect

interest in another 25% of VIP. He is sued in his individual capacity.

3.  Dolores Ann Marie Vole, was disinherited by Peter Vole Jr., and has no legal

2

interest in the Trust or VIP. Dolores is a resident of the State of Illinois.

4. Peter Vole III, was disinherited by Peter Vole Jr., and possesses no legal interest in the Trust or VIP. Peter III is a resident of the State of Florida.

5. Robert Vole, was disinherited by Peter Vole Jr., and possesses no legal interest in the Trust or VIP. Robert is a resident of the State of Florida.

6. Defendant Jacob F. McBride ("McBride") is the President of Riverside Management & Leasing Corporation, he is sued in his individual and corporate capacities.

7. Defendant Riverside Management & Leasing Corporation ("RMC") is an Illinois corporation with its registered agent address at 1391 Saint Paul Avenue, Gurnee, IL 60031.

8. Defendant Brian Bavaro ("Bavaro") is the President of Mid American Restoration Services, Inc., he is sued in his individual and corporate capacities.

9. Defendant Mid American Restoration Service, Inc. ("MAS"), is an Illinois corporation with its registered agents address at 2100 Sanders Rd., Suite 200, Northbrook, Illinois.

10. Defendant Edward Macek ("Macek") is an insurance agent with Country Insurance. He is sued in his individual capacity.

11. Defendant Lawrence Gempp ("Gempp") is a claims adjustor with Country Financial. He is sued in his individual capacity.

**JURISDICTIONAL STATEMENT**

12. This Court has subject matter jurisdiction over the claims arising under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. §§1961-1964, pursuant to 28 U.S.C. §§1331 and 1337. The complaint alleges that the Defendants are

3

"persons" within the meaning of 18 U.S.C. §1961(3). The Defendants are further alleged to have constituted an "enterprise" under 18 U.S.C. §1961(4), specifically as an association-in-fact of individuals and legal entities associated for the common purpose of defrauding the Plaintiff.

For a RICO claim, the enterprise must be engaged in, or its activities must affect, interstate commerce. *Haroco, Inc. v. American Nat. Bank and Trust Co. of Chicago*, 747 F.2d 384 at *388 (7th Cir. 1984). The interstate commerce nexus requirement is satisfied if the enterprise's activities affect interstate commerce, even if it is the racketeering activities that do so. Id. At the pleading stage, it is sufficient to allege that the enterprise engaged in, and its activities affected interstate commerce through the use of interstate wires and the U.S. Postal Service.

This complaint alleges that the Defendants conducted or participated in the conduct of the enterprise's affairs through a pattern of racketeering activity, consisting of multiple predicate acts of wire fraud. These predicate acts include the use of interstate wires and the U.S. Postal Service to transmit fraudulent information and manipulate access to insurance claim and financial data. A civil RICO plaintiff must allege an injury to business or property "by reason of" a violation of section 1962, which imposes a proximate cause requirement. Id.

This Court has subject matter jurisdiction over the civil rights claims arising under 42 U.S.C. §§1983 and 1985(3), pursuant to 28 U.S.C. §§1331 and 1343. For a claim under 42 U.S.C. §1983, the plaintiff must prove that the defendant deprived them of a right secured by the Constitution and laws of the United States, and that the defendant acted

4

under color of state law. *Sparkman v. McFarlin*, 601 F2d 261 at *263 (7th Cir. 1979). The complaint alleges that the defendants acted "under color of state law" through their dealings and support from the Lake County Housing Authority.

For claims alleging conspiracy under 42 U.S.C. §1985(3), private persons can be held liable if they are willful participants in joint activity with the State or its agents. Id., at 263. The Seventh Circuit requires allegations that the private party "reached an understanding" through a meeting of the minds with the state official. Id. 264. Here, the complaint alleges that Defendants conspired amongst themselves for the purpose of depriving Plaintiff of equal protection or equal privileges under law, and acted in furtherance of this conspiracy by coordinating to deprive Plaintiff of her business and property interests.

**Tiffany A. Vole's Current Legal Status:**
**<u>Fiduciary Removal and Pending Interlocutory Appeal</u>**

13. Plaintiff, Tiffany A. Vole was removed by order of the Nineteenth Judicial Circuit Court, Lake County, Illinois, entered on April 24, 2026, in case 23CH232 from her positions as Trustee of the Trust, Executor of the Estate, and President, Secretary, and Director of VIP Holding Company. The state court order further enjoined Plaintiff from receiving any assets or funds therefrom. While this removal order is currently pending appeal, Plaintiff asserts claims in this federal action solely in her individual capacity.

*Testamentary History*

14. Peter Vole, Jr., died on December 25, 2023, at the age of 83.

15. Peter Vole Jr., left behind one other child sharing the same maternal parent as

5

Tiffany, who he named as a co-beneficiary, Defendant Anthonio Vole (or "Tony"). Peter Vole, Jr., also fathered three other children, Peter Vole III (or "Peter III") , Robert B. Vole (or "Robert") and Defendant Dolores Ann Marie Vole (or "Dolly") who he intentionally disinherited and knowingly omitted from receiving anything under both his Will and Trust along with all their lineal descendants, expressly stating that these individuals receive no benefit of any type upon his death.

16. Prior to Peter Vole, Jr.'s execution of the 2021 Trust and the operative 2022 Second Amendment and Restatement—and before he disinherited Dolly—Dolly was, without his knowledge, improperly listed as sole trustee. That designation enabled her to hold herself out as trustee, conduct business on behalf of the Trust and VIP properties, and become an authorized agent on the Estate's financial and investment accounts.

17. The original revocable trust executed on October 30, 2017, the same month Peter Vole Jr. suffered a severe heart attack was written by attorney Joseph Moscov. Prior to executing the October 30, 2017, trust Dolores Ann Marie Vole had a history with attorney Moscov as his office regularly notarized multiple deeds concerning properties.

18. On May 3, 2018, a first amendment to the trust was executed, again, by attorney Joseph Moscov. Again, on May 11, 2018, a second amendment to the Trust was executed and contained language granting Dolly power of attorney without Peter Vole Jr's. approval concerning the management and sale of Trust properties.

19. Upon learning of the unauthorized power of attorney, in October of 2019, Peter Vole, Jr., went to attorney Moscov's office and directed attorney Moscov to remove Dolores Ann Marie Vole's Power of Attorney from the May 11, 2018, second amendment

to the Trust. Despite the request to remove Dolores's Power of Attorney from the Trust, Dolores refused to agree to be removed.

20. Upon learning of Peter Vole, Jr's. directive to remove her Power of Attorney Dolores prohibited Peter Vole Jr. from leaving her home or seeing Tiffany.

21. The Covid pandemic also restricted Peter Vole, Jr.'s ability to leave Dolores's home. Finally, on March 2, 2021, Peter Vole, Jr., executed the First Amendment and Restatement of the Trust. This First Amendment and Restatement drafted by attorney James Seibert removed revoked her Power of Attorney over Peter Vole Jr., and named Tiffany and Peter Vole, Jr., as co-trustees with 50/50 decision making power and named Robert Vole as successor Trustee.

22. In April 2022, a Second Amendment and Restatement (the "operative trust") was drafted by attorney James Seibert. The operative trust expressly disinherited Robert Vole, Dolores Ann Marie Vole, and Peter Vole III and all their decedents. It also changed the successor Trustee from Robert Vole to Anthonio P. Vole.

23. On April 6, 2022, attorney Seibert also drafted Peter Vole, Jr.'s Will, naming Tiffany A. Vole as Executor and naming Tiffany A. Vole and Anthonio P. Vole as the only two beneficiaries.

24. Prior to executing both the operative Trust and Will on April 6, 2022, attorney Seibert required Peter Vole, Jr., to undergo an extensive Independent Medical Exam. The IME was conducted at Bonnie White and Associates in April of 2022.

25. The operative Trust names Tiffany A. Vole as a Co-Trustee with Peter Vole, Jr., specifically providing:

7

"The initial Co-Trustees hereunder shall be myself, PETER VOLE JR, and my daughter TIFFANY A. VOLE. Upon my death, disability, resignation, or refusal to act as Co-Trustee, the then-acting Co-Trustee shall be the sole Trustee as if he or she had been sole Trustee from the beginning. It is my intent that while I am acting as Trustee, there shall always be a Co-Trustee acting with me".

26. In October of 2022, Peter Vole, Jr., resigned as Co-Trustee making Tiffany Sole Trustee of the operative Trust and President, Secretary, and Director of VIP.

**The Vole-McBride Coordinated Litigation Enterprise**
**(Dolores, Robert, Peter III, Anthonio Vole & Jacob McBride)**

27. On May 21, 2021, after discovering that Peter Vole Jr., removed her unauthorized Power of Attorney Dolores Ann Marie Vole filed an emergency petition for temporary guardianship over Peter Vole, Jr. in the Nineteenth Judicial Circuit Court, Lake County, Illinois case number 21P490. The emergency petition was drafted and filed by an attorney at the law office of Hood Law, P.C. located in Gurnee, Illinois. The Hood Law office is operated by the Mayor of Gurnee, Illinois, attorney Thomas Hood. Thomas Hood is also currently Lake County's Public Administrator and Public Guardian, serving the elderly, disabled and disadvantaged in Lake County and work with the Lake County Housing Authority to provide access to Section 8/Housing Voucher assistance. Defendant McBride testified at the January 27, 2026, preliminary-injunction hearing discussed *infra* that attorney Hood is corporate counsel for Riverside and his son is employed by and business parter with Defendant Jacob McBride at Riverside. Thomas Hood' son and Defendant McBride are also registered agents of McHood Holdings, LLC formed on October 24, 2024.

28. On June 2, 2021, the court granted Dolores's *ex parte* emergency guardianship petition.

29. Leading up to the plenary guardianship proceedings in 21P490 the probate court appointed attorney Sarah Kahn Wool guardian *ad litum*. The GAL again required Peter Vole, Jr., to undergo

8

two additional independent medical examinations.

30. On December 6, 2021, the GAL in case 21P490 issued a report denying Dolores Ann Marie Vole's petition for plenary guardianship over Peter Vole, Jr., and the Estate of Peter Vole, Jr. Details of these plenary guardianship proceedings in 21P490 are discussed in greater detail *infra*.

31. On August 22, 2023, Peter Vole Jr., and VIP filed a breach of contract complaint in the Nineteenth Judicial Circuit Court, Lake County, Illinois case number 23LA567 against Rober Vole seeking damages after Robert's failure to pay back a note from a November 17, 2020, $535,000 loan received from his father. The note matured on December 31, 2021,

32. After the first unsuccessful attempt to gain guardianship over Peter Vole, Jr. described *supra*, Dolores Ann Marie Vole retained the law firm of Lesser, Lutrey, Pasquesi & Howe LLP in Lake Forest, Illinois. On December 14, 2023, a second petition seeking guardianship over Peter Vole, Jr., entitled Combined Petition for Temporary Guardianship, Plenary Guardianship, and to Revoke Agencies was filed by attorney Jefferey O'Kelley. This case, number 23GR488, was later withdrawn following Peter Vole Jr.'s death on December 25, 2023.

33. Also on December 14, 2023, Dolores Ann Marie Vole, by and through her attorney David M. Lutrey, of Lesser Lutrey Pasquesi & Howe, LLP filed a complaint in the chancery division of the Nineteenth Judicial Circuit Court, Lake County, Illinois case number 23CH232 naming as defendants Tiffany A. Vole and Anthonio P. Vole alleging claims of financial exploitation.

34. On January 2, 2024, attorneys Ray J. Koenig III, MacKenzie A. Hyde, and Timothy Herman from the Chicago law firm of Clark Hill, PLC filed their appearance on behalf of Tiffany A. Vole in case 23CH232.

35. On January 17, 2024, Tiffany A. Vole filed her Notice to Heirs and Legatees in the probate division of the Nineteenth Judicial Circuit Court, Lake County, Illinois case number 24PR26 that

was subsequently consolidated with 23CH232.

36. On March 5, 2024, attorney Terrie Culver filed her appearance on behalf of Robert in case 23LA567, discussed *supra*.

37. On May 7, 2024, attorney Jefferey P. O'Kelley, identified *supra* filed an appearance for Plaintiff Peter Vole III in case 23CH232.

38. On May 15, 2024, Peter Vole III, was granted leave without objection to adopt the allegations of Dolores in case 23CH232 and to be added as an additional Plaintiff.

39. On June 18, 2024, attorney James Dahl filed his appearance on behalf of co-defendant Anthonio P. Vole in case 23CH232 and attorney Terrie Culver filed her appearance on behalf of co-plaintiff Robert Vole in case 23CH232.

40. On or about January 11, 2025, Defendant McBride advised Plaintiff that a property owned by VIP located at 20475 IL Rt. 173, Antioch, Illinois (or the "Antioch property") sustained severe water damage and needed to be repaired. As discussed *infra* in the insurance section of this Complaint, McBride then opened a claim through Country Financial with Defendant Edward Macek and 15 days later opened another claim with Country Financial on another property owned by the Estate located at 37 Kings Cross in Lincolnshire, Illinois (or the "Lincolnshire property").

41. As discussed in greater detail in the insurance claims section of this Complaint, on February 10, 2025, a claim check concerning the insurance claim on the Antioch, property in the amount of $127,163,54, was made payable to the order of Plaintiff. As discussed *infra*, Plaintiff never endorsed or received this check.

42. As discussed in greater detail in the Insurance Claims section of this Complaint, on February 13, 2025, a claim check concerning the Lincolnshire property in the amount of $72,032.56, was made payable to the order of Anthonio P. Vole. As discussed *infra*, Anthonio P.

Vole was not a named insured on either the Antioch or Lincolnshire property policies.

43. On April 10, 2025, co-defendant in 23CH232, Anthonio P. Vole, through his counsel James Dahl, filed a verified answer to the second amended complaint, <u>denying</u> in relevant part:

° That Tiffany misappropriated substantial sums of money from Peter Vole, Jr's., assets.

° That Peter Vole, Jr., agreed Dolly was the best person to manage VIP.

° That Peter Vole, Jr., entrusted Dolly with the management of VIP.

° That Peter Vole, Jr., expanded Dolly's role to include managing real estate business.

° That Tiffany moved more than $500,000 of Peter's business funds into a Fifth Third account.

° That Dolly was providing bank statements to Peter Vole, Jr., on a regular basis.

° That Tiffany made efforts to seize control over Peter's assets to use for her personal benefit.

° That Tiffany cleared out jewels, diamonds, and substantial sums of cash from the Grayslake Estate [Peter Vole Jr's. home] and other properties, along with other assets which effectively disappeared.

44. On July 18, 2025, another claim check on the Antioch property claim referred to *supra* in the amount of $66,637.91, was made payable to Defendant Anthonio P. Vole. Again, and as discussed *infra*, Anthonio P. Vole was not a named insured on either the Antioch or Lincolnshire property policies.

45. On September 3, 2025, Tiffany's lawyers at Clark-Hill filed a motion to withdraw instanter, that was granted by the court.

11

46. Thereafter, the northwest suburban law firm of Kelleher + Holland that had been engaged by Peter Vole Jr., and representing VIP concerning corporate matters since 2022, filed an appearance on behalf of Tiffany A. Vole in both her individual and fiduciary capacities and on behalf of VIP in all matters pending in Nineteenth Judicial Circuit Court, Lake County, Illinois.

47. Despite knowing of her disinheritance, Dolores filed an emergency motion for a restraining order on October 15, 2025, against Tiffany. Dolores attached a sworn affidavit to the motion averring in relevant part that:

- ° "I was advised by a representative of Charles Schwab that Tiffany has engaged in asset transfer requests with respect to a certain account titled to V.I.P. Holdings (of which the Estate and/or Trust is shareholder), which account I believe to be valued in the hundreds of thousands of dollars."

48. Dolore Ann Marie Vole later testified at the preliminary injunction hearing concerning Anthonio's motion for emergency temporary restraining order in case 23CH232 that she directed representatives at Schwab to rescind the transfer despite possessing no authority to act in any capacity to do so.

49. The attempted transfer was initiated by Plaintiff's financial advisor, Sarah Putz of LPL Financial, a registered investment advisor, located in Union Grove, Wisconsin.

50. Tiffany and Ms. Putz testified at the preliminary injunction hearing in case 23CH232 that the purpose of the transfer was to pay property taxes that had become delinquent while under the management of Defendant Riverside discussed in more detail *infra*.

51. Also on October 15, 2025, Robert Vole, Dolores Vole and Peter Vole III filed a

verified derivative complaint 25CH259 against Tiffany Vole, individually, in all her fiduciary capacities and as director and officer of VIP. The Lawsuit also named as defendants the Law Offices of James Siebert, P.C., attorney Siebert individually, Anthonio Vole, and 30 unknown defendants as well as VIP Holding Company.

52. The complaint details the history of Dolores Ann Marie's involvement with Peter Vole, Jr., and his business enterprises from the time Dolores actually possessed authority to act on behalf of Peter Vole and goes on to allege claims for unauthorized assumption of corporate powers, unauthorized redemption and redesignation of their voting rights, failing to have annual shareholder meetings with their participation, failure to provide distributions to plaintiffs, eliminating plaintiff's shares alleging the fabrication of VIP books and records by attorney Siebert, breach of fiduciary duties, fraud, constructive fraud, conversion, unjust enrichment, and legal malpractice.

53. On October 20, 2025, Dolly's request for an emergency injunction in case 23CH232 was denied, not because Dolly's Will contest in 24PR26 was pending and that she had been disinherited but instead, "on the basis that Movants' Motion for TRO and the Affidavit in support thereof do not sufficiently establish that irreparable harm will result in the absence of immediate injunctive relief". Despite denying the TRO, the court then scheduled a preliminary injunction hearing and allowed Dolores Ann Marie Vole discovery into records and accounts titled in whole or part to Peter Vole Jr., any trust of which Peter Vole Jr., was grantor, and/or V.I.P. Holding Co., and set a preliminary injunction hearing for December 8, 2025.

54. In support of her emergency motion for temporary restraining order Dolores

alleged that one of the grounds supporting her TRO request was that "Tiffany is delinquent with respect to the real estate taxes for more than 40 real properties titled to the Trust and/or VIP…..".

55. Also on October 20, 2025, another claims check on the Lincolnshire property described *supra* in the amount of $36,178.26, was issued to an unknown payee.

56. The next day, on October 21, 2025, Anthonio, a co-defendant with Tiffany in case 23CH232 filed for an emergency order of protection against Tiffany. Attached to the motion are sworn affidavits of both Anthonio and his attorney James Dahl.

57. After almost two years of denying by verification that Tiffany misappropriated funds or that Tiffany improperly moved funds, or improperly seized control over their father's assets for her personal benefit or that she absconded with their father's jewels, diamonds, cash, and other property, Anthonio's emergency motion for temporary restraining order alleges in relevant part that:

  ° Tiffany has misappropriated funds from the trust….

  ° Tiffany has retained for herself all of Peter's jewelry, all of the cash which Peter had in his safe which was in excess of $100,000.00….

  ° Tiffany has caused the Trust assets to lose money. (This allegation is based on information provided to Tony by the real estate management company retained by Tiffany).

58. Consequently, attorney Dahl acknowledges in his affidavit that Defendant Riverside was the management company of VIP and Trust properties. Further, although attorney Dahl acknowledges the execution of the operative Trust [disputed by Robert, Peter III, and Dolores] attorney Dahl goes on to aver that he was unsuccessful in his attempts at

14

receiving an inventory and accounting for the Trust from Tiffany's attorneys at the Clark-Hill law firm in early 2025 and that Clark-Hill only provided him with "some monthly reports from Riverside Property Management which managed the real estate for the Trust and V.I.P. Holdings Co. ("VIP")"; That on August 22, 2025, he sent Clark-Hill attorneys a formal request for access to the books and records maintained by Tiffany with respect to the Trust; that a few days later he received a call from attorney Tim Herman, a partner at Clark-Hill who assured him that he would receive the requested documents within a week or so; and that before Clark-Hill could produce the documents they withdrew from Tiffany's representation; That on August 22, 2025, he also sent a request to VIP corporate attorneys at Kelleher & Holland for access to VIP books and records and that he had not been afforded access to the corporate records.

59. At the time Anthonio filed his TRO he and attorney Dahl knew that a Delegation and Acceptance of Duties and Powers of Agent agreement was entered into between Tiffany and Defendant Jacob McBride discussed *infra* that was executed on January 24, 2025, appointing McBride as "Agent" of the *Trustee*, with respect to the following powers:

       (a) Real estate transactions.
       (b) Financial institution transactions.
       (c) Stock and bond transactions.
       (d) Tangible personal property transactions.
       (e) Safe deposit box transactions.
       (f) Insurance and annuity transactions.
       (g) Retirement plan transactions.
       (h) Social Security, employment and military service benefits.
       (i) Tax matters.

(j) Claims and litigation.

(k) Commodity and option transactions.

(l) Business operations.

(m)    Borrowing transactions

(n) Estate transactions.

(o) All other property powers and transactions.

60. In fact, prior to seeking his TRO and after attorney Dahl filed his appearance on behalf of Anthonio in 23CH232, Anthonio was an active participant in ongoing communications with Defendant Riverside Management and Leasing Corporation's president Defendant Jacob McBride, attorneys at Clark-Hill, and Tiffany concerning the preparation of a Summary Accounting for Anthonio. For instance:

61. On February 25, 2025, Defendant Jacob McBride emailed Clark-Hill attorney Adam Ansari the following:

> "Adam, Discussed with Ray and Tim yesterday the existence of two bank accounts dedicated to the Vole's portfolios. Both accounts are in the name of Riverside but dedicated to their portfolios. There is a business checking account used for operational in and outs and the account we issue owner draws from. Then there is a MM Account that's purpose was to be used as a cap ex reserve account, and there has never been any deposits or money held in that account since inception. Ray and Tim thought a quick run down on these accounts and how they could factor in would be beneficial. **Obviously I have full accounting for both portfolios for any income or expense under our per view and we run recs on both accounts monthly.**"[1]

62. On May 14, 2025, attorney Adam Ansari with Clark-Hill emailed Defendant McBride and Tiffany the following:

> "I am following up on the discussion concerning the preparation of the Summary Accounting for Anthonio. Attached are my notes based upon the materials I have reviewed thus far.

---

[1] Not bold in original.

16

To prepare, I am asking that you provide:

· 2024 Y/E Account Statements (or 2024 monthly statements for all bank and investment accounts listed.

· Also, if I missed a liquid account (savings, checking, investment)- please tell me and provide statements.

· **I received the AEGIS statements from Anthonio and RBC 1099**. See attached. I did not receive RBC annual/monthly statements.

· Please note that the attached includes accounts that likely have been closed for many months and/or no activity. I included b/c we will still need to follow the transfer of money.

· E.g. – On the attached- I note that on 4/5/24 all of the investments in the AEGIS account were transferred out. The April 2024 AEGIS statement indicates those securities were deposited into a US Bank account. If accurate, I would need to show a transfer out from AEGIS and transfer into such U.S. Bank account.

We will also account for the non-liquid assets (real estate holdings), but no need to include value for those. I will simply include a list of holdings (as of 5/1/25) and include "FMV".

**If you believe Anthonio has any information relevant to this Accounting (in addition to AEGIS), please let me know and I can follow-up with him on same**…."

63. Despite being an active participant with Tiffany's attorneys at Clark-Hill and with Jacob McBride concerning accounting, discussed *supra* Anthonio feigns ignorance in his verified affidavit attached to his October 21, 2025, TRO as to Jacob McBride's involvement with the operative Trust accounting or McBride's status as Agent to the Trustee. In fact, Anthonio states in relevant part that:

· "On July 26, 2025, I had a telephone conversation with Tiffany. Tiffany identified herself at the outset of the telephone conversation. During the that conversation, Tiffany stated that she had hired Jake McBride ("Jake"), who is associated with Riverside Property Management, as a "Trust Agent". I asked Tiffany what Jake did in his capacity as a Trust Agent. She responded that he did things in relation to the trust…."

· Tiffany has advised me that she had no intention of ever providing me with an accounting for the Trust's assets and liabilities. During our July 29, 2025 telephone conversation, I repeated prior requests which I had made to Tiffany for an accounting. Tiffany responded that she was never going to provide me with an

accounting because she was too busy.

· Jake, Tiffany's Agent, has consistently responded that he was not able to provide such documents or books and records to me because Tiffany had forbidden him to do so. These conversations with Jake were telephone conversations and in-person conversations and occurred no less frequently than monthly from September 2024 through September 2025…."

64. On October 27, 2025, the state court in 23CH232 entered an order providing that, "[t]he Court declines to consider the Motion because Tony has not filed a pleading seeking relief against Tiffany Vole ("Tiffany")."

65. Later that day Anthonio P. Vole, through his attorney James Dahl filed a document entitled, Counterclaim in Equity Seeking, Among Other Things, the Removal of the Trustee.

66. The next day, On October 28, 2025, Dolores Ann Marie Vole and Peter Vole III, despite contesting the validity of the Trust and naming Anthonio P. Vole as a defendant in cases 23CH232 and 25CH259 identified *supra* filed a Motion to Join Anthonio Vole's Motion for Temporary Restraining Order.

67. On October 31, 2025, the court entered an order granting Anthonio's motion for temporary restraining order and granting leave for Peter Vole III and Dolores Ann Marie Vole to adopt Anthonio's TRO. The October 31, 2025, order makes no mention of Robert Vole.

68. On November 5, 2025, the court entered a more comprehensive order again allowing Dolores and Peter III to adopt Anthonio's TRO and again making no mention of Robert Vole.

69. The November 5, 2025, order also provided that, "Riverside Management

18

Company ("Riverside"), the current real estate manager, shall continue to manage the real estate for the Trust and for VIP, in this regard, Riverside shall not incur or pay any expenses which are outside the ordinary course of business without the written agreement of the parties or this Court's further order."

70. On January 26 – 30, 2026, a preliminary injunction hearing was conducted in 23CH232 and on April 26, 2026, the state court entered a preliminary injunction order against Tiffany A. Vole. The order [under appeal] also removed Tiffany A. Vole from each of her fiduciary and corporate capacities and ordered that Defendant Riverside continue to manage Trust and VIP properties. The order also requires, among other things, that Plaintiff and her young daughter to vacate their home. Exhibit 1.

***Dolores Ann Marie Vole***

71. In the spring of 2021, prior to being granted her *ex parte* emergency order of guardianship over Peter Vole, Jr., discussed *supra* it was discovered that Real estate belonging to the Trust and VIP were found to be improperly titled to Dolores Ann Marie Vole while Peter Vole Jr. believed he was the sole owner of the properties.

72. Prior to the March 2, 2021, First Amendment and Restatement of the Trust described *supra* being executed Dolores managed the Estate properties and handled all the real estate transactions, and took the commissions for managing, buying, and selling the properties.

73. On November 24, 2021, Dolores was removed from her capacity as officer of V.I.P. Holding Company, and that she no longer had authority to act on behalf of that corporation, or in regard to any other matter concerning Peter Vole, Jr. business. The termination notice

was sent by Peter Vole, Jr.'s attorney's at the Elder Law & Estate Planning Attorneys of Illinois, P.C., to Dolores Ann Marie Vole's attorney Thomas Hood on November 24, 2021. Exhibit 2.

74. During the pendency of 21P490 Peter Vole Jr's., lawyer sent the court appointed GAL attorney Sarah Kahn Wool a letter dated September 27, 2021, advising that his office had made numerous reasonable requests for Dolores to produce Peter Vole Jr.'s personal and corporate documents and records, but that she had refused to do so. The letter further provided if Dolores wanted Peter Vole Jr. to consider any of the demands contained in the GAL's letter to Peter Vole Jr., that Dolores must provide Peter Vole Jr. with the following:

- The corporate minute book, stock certificates and other records for VIP Holding, Inc. which is owned 100% by Peter Vole, Jr.

- Copies of tenant, rent roles, security deposits and the leases on Peter and VIP Holding, Inc. properties.

- An accounting with the supporting documentation from Dolly for her handling of Peter's personal and Trust finances as well as VIP Holding Inc.

- Peter and VIP Holding Inc. financial and tax documents for the year 2020 which are in her possession despite repeated requests from Peter, and as a result thereof Peter's and VIP Holding, Inc's 2020 tax returns have not been filed.

- Peter's Genworth Long Term Care Insurance policy, along with copies of any correspondence to Genworth making claims on said policy with the supporting evidence for each said claim.

- Peter's life insurance policy.

75. Also on September 27, 2021, Peter Vole Jr's. attorney, James Seibert sent a certified letter to Dolores Ann Marie Vole's attorney Thomas Hood advising him Dolores

20

had purportedly been acting on behalf of Peter Vole Jr., by representing herself as his agent under a durable power of attorney after the power of attorney had been revoked. The letter also describes how it became known to Peter Vole Jr., that Dolores was improperly making auto-deposits in her mother's name into an account with Dolores's and her mother's name on it. The money deposited into this account came from an insurance policy intended for the long-term care of Peter Vole, Jr., and not Dolores or her mother. Exhibit 3.

76. Again, on November 29, 2021, Peter Vole, Jr's. lawyer sent a certified letter to Dolores Ann Marie Vole's lawyer, attorney Thomas Hood advising attorney Hood that Dolores was in possession of Peter Vole, Jr's. personal and business records, and requesting that Dolores immediately arrange for the return of all such records. The letter demanded that Dolores turn over all documents or other property of Peter Vole Jr., his corporation and Trust, including but not limited to the following known to be in her possession:

· Each and every separate file which my Client maintained in regard to each property which he owned, whether said property was owned by himself individually, in his revocable trust, his corporation VIP Holding Company, his LLC or in a land trust, including the files on properties currently owned as well as all properties which have been sold or otherwise transferred.
· Properties currently owned as well as properties which have been sold or otherwise transferred.
· The file for each bank account, brokerage account or other account held at any financial institution, whether said account was owned by Peter Vole Jr., individually, in his revocable trust, his corporation VIP Holding Company, in his LLC or in any other entity.
· All files and records concerning the 2020 taxes for Peter Vole, Jr. individually, in his revocable trust, his corporation VIP Holding Company, his LLC or in any other entity.
· All files and records concerning Thomas Cox, the individual Peter Vole Jr. is said individual's conservator.
· All files and records concerning the mortgages where Peter Vole, Jr. is the

21

lender, including but not limited to: mortgage for loan to Gary Medula in McHenry and mortgage for loan to Marcia Glasgow.

· All files and records concerning the personal loans given by Peter Vole, Jr. including but not limited to loans to: loan for Steve Vole, a loan for Robert Vole, and a loan for Fred Slayton.

· All files and records concerning expenditures made in regard to each property.

· All files and records concerning VIP Holding Company, including the corporate minute books and stock.

· All files and records concerning Peter Vole, LLC, including any agreement and records of the limited liability company's business and finances.

· All files and records concerning every land trust at Wayne Hummer, Chicago, Trust Company or other, past and present, including information in regard to the properties bought, sold, transferred or owned by each said land trust.

· All files and records concerning any loan or other indebtedness of Peter Vole, Jr., his Trust, VIP Holding Company, Peter Vole, LLC, any land trust holding the property of any such entities, which resulted in a mortgage or other lien being placed upon the real property owned by any of them.

· All files and records concerning any agreement with he City of Waukegan in regard to the development or sale of any property owned by Peter Vole, Jr., his Trust, VIP Holding Company, Peter Vole, LLC, any land trust holding the property of any such entities.

· All files and records concerning Vole, Inc.

· All files and records concerning Peter Vole, Jr's. Genworth Long Term Policy including copies payments to caregivers with proof of Grenworth reimbursement.

· All files and records concerning Peter Vole, Jr's. Country Life Insurance Policy, including the policy, premium notices, designation of beneficiary, correspondence from said insurance company including any annual statement of face value, cash value, death value and named beneficiary(ies).

· All files and records concerning Peter Vole, Jr's. State Farm Life Insurance Company Policy, including the policy, premium notices, designation of beneficiary, correspondence from said insurance company including any annual statement of face value, cash value, death value and named beneficiary(ies).

· All files and records of any agreement with the Lake County Housing Authority.

· All files and records received from attorney Joseph Moscov's office regarding any personal or business matter of Peter Vole, Jr., his Trust, VIP Holding Company, Peter Vole, LLC, and any land trust holding the property of any such entities.

· Immediate transfer of the VIP Holding Company telephone number (847)

22

338-1260 and email address vipholdingpv@gmail.com back to my client.

· Any and all other records, documents, assets, or evidence thereof concerning Peter Vole, Jr., his Trust, VIP Holding Company, Peter Vole, LLC, any land trust holding the property of any such entities.

_____

77. Ms. Putz testified at the preliminary injunction hearing that Tiffany Vole was the only authorized person on the Schwab account in October of 2025. Ms. Putz then testified:

Q: And did you attempt to move assets of Charles Schwab somewhere else?

A: Yes. The account number was known, the registration was known and matched the account that we had opened. The statement was provided in full. As I said, her credentials, her background, the Trust was certified. As far as the certification, she was the one who had access to it. And anything that we needed in order to certify that she had the ability to transfer those assets was done.

Q: And was that done?

A: It was an ACAT that was attempted, yes, from Charles Schwab to LPL Financial.

Q: And was that successful?

A: No, it was not.

Q: Can you give us the reasons why that was not successful?

A: The initial ACAT rejection listed it as account control person rescinded the ACAT.

Q: Who else other than Tiffany Vole could have rescinded the ACAT?

A: Nobody on my side of the transaction.

Q: What, if anything, did you do when that ACAT transaction was rejected?

23

A:     We have a department, a compliance department and a transfers department, and they advised me to instruct the client to contact Charles Schwab and ask them who did they authorize, since it wasn't her.

Q:     Did you receive an answer?

A:     I noted in my compliance note that I instructed the client to make an in-person visit to Charles Schwab so that her identity could be verified, the same as anything she had done with me. I advised her to take all her appropriate documentation and paperwork that was utilized to set up the account by us and make sure and ascertain with them if they had the correct credentials, accommodations, control persons, authorizations on that account, and she had gone in.

_____

78. As discussed *supra* in the History of Probate and Chancery Litigation section of this complaint Dolores Ann Marie Vole admitted to rescinding a Transfer from a Charles Schwab account holding Trust assets. Specifically, Dolores testified at the preliminary injunction hearing that,  "in the beginning of October 2025", "I received a call from David Joseph, who is a representative that helps me with my accounts" concerning the Trust and VIP Holding accounts and that "[h]e explained that there was a transfer being made that needed to know approved, and I had not gotten in touch with them to approve it, and I said I did not approve any transaction".

79. Dolores unauthorized conduct prevented Tiffany from using those assets to pay Estate taxes and the failure to pay the Estate taxes was then used by Dolores, Robert, Peter

III, and Anthonio to support their preliminary injunction and removal of Tiffany from her fiduciary roles and as President of VIP and allow McBride and Riverside to remain as the management company over VIP and Trust properties.

***Discovery Concerning the Preliminary Injunction Hearing***

80. On December 5, 2025, after Anthonio's TRO was granted on October 31, 2025, his counsel [attorney Dahl] caused a subpoena to be served upon Riverside Management requiring voluminous document production that encompassed the documents requested in the September 27, 2021, document request to the GAL [Sarah Kahn Wool] from Peter Vole, Jr.'s attorney James Seibert and Seibert's September 27, 2021, document request to Dolores Ann Marie Vole's attorney Thomas Hood [also the corporate attorney for Riverside whose son is partnered with McBride in McHood] described *supra*.

81. Attorney Dahl's subpoena also requested,

· All communications between Riverside and any accountant who represented or purported to represent Tiffany in any capacity which concerned the Trust and/or VIP.

· All communications between Riverside and any accountant who represented or purported to represent the Trust.

· All communications between Riverside and any accountant who represented or purported to represent VIP.

· All communications between Riverside and any attorney who represented or purported to represent Tiffany in any capacity which concerned the Trust and/or VIP.

· All communications between Riverside and any attorney who represented or purported to represent the Trust.

· All communications between Riverside and any attorney who represented or purported to represent VIP.

25

82. After requesting that attorney Dahl send Riverside's response to the subpoena described in the foregoing paragraph an unsigned and undated response was received.

83. Riverside's response to the subpoena contained numerous legal objections similar to those found in formal discovery responses.

84. Despite the numerous objections Anthonio never filed any motion compelling compliance with the subpoena.

85. Instead, Anthonio through his counsel filed motions to compel Tiffany to produce the requested information, knowing that Riverside possessed it.

86. After the October 31, 2025, TRO discussed *supra* was entered, Tiffany's attorneys at Kelleher + Holland filed motion to withdrew from all matters pending in the Nineteenth Judicial Circuit, Lake County, Illinois. The motions to withdraw were granted on December 10, 2025. The order provided that the preliminary injunction hearing scheduled for January 26-30, 2026, in case 23CH232 shall stand.

87. Despite issuing his subpoena to Riverside discussed *supra*, Anthonio, through his counsel continued to demand documents from Tiffany knowing Riverside, as management company of VIP possessed relevant financial records filed a motion to compel against Tiffany that was granted.

88. During the preliminary injunction hearing responsive discovery documents that Tiffany was able to secure were objected to by Plaintiffs' counsel.

89. During the preliminary injunction hearing McBride was asked whether he received a demand from Tiffany's former attorneys to turn over all the books [concerning VIP and

the Trust] McBride responded,

Q:    Okay. Have you ever done that? Have you turned over your books?

A:    To who? Anybody, ever?

Q.    To VIP or the Trust?

A.    No, because it was immediately after that that we asked by the Judge to stay on.

Q:    The TRO was entered, in the end of October of 2025; correct?

A:    I believe so.

Q:    And you received the Kelleher + Holland notice in September of 2025?

A:    I believe it was toward the end of September of 2025.

Q:    So prior to the TRO?

A:    Correct.

Q:    So between the time you received the notice from Kelleher + Holland in September to the time the order of protection was entered on October 25, 2025 (*sic* October 31, 2025), did you produce any books to VIP or the Trust?

A:    No

A:    When we received the notice from Kelleher + Holland, we attempted to communicate with Mike Lee, which doesn't always go very responded to. And unfortunately, that matter never went anywhere until the TRO was in place.

_____

90. In reality, after receiving formal notice of termination Riverside responded by

27

*rejecting* the termination notice through Riverside's corporate counsel and McBride's

business partner, attorney/Mayor Thomas Hood in a letter dated September 28, 2025. The

letter reads as follows:

> "I represent Riverside Management Leasing Corporation with reference to the above captioned business relationship. I am in receipt of your correspondence dated September 19, 2025.
>
> By my reading of your correspondence you allege the following:
>
> 1. Poor performance under the Agreement;
> 2. Act in its own interest in dereliction of its obligations;
> 3. Insurance fraud;
> 4. Nefarious and criminal conduct;
> 5. Failure to abide by the terms of the Agreement.
>
> First, the allegations of insurance fraud, nefarious and criminal conduct are false and defamatory. Additionally, these defamatory statements have been published to a third party. Please accept this as a demand to immediately retract these statements and issue an apology which then needs to be published to each party that you made this statement. It should go without saying that the remaining statements are false as well.
>
> Next, the attempted unilateral termination of the Agreement between the parties by your client is rejected. Absolutely no facts exist to support your allegations that would allow your client to terminate the parties Agreement.
>
> Finally, in prior correspondence to my client you required that they seek your preapproval of actions that they would take on your client's behalf. My client is in the spirit of working this out made numerous requests regarding work that needed to be completed of you in writing and you did not respond.
>
> My client has no interest in pursuing legal action against you or your client however they will if you and your client persist.
>
> 1. That the Agreement terminate effective December 1, 2025 as originally contemplated between the parties.
> 2. That a separate agreement be entered into between that parties that would detail how winding up affairs would occur including the following:
>    A. The drafting of a schedule detailing an orderly turning over of properties to either your client or a new property management company. That an inspection

28

of each Property would occur at each turn-over upon which each party would sign a release concerning that individual property until each property has been covered.

B. A monthly accounting between now and December 1, 2025 be provided to you and your client.

C. A Final Accounting will be provided by December 31, 2025 to you and your client.

D. The execution of a hold harmless by both parties.

The intent would be an amicable resolution.
Respectfully
Thomas B. Hood

91. Riverside did not provide a final accounting on December 31, 2025. Instead, Defendants Anthonio P. Vole, Dolores Ann Marie Vole, Robert Vole and Peter Vole III argued at the preliminary injunction hearing that Tiffany A. Vole's failure to produce complete accountings amounted to just cause to remove her from her fiduciary positions and as president of VIP.

***The Riverside Management Agreements and Other Matters Concerning Jacob McBride***

92. On December 7, 2023, Tiffany A. Vole. as co-Trustee with Peter Vole Jr enter into a Property Management, Leasing and Asset Management Agreement with Riverside Management and Leasing Corporation. The agreement was signed by the then Riverside President, Chris Shaw.

93. On December 13, 2023, Tiffany A. Vole. as co-Trustee with Peter Vole Jr . made a loan $120,000.00 to Defendant Jacob McBride.

94. At some point thereafter, McBride secured required licensing and used the $120,000.00 to purchase Riverside from Chris Shaw.

95. Defendant Riverside and McBride work closely with Lake County Housing

29

Authority, Illinois to locate homes for housing voucher recipients [similar to Section 8 housing used by Cook County].

96. On December 7, 2023, Tiffany in her capacity as sole Trustee to the Trust and President of VIP entered a Property Management, Leasing and Asset Management Agreement with Defendant Riverside through its president Defendant Jacob McBride. Exhibit 4.

The agreement provides in relevant part:

· Agent shall establish and maintain a bank account (the "Account") for funds relating to the Properties. All monies deposited from time to time in the Account shall be deemed to be trust funds and shall be and remain the property of Owner and shall be withdrawn and disbursed by Agent for the account of Owner only as expressly permitted by this Agreement for the purposes of performing the obligations of Agent hereunder. No monies collected by Agent on Owner's behalf shall be commingled with funds of Agent. The Account shall be maintained, and monies shall be deposited therein and withdrawn therefrom, in accordance with the following:

· If requested, it is understood that the payment of real property taxes and assessment and insurance premiums will be paid out of the Account (as hereinafter defined) by Agent.

97. Shortly after Peter Vole, Jr.'s death Tiffany and McBride entered another agreement whereby Tiffany as Trustee of the Trust delegated duties and powers to McBride as Agent to the Trustee [Tiffany]. The agreement entitled Delegation and Acceptance of Duties and Powers of Agent discussed *supra* was executed on January 26, 2024.

The agreement provides:

° "Pursuant to ARTICLE VI, paragraph A(8), of The Living Trust Agreement of Peter Vole, Jr. u/a/d 10/30/20, as amended and/or restated (the "Trust") and Section 807 of the Illinois Trust Code ("ITC"), Tiffany A. Vole, as Trustee of the Trust (the "Trustee"), hereby appoints Jacob McBride, as the

30

Agent (the "Agent") of the Trustee, with respect to the following powers:

98. Possessing this Agreement Defendant McBride abused his authority to act as an Agent to Tiffany by:

- ° Not only gaining access to financial and investment accounts owned by the Trust and VIP but initiating various transactions without first seeking approval from Plaintiff.

- ° Secreting account numbers and other important security information on Trust and VIP accounts thereby preventing Plaintiff ability to gain access to those accounts.

- ° Preventing Plaintiff the ability to move funds out of and into financial institutions holding Trust and VIP financial and Investment accounts.

- ° Enabling himself to contract for and approve work allegedly performed on Trust and VIP properties without first seeking approval from Plaintiff.

- ° Opening insurance claims on Trust and VIP properties without first obtaining approval from Plaintiff.

- ° Coordinating with Anthonio P. Vole to open Insurance claims on Trust and VIP properties wherein Anthonio P. Vole was improperly listed as an insured and thereby allowing him to profit from the unapproved claims as discussed *infra*.

99. Defendant McBride recommended that an investment firm managing the Trust be transferred to 1492 Capital Management another investment firm who utilized U.S. Bank as its custodian. McBride then coordinated with 1492 and Tiffany and provided Tiffany with forms to electronically sign via DocuSign that were executed on April 1, 2024.

100. Around the time the September 19, 2025, termination letter to McBride at Riverside, Tiffany contacted financial advisor and fiduciary, Sarah Putz at LPL Financial, discussed *supra* who then intended to transfer funds from 1492 into LPL Financial.

101. Upon review of statements from 1492 that Tiffany provided Putz, Putz

31

noticed irregularities in that the statements appeared to be "generalized" and not something customary to her industry.

102.     Ms. Putz testified at the preliminary injunction hearing that, "[t]ypically there are disclosures on the bottom of a statement if it's held in an IRA arrangement with a larger entity, such as 1492 utilizes U.S. Bank for custodial services and Trustee services. Typically, on a statement of assets, it will disclose on the bottom that this is in conjunction with a relationship with U.S. Bank for Trustee and custodial services, and it is not found anywhere on there".

103.      Ms. Putz went on to testify that once she set up an account with all proper documentation at LPL financial, she attempted to transfer the assets out of 1492, and "that's were the irregularities became really known as far as that these didn't correspond to an actual account number".

104.     Ms. Putz went on to explain that, "when you look at what is known as a DTC code, which is Direct Transfer Code, related to financial institutions – how they talk to one another – that the DTC code for 1492 was in reference U.S. Bank, that U.S. Bank housed their assets. So as we entered that DTC code onto the transfer form, attempted to utilize these numbers that were on the 1492 statement, the initial form that we submitted, after everything was signed for, came back from LPL's transfer ACAT department as stating that that was not a U.S. Bank account number and to please provide them manually a statement. So scanned the statement in, and I informed Tiffany at that point in time these are not actual account numbers."

105.     Ms. Putz testifying further:

32

Q: Do you know who opened the account at 1492? Was it Tiffany?

A: The information is, again, something we inquired about because typically at account opening documentation, it will have an account number. You, Mrs. or MR. So and So or Mr. Control Person for said company, you have opened the account, welcome. Here is your account number. Here is your advisor. Here is your individual that you should call. Here is an 800 number, and here is the disclosure for U.S. Bank, as being your custodian should you have any problems. So I had Tiffany look up the originating paperwork so as we could, again, attempt to find the actual account numbers since the actual statements do that have them, and was met with, yet again, there was empty paperwork of which she signed to open the accounts.

Q: And when you say, "empty paperwork," does that mean blank sheets of paper with a signature?

A: There was blanks where the account number was, blank for the account registration, blank for any of the U.S. Bank forwarding, titling, control information, and it was her electronic signature signed on the form.

106. On April 1, 2024, Defendant advised Tiffany that she was required to sign originating documents to open the 1492 account and emailed her DocuSign documents believed to be required by 1492 to Tiffany's tav987@yahoo.com email account. Tiffany electronically signed the documents, and they were electronically received by McBride at

33

10:58 A.M. that same day.

107.      1492 Capital Management is located at 111 E. Wisconsin Ave., #1300, Milwaukee, Wisconsin.

108.      On December 19, 2024, the documents electronically sent to Tiffany from McBride for signature and sent electronically back to McBride after electronically signing on April 1, 2024, were electronically voided by McBride without Tiffany's knowledge or consent. Exhibit 5.

109.      McBride had no authority to void Tiffany from the 1492 account.

110.      Concerning the notice of termination sent to Riverside and discussed *supra* in the Discovery Concerning the Preliminary Injunction Hearing section of this complaint McBride testified as follow at the preliminary injunction hearing concerning a delegation agreement:

Q:     So you didn't want to leave after you were given notice of termination?

A:     That has nothing to do with it. I didn't want to see the portfolio fall apart.

Q:     Okay. But that's not your portfolio. That's Tiffany's portfolio.

A:     I understand that.

Q:     It's the Trust.  Are you an agent of the Trust?

A:     I am Agent of the Trust.

Q:     And why do you think that?

Court:      Wait, I'm sorry. Think what? Why does he think he's an Agent of the Trust?

Q:     Why do you think you're an Agent of the Trust?

A:     Because I was assigned an Agent of the Trust by the Trustee.

Q:     This document has been entered into evidence previously. It's Defendant's Exhibit 1, Tiffany 443 through Tiffany 444. Do you recognize that document?

A:     Yes, sir.

Q:     Okay. And what is your understanding of your statement that you're the Trust—you're an Agent of the Trust based on that document? Where does it say you're an Agent of the Trust? Can you read that part?

A: What do you mean?

Q: Read the part of the –

A: Hereby appoints Jacob McBride as the Agent of the Trust with respect to the following powers.

Q:     Can you point to where it says that?

A:     Jake McBride, as Agent.

Q:     So what is your educational background?

A:     I have a college degree.

Q:     Okay. So what is your degree in?

A:     Education.

Q:     It doesn't say you're the Agent of the Trust; is that correct?

A:     That's not how it was presented to me.

Q:     Is that what you just read?

A:     No.

Q:     Is that what you just read verbatim on the record?

35

A: No. I'm telling you if that's not how it was presented to me.

Q: And I'm asking you if that's what you just read off this sheet of paper.

A: No, it is not.

Q: You have a degree in English?

A: I do.

Q: You have been working in a sophisticated field for how long now since you graduated?

A: A long time.

Q: And you don't understand that this document made you Agent of the Trustee as opposed to Trust?

Mr. O'Kelley: Objection, argumentative.

The Court: Sustained.

Mr. Rosati: Do you think there's a difference between Trust and Trustee?

A: As it was explained to me by the legal Counsel that presented me those documents, I was an Agent of the Trust.

Q: Would you agree that there's a difference between being assigned as Agent to the Trust and being assigned as Agent to Tiffany?

A: Sure.

**The Insurance Claims Misappropriation Enterprise**
**(Macek, Gempp, McBride, Bavaro & Anthonio)**

**The Management Contract Between Plaintiff**
**and Riverside Management & Leasing Corporation**

111. Defendant Riverside Management & Leasing Corporation through its

36

president Defendant Jacob F. McBride and Peter Vole Jr. entered a two-year contract on December 1, 2021, wherein Riverside would assist with managing VIP and Trust properties. The contract renewed for an additional one year on December 1, 2023.

112.     As discussed *supra* in The Vole-McBride Coordinated Litigation Enterprise section of this complaint, on January 26, 2024, Plaintiff entered into a written agreement with McBride entitled Delegation and Acceptance of Duties and Powers of Agent (the "Agreement"). The Agreement appointed McBride as agent of the Trustee [*i.e.*, Tiffany] giving him various powers including insurance matters.

113.     The Agreement limited McBride's powers subject to Section 807 of the Illinois Trust Code and specifically excluded McBride from performing any act involving the exercise of judgment and discretion and required him to comply with the terms and purpose of the Trust. Exhibit 6.

114.     The Agreement also enabled McBride access to Plaintiff's computer and E-mail servers, which in turn enabled McBride access to most if not all of Tiffany's electronic communications including everything contained on her mobile devices and home and office security systems. Exhibit 7.

### *Country Financial Insurance Agent Edward Macek*

115.     During his lifetime Peter Vole Jr., opened numerous life, auto, homeowners, and personal liability insurance policies through Country Financial. Tiffany as well as her father developed what they believed to be a reliable and trustworthy insured/insurer relationship with Country Financial through its agent Macek.

116.     Things changed after the passing of Peter Vole Jr. on December 25, 2023.

Tiffany began noticing irregularities with policy documents. For instance, despite being the only individual holding authority/title to be listed as a named insured or additional insured on any policy held in VIP or the Trust insurance, documents prepared by Macek began listing Defendant Anthonio as a named insured on various policies. Policies also failed to identify or designate the entity corresponding to each property, whether it be VIP or the Trust. Twelve-month term Policy statements also provided annual coverage dates that contained lapses. For instance, one policy contains an annual policy term of February 24, 2024, through February 24, 2025, that was renewed for another year with coverage from February 27, 2025, through February 27, 2026, resulting in a three-day lapse in coverage.

### *The Antioch and Lincolnshire Claims*

117.	On or about January 11, 2025, Plaintiff was advised by McBride that a property owned by VIP located at 20475 IL Rt. 173, Antioch, Illinois (the "Antioch property") sustained severe water damage and needed to be repaired. McBride then opened a claim with Macek that was assigned to Country Financials' adjustor Lawrence Gempp.

118.	Tiffany advised McBride that because of the damage to the Antioch property [that she had yet to see] another property located at 37 Kings Cross in Lincolnshire, Illinois (the "Lincolnshire property") would need to be sold as the Lincolnshire property was the only "turnkey" property that was then ready to be placed on the market.

119.	Approximately 15 Days later McBride advised Tiffany that the Lincolnshire property had also sustained severe water damage. McBride then opened another claim with Country Financial. This claim was also assigned to Gempp.

120. Plaintiff never had an opportunity to inspect the subject properties prior to McBride submitting the insurance claims.

121. On or about January 26, 2025, Tiffany advised McBride not to hire a contractor to conduct repairs on either of the subject properties only that he was authorized to perform mitigation on the properties.

122. Notwithstanding Plaintiff's directive and before her approval as required by both the Trust and Agreement, McBride on behalf of VIP contracted with Defendant Bavaro at Mid American Restoration Services, Inc., who then began alleged and unsubstantiated repairs on the Antioch and Lincolnshire properties.

123. Plaintiff never approved Mid American Restoration to conduct repairs on the either the Antioch or Lincolnshire property and possessed no disclosure of the extent of the claim for damages McBride and Bavaro presented to Gempp.

124. Once Plaintiff was able to inspect the Antioch and Lincolnshire properties she immediately noticed that neither the water heaters nor furnaces operating in the Antioch or Lincolnshire property had sustained any damage and confirmed that a new water heater and furnace were installed in each property before McBride alleged severe flood damage.

125. On or about July 24, 2025, during an in-person meeting McBride advised Plaintiff she needed to endorse check number 6899661 drawn by Country Financial and approved by Macek and Gempp in the amount of $66,637.91, issued for the Antioch property. Plaintiff asked McBride why it was so much and requested itemization, a breakdown, documentation for work performed, receipts, certificates of insurance and all information concerning the claim from McBride. During the July 24, 2025, meeting

39

Plaintiff asked McBride whether there were any other payouts on any other claims. McBride responded, "no" and that he would e-mail Gempp and see what the holdup was.

126. At the time of the July 24, 2025, meeting McBride, Anthonio, Macek and Gempp knew that another check, number 6808360 (check "360") drawn by Country Financial and approved by Macek and Gempp in the amount of $127,163.54, was previously issued on February 10, 2025, and deposited by Bavaro on March 7, 2025.

127. All Defendants deliberately concealed from Plaintiff that the claims check described in the foregoing paragraph was issued on the Antioch property claim.

128. On July 28, 2025, still unaware that check 360 was issued on February 10, 2025, and deposited by Bavaro on March 7, 2025, Plaintiff called the Country Financial call center because Macek was not returning her calls. Plaintiff spent approximately 8 hours on the phone in effort to obtain claim details and documentation. Plaintiff was repeatedly transferred to different agents each time requesting to speak with someone with more authority than Gempp. Instead of being connected to a higher authority Plaintiff was connected Gempp who refused to discuss the Antioch or Lincolnshire property claims. Ultimately Plaintiff directly requested Gempp stop deflecting and that he provide responsive information concerning the Antioch and Lincolnshire property claims, including how the claims were entered and all itemizations. In response Gempp stated he would get back to Plaintiff that Wednesday and ended the call.

129. Despite ongoing attempts to speak with him, Plaintiff has not heard from Gempp since the July 28, 2025, phone call. Plaintiff continued to follow up with Country Financial and was unsuccessful.

130.     Between July 26 and 27, 2025, Plaintiff had a series of conversations with Anthonio where she learned Anthonio had been directly involved with the Antioch and Lincolnshire claims along with Bavaro at Mid American Restoration Services, Inc.

131.     When Plaintiff asked whether he reviewed itemizations for the claims Anthonio stated he had not and that Bavaro, McBride, Macek and Gempp were handling everything.

132.     Plaintiff's attempts to obtain itemizations of the work performed on the claims from  Country Financial continued to be unsuccessful and Gempp and Macek evaded communication with Plaintiff.

133.     During this time Plaintiff learned that she was also being denied access to Country Financials' electronic portal. On August 2, 2025, Plaintiff contacted Country Financial satellite office and was finally able to access the portal and see the claim payouts for the Antioch and Lincolnshire claims. Exhibit 8. The portal reveals the following payouts:

| Claim | Date | Amount | Paid To |
|-------|------|--------|---------|
| Antioch | 02/10/2025 | $127,163.54 | Tiffany Vole |
| Antioch | 07/18/2025 | $66,637.91 | Anthonio Vole |
| Lincolnshire | 02/13/2025 | $72,032.56 | Anthonio Vole |
| Lincolnshire | 10/20/2025 | $36,178.26 | No payee |

134.     Knowing the data on the portal to be fake as Plaintiff never received anything, that Anthonio should not have been listed as a payee on the checks, and that

41

Plaintiff never signed any $127,163.54, check on the Antioch claim, Plaintiff requested copies of all the claims checks paid on the Antioch and Lincolnshire property from Gempp who continued to ignore Plaintiff.

135. Plaintiff's efforts at obtaining copies of the checks from Macek resulted in Macek advising Plaintiff she would have to get them from Gempp.

136. Thereafter Plaintiff received mail from Macek through the U.S. Postal Service containing declaration documents for all properties owned by VIP and the Trust that falsely named Anthonio as the named insured, the address block on almost every declaration page also falsely provided the named insured as Anthonio Vole, Tiffany Vole, and VIP or the Trust. Exhibit 9. Prior to sending the subject mail Macek was aware that the address blocks contained on the declaration pages should have properly been titled to the corresponding entity, the Trust or VIP with the additional insured/named insured Tiffany Vole. Exhibit 10.

137. Macek with Anthonio and McBride's knowledge and consent manipulated Country Financials electronic portal by using an electronically generated signature of Plaintiff to make false and unauthorized changes to policies with the goal of blocking Plaintiff's access to the claims and prevent her from possessing the information she had been requesting. Exhibit 11.

138. The manipulation also stopped Plaintiff's attempts at transferring VIP and Trusts policies to any other Country Financial agent because the unauthorized changes resulted in her being designated as unauthorized to make policy changes.

139. As a result of Defendants' conduct described *supra* and *infra* Plaintiff was

42

unable to change insurers or even qualify for rental insurance because of all the insurance claims Defendants opened including the claims on the Antioch and Lincolnshire properties.

140. In effort to cover up Defendants' conspiracy, McBride abused the authority given to him in the Agreement by manipulating Plaintiff's business and personal email servers in coordination and cooperation with Anthonio, Gempp and Macek to ensure emails that were sent to Plaintiff by any Defendant concerning the claims would never actually be received by Plaintiff. Exhibit 12.

141. Plaintiff was ultimately able to retrieve copies of the paid check on the Antioch claim from another Country Financial employee. The employee would not provide any other documentation for either the Antioch or Lincolnshire claim and advised that Plaintiff would need to contact Gempp for further details.

142. Upon reviewing the Antioch checks, Plaintiff immediately noticed that her signature on check number 6808360 in the amount of $127,163.54 discussed *supra* was a forgery. Copies of the check also confirmed that Anthonio was indeed improperly named a payee. Exhibit 13.

143. Plaintiff alleges on information and belief that the forgery of her signature on check number 6808360, in the amount of $127,163.54, was perpetrated by one or more of the Defendants or someone acting for their benefit, as part of a coordinated scheme to defraud Plaintiff. This belief is based on the following facts: Plaintiff discovered her signature on the aforementioned check was a forgery upon reviewing a copy, noting that Anthonio Vole was improperly named as a payee. The check, payable to Tiffany Vole & Anthonio Vole & Mid American Restoration, was deposited by Defendant Brian Bavaro

43

into a Mid American Restoration account. All Defendants, including Anthonio Vole, Jacob F. McBride, Brian Bavaro, Edward Macek, and Lawrence Gempp, deliberately concealed the issuance and deposit of this check from Plaintiff. Defendant Macek, with the knowledge and consent of Anthonio and McBride, manipulated Country Financials electronic portal using an electronically generated signature of Plaintiff to make unauthorized changes to policies, thereby blocking Plaintiff's access to claims information. Furthermore, Defendant McBride, in coordination with Anthonio, Gempp, and Macek manipulated Plaintiff's business and personal email servers to prevent emails concerning claims from reaching Plaintiff. Defendants Gempp and Macek repeatedly rebuffed Plaintiff's attempts to obtain claim details and documentation. Anthonio confirmed his direct involvement with the claims alongside Bavaro, McBride, Macek, and Gempp. The precise identity of the individual who physically executed the forgery is peculiarly within the knowledge of the Defendants and those acting in concert with them.

144.    Plaintiff has never received copies of the Lincolnshire checks even after the original complaint in this matter filed on December 12, 2025, from anyone including any Defendant after ongoing requests discussed *supra* and *infra*.

145.    The Country financial portal fails to provide much information other than that one Linconshire property claim check was paid to Anthonio Vole on February 13, 2025, in the amount of $72,032.56, and another paid to an unidentified payee on October 20, 2025, in the amount of $36,178.26. *See* Exhibit 8.

146.    The Country Financial electronic portal directs users to contact their adjustor for further information. As discussed *supra*, Plaintiff has not heard back from Gempp.

**Open Ended Continuity Is Further Evidenced by**
**McBride and Anthonio's Actions Taken in the State Probate Litigation**

147. As discussed *supra*, in this complaint's The Vole-McBride Coordinate Litigation Enterprise section, Plaintiff and Anthonio are the only two beneficiaries to the estate of Peter Vole Jr., as his other surviving kin were intentionally disinherited.

148. Some surviving disinherited next of kin filed contests in the circuit court of Illinois' nineteenth judicial circuit (Lake County).

149. As discussed *supra*, Prior to October 21, 2025, and since the first will contest filed by Dolores Vole, in the chancery division on February 21, 2023, Anthonio was a codefendant with Tiffany in 23CH232.

150. On October 21, 2025, approximately one and a half years after being named a co-defendant with Plaintiff in 23CH232 and the day after the last known claims payment was issued on the Lincolnshire property claim to an unknown payee as reflected in the Country Financial portal [Exhibit 8] in the amount of $36,178.26, and after Plaintiff's numerous attempts at obtaining claims documents from all Defendants including Anthonio, Anthonio filed for "Temporary Restraining Order" against Tiffany.

151. Thereafter, on October 27, 2025, approximately one and a half years after being named a co-defendant with Plaintiff in the 23CH232 and seven days after the last known claims check was issued on the Lincolnshire property claim to an unknown payee as reflected in the Country Financial portal [Exhibit 8] in the amount of $36,178.26, and after numerous attempts at obtaining claims documents from all Defendants including Anthonio, Anthonio filed a "Counterclaim in Equity Seeking, Among Other Things, The Removal Of The Trustee"..

152.     The state court granted Anthonio a temporary restraining order on October 31, 2025.

153.     The official temporary restraining order was entered by the state court on November 5, 2025. Exhibit 14.

On November 11, 2025, after receiving formal notice that he and his company Riverside were being terminated from the property management contract with VIP as discussed in the Discovery Concerning the Preliminary Injunction Hearing section of this complaint, McBride sent out a mass e-mail to all the tenants of the Trust and VIP stating that, "[t]he court has ruled that **Tiffany Vole[2]** is **restrained and prohibited** from engaging in any activity involving the management or financial affairs of **V.I.P. Holding Company ("VIP")** and **The Trust of Peter Vole Jr. ("the Trust")**. Exhibit 15.

McBride also writes in his e-mail the following:

> **Key Court Directives**
>
> Effective **October 31, 2025**, as reaffirmed in the Court's detailed order of **November 5, 2025**, the following prohibitions are in full effect:
> 1.  **Tiffany Vole is not authorized to take or receive any funds or assets from the Trust or VIP Holdings.**
> 2.  **She may not enter into, modify, or negotiate any lease agreements, rental concessions, or property-related contracts.**
> 3.  **She is prohibited from visiting or being present on any property owned or managed by the Trust or VIP Holdings.**
> 4.  **She is barred from any communication with tenants regarding rent, maintenance, lease terms, or property management matters.**
> 5.  **Riverside Management** remains the **exclusive property manager** for all Trust and VIP properties and will continue to handle **rent payments, maintenance, and tenant communications** as it has for the past four years.
>
> **Tenant Responsibilities**
>
> All tenants are hereby **legally required** to comply with this court order This includes the following obligations:

---

[2] Bold in original.

46

· **Do not make rent payments** to Tiffany Vole directly or indirectly (including electronic transfers, cash, or checks).
· **Do not discuss** lease or property matters with her or any representative acting on her behalf.
· **Do not allow access** to any property under her direction or request.
**All payments, communications, and maintenance requests must be made through Riverside Management.**

Failure to adhere to this notice could result in tenants being culpable in violating a court order, which may expose them to legal liability as aiders or abettors of a violation of a judicial injunction under Illinois law (see, e.g., People v Wilcox, 237 Ill. 421 (1908); People ex rel. Peters v. Bowman, 247 Ill. App. 3d 199 (1993)).

Final Notice

This notice serves as formal communication of the **court's restraining order**. Continued compliance is required until further order of the court.
Your cooperation ensures the lawful and proper management of all properties under **VIP Holding** and **The Trust of Peter Vole Jr. (**Exhibit 15).

154. A direct comparison of the email and the TRO reveal the following misstatements and overstatements:

**Prohibition on Physical Presence at Properties**

155. McBride's email states: "Tiffany Vole" is prohibited from visiting or being present on any property owned or managed by the Trust or VIP Holdings".

156. The TRO does not contain any language restraining Plaintiff from physically visiting or being present at any property.

**Scope of Contractual Prohibitions**

157. McBride's email asserts: "She may not enter into, modify, or negotiate any lease agreements, rental concessions, or property-related contracts".

158. McBride's email is broader and more explicit and overstates the restriction by including modifications and negotiations of all property-related contracts without specifying that only actions that obligate the Trust or VIP are prohibited.

47

**Threats of Liability for Tenants**

159.     McBride's email warns tenants that failure to comply with legal liability as "aiders or abettors of a violation of a judicial injunction under Illinois law".

160.     The TRO contains no directive imposing obligations on tenants or threatening them with liability for communicating with Plaintiff.

161.     The TRO did not explicitly bar Plaintiff from all communications with tenants regarding rent, maintenance, or lease terms, nor does it state that tenants could be held legally liable as aiders or abettors for communicating with Plaintiff.

162.     McBride knowingly misrepresented the court order in his e-mail by asserting a blanket prohibition on communication with tenants threatening legal liability for non-compliance.

163.     McBride's e-mail instructed tenants not to discuss lease or property matters with her, and not to allow her access to property premises.

164.     McBride sent the e-mail to further Defendants' fraudulent scheme and contained material misstatements about the court order's scope.

165.     McBride's misstatements contained in his November 11, 2025, email were relied upon by tenants and other parties to Plaintiff's detriment in that tenants will not communicate with Plaintiff regarding rent, maintenance or lease matters out of fear caused by the threats contained in McBride's e-mail.

## COUNT I – FRAUDULENT INSURANCE CLAIMS
### FEDERAL CIVIL RICO
### (18 U.S.C. §1962 (c))

1.  Each paragraph of this Complaint is incorporated as if restated fully herein.

2.  This claim is brought pursuant to 18 U.S.C. §1964 (c), which provides civil remedy for any person injured in their business or property by reason of a violation of 18 U.S.C. §1962.

48

3. Defendants Anthonio Vole, Jacob F. McBride, Riverside Management & Leasing Corporation, Brian Bavaro, Mid American Restoration Services Inc., Lawrence Gempp, and Edward Macek ("Defendants") are "persons" within the meaning of 18 U.S.C. §1961 (3).

4. Defendants constituted an "enterprise" within the meaning of 18 U.S.C. §1961(4), as an association-in-fact of individuals and legal entities, including Riverside Management & Leasing Corporation and Mid American Restoration Services Inc., associated for the common purpose of defrauding Plaintiff through a coordinated scheme.

5. The enterprise engaged in, and its activities affected, interstate commerce through the use of interstate wires and the U.S. Postal Service.

6. Defendants conducted or participated, directly or indirectly, in the conduct of the enterprise's affairs through a "pattern of racketeering activity".

7. The pattern of racketeering activity consisted of multiple predicate acts of wire fraud in violation of 18 U.S.C. § 1961 (1)(B).

8. These predicate acts included, but were not limited to, the following:

   ° Defendants used interstate wires (electronic insurance portals and email communications) and the U.S. Postal Service to transmit fraudulent information and manipulate access to insurance claim data.

   ° On February 10, 2025, check number 6808360 for $127,163.54 was issued, and Defendant Brian Bavaro deposited it on March 7, 2025, with Plaintiff's forged signature and without Plaintiff's knowledge.

   ° Defendants coordinated to remove Plaintiff from her designation as Trustee and profit from a scheme to commit fraud by submitting, opening, and paying out approximately $300,000.00 in fraudulent insurance claims on properties owned by the Trust and VIP.

   ° Defendant Macek sent declaration documents falsely naming Anthonio as the named insured on properties owned by VIP and the Trust.

   ° McBride sent a mass email misrepresenting the scope of a court order to tenants, overstating restrictions and threatening legal liability for communicating with

49

Plaintiff.

° Defendants concealed the existence of claim payouts from Plaintiff and refused to provide itemizations or documentation despite repeated requests.

9. These predicate acts are related, having the same or similar purposes, results, participants, victims, and methods of commission, and amount to or pose a threat of continued criminal activity.

10. The predicate acts occurred over an extended period, involved multiple victims, and resulted in distinct injuries, establishing closed-ended continuity.

11. The complaint alleges a specific threat of repetition and that the predicate acts were a regular way of conducting the Defendants' business, establishing open-ended continuity.

12. Defendants acted with specific intent to defraud Plaintiff, and Plaintiff suffered detrimental reliance and injury to her business and property as a direct result of these violations.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in Plaintiff's favor and grant the following relief:

° Award compensatory damages in an amount to be determined at trial, trebled pursuant to 18 U.S.C. § 1964(c);

° Award Plaintiff's reasonable attorneys' fees and costs of suit;

° Enter appropriate injunctive relief enjoining Defendants from further racketeering activity, including interference with Plaintiff's management and control of trust assets and business operations;

° Enter declaratory judgment confirming Plaintiff's rights as Trustee and Executor and the invalidity of Defendants' actions to remove Plaintiff or alter trust/testamentary arrangements;

° Award prejudgment and post judgment interest permitted by law.

° Award such other and further relief to Plaintiff as this Court deems just and proper.

## COUNT II - FRAUDULENT INSURANCE CLAIMS
### FEDERAL CIVIL RICO
### (18 U.S.C. §1962(d))

50

13. Each paragraph of this Complaint is incorporated as if restated fully herein.

14. Defendants conspired to violate the provisions of 18 U.S.C. § 1962(d) by agreeing to engage in a pattern of racketeering activity described *supra*.

15. Each Defendant played a specific role in the conspiracy: McBride managed property contracts and communications; Macek manipulated insurance documents and the portal; Gempp blocked access and provided limited information; Bavaro deposited checks; Anthonio participated in claims and concealment; and Riverside facilitated management activities.

16. Defendants acted in concert through a well-organized conspiratorial scheme to commit fraud for profit by submitting fraudulent insurance claims on properties owned by the Trust and VIP.

17. Defendants coordinated efforts to forge signatures on insurance checks, manipulate insurance portals and email servers, misappropriate insurance proceeds, send mass emails with false statements to tenants, and conceal information from Plaintiff.

18. Plaintiff suffered injury to her business and property as a direct result of this conspiracy.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in Plaintiff's favor and grant the following relief:

° Award compensatory damages in an amount to be determined at trial, trebled pursuant to 18 U.S.C. § 1964(c);

° Award Plaintiff's reasonable attorneys' fees and costs of suit;

° Enter appropriate injunctive relief enjoining Defendants from further racketeering activity, including interference with Plaintiff's management and control of trust assets and business operations;

° Enter declaratory judgment confirming Plaintiff's rights as Trustee and Executor and the invalidity of Defendants' actions to remove Plaintiff or alter trust/testamentary arrangements;

° Award prejudgment and post judgment interest permitted by law.

51

&#176;      Award such other and further relief to Plaintiff as this Court deems just and proper.

## COUNT III - FRAUDULENT INSURANCE CLAIMS
### FEDERAL CIVIL RICO
### (18 U.S.C. §1962(a))

19. Each paragraph of this Complaint is incorporated as if restated fully herein.

20. Defendants received income derived, directly or indirectly, from the pattern of racketeering activity described *supra*.

21. Defendants used or invested, directly or indirectly, part of this income or its proceeds in the acquisition of an interest in, or the establishment or operation of, the enterprise.

22. Plaintiff suffered injury to her business and property as a direct result of these violations.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in Plaintiff's favor and grant the following relief:

&#176;      Award compensatory damages in an amount to be determined at trial, trebled pursuant to 18 U.S.C. § 1964(c);

&#176;      Award Plaintiff's reasonable attorneys' fees and costs of suit;

&#176;      Enter appropriate injunctive relief enjoining Defendants from further racketeering activity, including interference with Plaintiff's management and control of trust assets and business operations;

&#176;      Enter declaratory judgment confirming Plaintiff's rights as Trustee and Executor and the invalidity of Defendants' actions to remove Plaintiff or alter trust/testamentary arrangements;

&#176;      Award prejudgment and post judgment interest permitted by law.

&#176;      Award such other and further relief to Plaintiff as this Court deems just and proper.

## COUNT IV - FRAUDULENT INSURANCE CLAIMS
### FEDERAL CIVIL RICO
### (18 U.S.C. §1962(b))

23. Each paragraph of this Complaint is incorporated as if restated fully herein.

52

24. Defendants, through a pattern of racketeering activity described *supra*, acquired or maintained, directly or indirectly, an interest in or control of the enterprise.

25. Plaintiff suffered injury to her business and property as a direct result of these violations.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in Plaintiff's favor and grant the following relief:

° Award compensatory damages in an amount to be determined at trial, trebled pursuant to 18 U.S.C. § 1964(c);

° Award Plaintiff's reasonable attorneys' fees and costs of suit;

° Enter appropriate injunctive relief enjoining Defendants from further racketeering activity, including interference with Plaintiff's management and control of trust assets and business operations;

° Enter declaratory judgment confirming Plaintiff's rights as Trustee and Executor and the invalidity of Defendants' actions to remove Plaintiff or alter trust/testamentary arrangements;

° Award prejudgment and post judgment interest permitted by law.

° Award such other and further relief to Plaintiff as this Court deems just and proper.

## COUNT V - FRAUDULENT INSURANCE CLAIMS
## FRAUD/MISREPRESENTATION
## (ILLINOIS COMMON LAW)

26. Each paragraph of this Complaint is incorporated as if restated fully herein.

27. Defendants made false statements of material fact, including:

° Forging Plaintiff's signature on insurance checks, such as check number 6808360 for $127,163.54.

° Manipulating insurance policies and blocking Plaintiff's access to information by altering electronic portals and policy documents.

° Macek sending declaration documents falsely naming Anthonio as the named insured on properties owned by VIP and the Trust.

° McBride sending a mass email misrepresenting the scope of a court order to tenants, overstating restrictions and threatening legal liability for communicating with Plaintiff.

53

- ° Concealing the existence of claim payouts from Plaintiff and refusing to provide itemizations or documentation despite repeated requests.

28. Defendants knew or believed these statements and actions were untrue.

29. Defendants made these false statements and engaged in these deceptive acts with the intention of inducing Plaintiff to act or refrain from acting, specifically to prevent her from managing her properties and accessing insurance proceeds.

30. Plaintiff believed and relied on these misrepresentations and had a right to do so, as the complexity of the scheme and the manipulation of electronic systems made the fraud not readily discoverable.

31. Plaintiff suffered damages as a result of her reliance, including the misappropriation of approximately $300,000 in insurance proceeds and the inability to manage her properties.

32. The facts constituting the alleged fraud are pleaded with sufficient specificity, particularity, and certainty, including who made the misrepresentations, what they were, when they were made, and how they induced Plaintiff to act.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in Plaintiff's favor and grant the following relief:

- ° Award Plaintiff compensatory damages for all losses resulting from Defendants' fraudulent conduct;

- ° Award Plaintiff punitive damages as permitted by law;

- ° Enter injunctive relief prohibiting Defendants from further fraudulent acts and requiring the return or accounting of misappropriated funds and property;

- ° Enter declaratory judgment as appropriate;

- ° Award attorneys' fees and costs as permitted by law.

- ° Award such other and further relief to Plaintiff as this Court deems just and proper.

## COUNT VI - FRAUDULENT INSURANCE CLAIMS
## TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE
## (ILLINOIS COMMON LAW)

33. Each paragraph of this Complaint is incorporated as if restated fully herein.

34. Plaintiff had a reasonable expectation of entering into and maintaining valid business relationships concerning the management and insurance of her properties, including the ability to change insurers and qualify for rental insurance.

35. Defendants, including McBride and Riverside, were aware of Plaintiff's business expectancies, having entered into management contracts with Plaintiff that granted McBride access to Plaintiff's business and personal communications.

36. Defendants intentionally and unjustifiably interfered with Plaintiff's prospective economic advantage through a series of improper acts:

- ° Submitting fraudulent insurance claims and manipulating policies and portals to block Plaintiff's access to critical information.

- ° Preventing Plaintiff from changing insurers or qualifying for rental insurance due to fraudulent claims opened on the Antioch and Lincolnshire properties.

- ° McBride manipulating Plaintiff's email servers to prevent her from receiving communications regarding property management and insurance claims.

- ° McBride sending a mass email misrepresenting a court order's scope, instructing tenants not to communicate or transact with Plaintiff regarding rent or property matters and threatening legal liability for doing so.

37. Defendants' interference was purposeful and improper, as it involved fraud, deceit, and deliberate disparagement,and was not merely the conveyance of truthful information.

38. As a direct result of Defendants' interference, Plaintiff suffered damages, including the inability to manage her properties, loss of income, and damage to her business relationships.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in Plaintiff's favor and grant the following relief:

    °       Award Plaintiff compensatory damages for lost business harm;

    °       Award Plaintiff punitive damages as permitted by law;

    °       Enter injunctive relief prohibiting Defendants from interfering with Plaintiff's business relationships and management of trust assets;

    °       Enter declaratory judgment as appropriate;

    °       Award attorneys' fees and costs as permitted by law;

    °       Award such other and further relief to Plaintiff as this Court deems just and proper.

## COUNT VII - FRAUDULENT INSURANCE CLAIMS
## DEFAMATION
## (ILLINOIS COMMON LAW)

39. Each paragraph of this Complaint is incorporated as if restated fully herein.

40. On November 11, 2025, Defendant McBride made false statements about Plaintiff by sending a mass email to all tenants of the Trust and VIP.

41. The email falsely stated that Plaintiff was restrained from engaging in any activity involving management or financial affairs of VIP Holding Company and the Trust of Peter Vole Jr., including prohibitions not contained in the actual court order.

42. The email further falsely stated that Plaintiff was barred from properties and threatened tenants with legal liability for communicating with her or making payments.

43. These statements are defamatory per se because they impute a lack of ability and integrity in Plaintiff's business and profession, and prejudice her in her trade.

44. The statements are not reasonably capable of an innocent construction, as they clearly and unmistakably convey a defamatory meaning regarding Plaintiff's ability to manage her properties and interact with tenants.

45. Defendant McBride made an unprivileged publication of these false statements to third parties, specifically all tenants of the Trust and VIP.

56

46. The tenants, as third parties, relied upon McBride's misstatements to Plaintiff's detriment by refusing communications with her regarding rent or lease matters.

47. As a direct result of this defamation, Plaintiff suffered damages to her reputation and business, including loss of income and control over her properties.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in Plaintiff's favor and grant the following relief:

○ Award Plaintiff compensatory damages for reputational harm and related losses;

○ Award Plaintiff punitive damages as permitted by law;

○ Enter injunctive relief requiring Defendants to retract defamatory statements and prohibiting further defamatory communications;

○ Award attorneys' fees and costs as permitted by law.

○ Award such other and further relief to Plaintiff as this Court deems just and proper.

**COUNT VIII**
**CONVERSION – FRAUDULENT INSURANCE CLAIMS**
**(ILLINOIS COMMON LAW)**

48. Each paragraph of this Complaint is incorporated as if restated fully herein.

49. Plaintiff had a right to the itemizations, all documentation concerning all mitigation work, repair work, claims documentation, and any insurance proceeds paid on all genuine property damages alleged to have been sustained on both the Antioch and Lincolnshire properties.

50. Plaintiff made demands for the itemizations, all documentation concerning all mitigation work, repair work, claims documentation, and any insurance proceeds paid on all genuine property damages alleged to have been sustained on both the Antioch and Lincolnshire properties, which Defendants refused.

51. Defendants wrongfully and without authorization assumed control, dominion, or

ownership over Plaintiff's property specifically the itemizations, all documentation concerning all mitigation work, repair work, claims documentation, and any insurance proceeds paid on all genuine property damages alleged to have been sustained on both the Antioch and Lincolnshire properties.

52. This wrongful control included:

° Forging Plaintiff's signature on insurance checks, such as check number 6808360 for $127,163.54, and negotiating those checks without proper authorization or all required endorsements.

° Bavaro depositing checks made payable to Tiffany Vole & Anthonio Vole & MARS into a MARS bank account without proper endorsement from all payees.

° Anthonio being improperly named as payee on multiple checks, leading to Plaintiff never receiving any proceeds.

° Defendants concealing the existence of claim payouts from Plaintiff and refusing to provide the itemizations, all documentation concerning all mitigation work, repair work, claims documentation, and any insurance proceeds paid on all genuine property damages alleged to have been sustained on both the Antioch and Lincolnshire properties despite repeated requests.

53. The portion of money paid on all genuine property damage [yet to be determined] and converted is capable of being described as chattel, referring to the specific insurance checks and their identifiable proceeds.

54. As a direct result of Defendants' conversion, Plaintiff suffered damages in the amount of all misappropriated insurance proceeds paid on all genuine property damage found to have been sustained on both the Antioch and Lincolnshire properties.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in Plaintiff's favor and grant the following relief:

° Award Plaintiff compensatory damages for the value of misappropriated property, including insurance proceeds and trust assets;

° Award Plaintiff punitive damages as permitted by law;

58

  °   Enter injunctive relief requiring Defendants to return or account for all converted property;

  °   Award attorneys' fees and costs as permitted by law.

  °   Award such other and further relief to Plaintiff as this Court deems just and proper.

### COUNT IX – FRAUDULENT INSURANCE CLAIMS
### CIVIL CONSPIRACY
### (ILLINOIS COMMON LAW)

128. Each paragraph of this complaint is incorporated as if fully stated herein.

129. Defendants acted in concert through a well-organized conspiratorial scheme.

130. There was an agreement between two or more Defendants to participate in an unlawful act in an unlawful manner.

131. The unlawful purpose was to commit fraud for profit by submitting fraudulent insurance claims on properties owned by the Trust and VIP, and to misappropriate Plaintiff's assets.

132. An injury was caused by unlawful overt acts performed by one or more of the Defendants pursuant to and in furtherance of the common scheme.

133. These overt acts included, but were not limited to:

  °   Coordinating efforts to forge signatures on insurance checks.

  °   Manipulating insurance portals and email servers.

  °   Misappropriating insurance proceeds.

  °   Sending mass emails with false statements to tenants.

  °   Concealing information from Plaintiff.

134. Each Defendant played a specific role in the conspiracy: McBride managed property contracts and communications; Macek manipulated insurance documents and the portal; Gempp blocked access and provided limited information; Bavaro deposited checks; Anthonio participated

59

in claims and concealment; and Riverside facilitated management activities.

135. Plaintiff suffered damages as a direct result of this civil conspiracy, including the misappropriation of insurance proceeds on any and all insurance proceeds and the inability to manage her properties.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in Plaintiff's favor and grant the following relief:

° Award Plaintiff damages for all losses resulting from the conspiracy, including damages for underlying torts;

° Award Plaintiff punitive damages as permitted by law;

° Enter injunctive relief prohibiting Defendants from continuing the conspiracy and requiring restitution of all misappropriated assets;

° Award attorneys' fees and costs as permitted by law;

° Award such other and further relief to Plaintiff as this Court deems just and proper.

## COUNT X – VOLE-McBRIDE COORDINATED LITIGATION ENTERPRISE DUE PROCESS/DEPRIVATION OF PROPERTY (42 U.S.C. §1983)

136. Each paragraph of this complaint is incorporated as if fully stated herein.

137. Defendants Anthonio Vole, Jacob F. McBride, Riverside Management & Leasing Corporation, Robert Vole, Dolores Ann Marie Vole, Jacob McBride, and Riverside Management and Leasing Corporation ("Defendants") are "persons" within the meaning of 18 U.S.C. §1961 (3).

138. Defendants constituted an "enterprise" within the meaning of 18 U.S.C. §1961(4), as an association-in-fact of individuals and legal entities, including Riverside Management & Leasing Corporation, associated for the common purpose of defrauding Plaintiff through a coordinated scheme.

60

139. Defendants acted "under color of state law" through their dealings with and support from the Lake County, Illinois Housing Authority, to profit from properties owned by the Trust of Peter Vole, Jr. and his business VIP Holding Company.

140. As a consequence of Defendants' conduct Plaintiff was deprived of her federally protected rights in property.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in Plaintiff's favor and grant the following relief:

- ° Award Plaintiff damages for all losses resulting from the conspiracy, including damages for underlying torts;

- ° Award Plaintiff punitive damages as permitted by law;

- ° Enter injunctive relief prohibiting Defendants from continuing the conspiracy and requiring restitution of all misappropriated assets;

- ° Award attorneys' fees and costs as permitted by law;

- ° Award such other and further relief to Plaintiff as this Court deems just and proper.

## COUNT XI - VOLE-McBRIDE COORDINATED LITIGATION ENTERPRISE CIVIL CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS (42 U.S.C. §1985(3))

141. Each paragraph of this complaint is incorporated as if fully stated herein.

142. Defendants conspired amongst themselves for the purpose of depriving Plaintiff of the equal protection of the laws or of equal privileges and immunities under law.

143. Defendants acted in furtherance of the conspiracy by coordinating amongst themselves to deprive Plaintiff of her business and property interests.

144. Defendants' actions were driven by a discriminatory animus.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in Plaintiff's favor and grant the following relief:

   °     Award Plaintiff damages for all losses resulting from the conspiracy, including damages for underlying torts;

   °     Award Plaintiff punitive damages as permitted by law;

   °     Enter injunctive relief prohibiting Defendants from continuing the conspiracy and requiring restitution of all misappropriated assets;

   °     Award attorneys' fees and costs as permitted by law;

   °     Award such other and further relief to Plaintiff as this Court deems just and proper.

## COUNT XII – VOLE-McBRIDE COORDINATED LITIGATION ENTERPRISE CIVIL RICO (18 U.S.C. §§1961-1968)

145. Each paragraph of this complaint is incorporated as if fully stated herein.

146. Defendants operated and managed an enterprise through a pattern of racketeering activity that includes at least two known predicate acts of racketeering which caused Plaintiff injury to her business and property.

WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in Plaintiff's favor and grant the following relief:

   °     Award Plaintiff damages for all losses resulting from the conspiracy, including damages for underlying torts;

   °     Award Plaintiff punitive damages as permitted by law;

   °     Enter injunctive relief prohibiting Defendants from continuing the conspiracy and requiring restitution of all misappropriated assets;

   °     Award attorneys' fees and costs as permitted by law;

   °     Award such other and further relief to Plaintiff as this Court deems just and proper.

## JURY DEMAND

PLAINTIFF demands a trial by jury on all issues so triable.

Respectfully Submitted,

_Fabian Rosati_

Fabian Rosati

Law Office of Fabian Rosati, LLC
24332 N. Forest Drive
Lake Zurich, IL 60047
(312) 278-3115
frosati@rosati-law.com
ARDC #6281531

# EXHIBIT 1

# (NOVEMBER 24, 2021, LETTER FROM ATTORNEY JAMES SEIBERT TO ATTORNEY THOMAS HOOD)



| | |
|---|---|
| 3325 N. Arlington Heights Rd | (847) 253-7500 |
| Suite 500 | Fax: (847) 253-1904 |
| Arlington Heights, IL 60004 | Email: info@jcslaw.com |
| | Web: https://jcslaw.com |

November 24, 2021

**<u>Via Email (tom@hoodlawpc.com) and Regular Mail</u>**

Thomas Hood, Attorney at Law
Hood Law P.C.
501 N. Riverside
Gurnee, Illinois 60031

> **Re: Doloris Ann Marie Vole Removal as Corporate Officer or Director of V.I.P. Holding Company**

Dear Mr. Hood,

I am contacting you once again on behalf of my Client, Peter Vole, Jr. in regard to your client, Doloris Ann Marie Vole. Since I received no response to my letter of September 27, 2021, whether you represent Ms. Vole in matters other than the pending guardianship matter in the circuit court of the 19th judicial district Lake County. Again, I request that you clarify your representation of Ms. Vole, and if you are not her attorney in regard to other matters, I would ask that you forward this correspondence on to your client or to the attorney . resenting her for all other matters.

This letter is to inform your Client, Doloris Ann Marie Vole, that she has been removed from her capacity as both a director and officer of V.I.P. Holding Company, an Illinois Corporation. As such she no longer has authority to act on behalf of that corporation, or in regard to any other matter concerning my Client's business. Please consider this letter a demand that Doloris Ann Marie Vole immediately cease and desist from representing herself as having authority to act on behalf of that corporation. It is my understanding that Ms. Vole receives many of the rent checks from the tenants of real property owned by my Client, my Client's Trust and V.I.P. Holding Company. I would ask that in regard to any such checks that she is in receipt of or which she may receive prior to the new property management company.

If you wish to discuss this matter, or if your client's attorney representing her in other matters wishes to discuss this matter, please have them contact my office.

Sincerely,

James C. Siebert
*Attorney at Law*

Cc: Peter Vole Jr.

Page 1 of 1

# EXHIBIT 2

# (*LAKE COUNTY CIRCUIT COURT ORDER OF APRIL 24, 2026* )

FILED

4/24/2026 3:55 PM

Erin Cartwright Weinstein
Clerk of the Court
Lake County, Illinois

IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT
LAKE COUNTY, ILLINOIS - CHANCERY DIVISION

| | | |
|---|---|---|
| ESTATE OF<br>     PETER VOLE, JR.,<br>                    Deceased. | ) ) ) ) | |
| DOLORES VOLE, et al., | ) ) | |
|                                   Plaintiffs, | ) | **Case No. 2023 CH 232** |
|                    v. | ) ) | into which Case No. 24 PR 26<br>has been consolidated |
| TIFFANY VOLE, Individually and as<br>Executor of the Will of Peter Vole, Jr.<br>Dated April 6, 2022, et al., | ) ) ) | |
|                                   Defendants. | ) ) | |
| ANTHONIO VOLE, individually and derivatively<br>on behalf of V.I.P. Holding Company, | ) ) ) | |
|                              Counter-Plaintiff, | ) | |
|                    v. | ) ) | |
| TIFFANY VOLE, individually and as Trustee<br>of the "Second Amendment And Restatement Of<br>The Living Trust Agreement Of Peter Vole, Jr.<br>Dated October 30, 2017" executed on April 6, 2022,<br>and V.I.P. HOLDING COMPANY, | ) ) ) ) ) ) | |
|                              Counter-Defendants. | ) | |

## MEMORANDUMN  ORDER PRELIMINARY INJUNCTION

THIS CAUSE COMING ON TO BE HEARD on a Preliminary Injunction hearing on January 26-29, 2026, the court having heard the testimony, reviewed the evidence as well as the arguments submitted by counsel in closing and in rebuttal, finds as follows:

**THE PENDING MOTION FOR PRELIMINARY INJUNCTION**

Anthonio Vole (hereinafter "Tony") filed a Motion for Temporary Restraining Order against Tiffany Vole. That motion was joined by Dolly Vole and Robert Vole.  In the prayer for relief, the parties asked the court to:

1) Restrain Tiffany from causing the Trust to make any distributions to her or for her personal benefit, including, but not limited to, the payment of (i) a salary as Trustee, (ii) the retention of loan payments due to the Trust, (iii) the receipt of so-called "Owner's

Page **1** of **44**

Draws," and (iv) personal expenses including payment of credit card charges for personal expenses; and

2) Restrain Tiffany from making any distributions from the Trust which are outside the ordinary course of the business of the Trust.

Every Motion for TRO must be supported by an underlying pleading. Tony filed a counter complaint against Tiffany, both individually and derivatively, sounding in the following causes of action:

Count I:        Removal of Tiffany as Trustee
Count II:       Breach of Fiduciary Duty
Count III:      Failure to Respond to Statutory Request for Corporate Records
Count IV:       Derivative claim on behalf of VIP against Tiffany
Count V:        Derivative claim on behalf of VIP against Tiffany for breaches of Fiduciary Duty

Petitioners Dolly, Peter III and Robert have filed suit to set aside Peter Jr.'s last known purported Will, as well as the Second Amendment and Restatement for the Trust. (Pet. Ex. 22). However, as the facts of those complaints are not pertinent to the TRO, the court heard no evidence on their complaints.

On October 31, 2025, the court granted the Temporary Restraining Order and set the matter for Preliminary Injunction hearing.

**FINDING OF FACTS**

The Decedent, Peter Vole, Jr. (hereinafter "Peter") has five children: Dolly, Peter III, Robert, Tiffany and Tony. Peter died on December 25, 2023. (01/26/26 Tr. p. 271). Peter developed his wealth by building an empire of residential and commercial real properties over the course of his life. Peter leased these real properties to tenants, generating substantial income streams, as well as millions of dollars in underlying property value. By the time of Peter's passing, the assets of the Trust and VIP collectively included, inter alia: (1) more than 100 residential real properties as well as 10 commercial properties and parcels of land; (2) brokerage accounts held by financial institutions Charles Schwab and 1492; and (3) accounts held by Huntington Bank, Fifth Third Bank, and Chase Bank. (01/26/26 Tr. p. 85). The ending balance of the trust account in January of 2024 (the month after Peter died) was **$** 2, 576,644.45. (1/26/26. Tr. p.230 and PEX 12)

**VIP and the Trust**
Prior to his passing, Peter established the Trust, for which he served as initial trustee. (See PEX 21; PEX 22). On or about April 16, 2021, pursuant to the First Amendment and Restatement of the Trust, Tiffany Vole began serving as co-trustee of the Trust with Peter. (01/26/26 Tr. p. 88; Pet. Ex. 21). Thereafter, upon Peter's passing in December of 2023, Tiffany began serving as sole successor trustee of the Trust. (01/26/26 Tr. p. 88). Additionally, by the time of Peter's passing, Tiffany was acting as both the sole director and only officer of Peter's primary business, VIP. (01/26/26 Tr. p. 224). Significantly, assets of VIP have been and remain, by extension, assets of the Trust, which holds a 50% ownership interest in VIP. (01/26/26 Tr. p. 25).

**Dolly Managed Peter's Business Until November 2021 at Which Point Peter Terminated Dolly's Services**

In 2019, Dolly was in charge of Peter's businesses. (1/26/26. Tr. p 80). In 2019, Tiffany left Florida and returned to Illinois to help her father. (1/26/26. Tr. p.79) Tiffany began assisting Dolly in her father's business. Tiffany described her position as Dolly's errand girl. (1/26/26. Tr. p.80) Tiffany sanded drywall; she picked up materials and people; she drove workers to job sites; she paid workers; she collected rent (1/26/26. Tr. p.80) Tiffany was treated as an independent contractor and initially she was paid $1,800 bi-weekly or about $3,600 per month. (1/26/26. Tr. p.82-83). Later, her father increased her pay to $2,500 biweekly or $5,000 per month. (1/26/26. Tr. p.176) The $5,000 included her work for VIP and it also included her work as a care giver for her father. (1/26/26. Tr. p.176)

At some point, relations between Dolly and Peter became strained. Peter terminated Dolly in November of 2021, and he took control of his business. Tiffany began taking a more prominent role in the business. (1/26/26. Tr. p.81) Her father was trying to teach her the business. (1/26/26. Tr. p.81) Tiffany was her father's assistant and she did whatever he wanted her to do. (01/26/26 Tr. p. 275). Her father used a contractor named Ivan Purnell to do work on the properties. (1/26/26. Tr. p.81)

**Peter Hired an Outside Property Management Company, Riverside, to Manage his Properties**

In 2021, Dolly had instituted a guardianship proceeding against her father. At this time, Peter's attorney, James Siebert, told Peter that it was in his best interest to get a management company in place because Peter was struggling with his health and Tiffany did not have broker's license, so she could not write leases. (1/26/26. Tr. p.270) Peter signed a two year contract with Mr. Jake McBride of Riverside, with the contract expiring in 2023. (1/26/26. Tr. p.270-271) Riverside is a property management company. (1/26/26 Tr. p.237) Peter delegated certain responsibilities of VIP to Riverside. (1/26/26 Tr. p.237)

Tiffany testified that Riverside was responsible for collecting rents and maintaining the properties. On the other hand, Tiffany testified that she also was involved in the day to day management of the properties. (1/27/26. Tr. p.65) Although Riverside handled the accounting, she was the contact person if Riverside did not show up. (1/27/26 Tr. p.65) In her opinion, the relationship was not working out, and therefore it was her intent to end the contract with Riverside in 2025 and transition back into self-management. (1/27/26 Tr. p.67)

In 2023, Jake purchased Riverside from the previous owner, Chris Shaw. (1/27/26 Tr. p.74) Tiffany asked her father to loan Jake money. (1/27/26 Tr. p.73) Tiffany testified that Jake needed a $120,000 loan from her father to purchase software licensing agreements for the day to day operations of Riverside. (1/27/26. Tr. p.75) In 2023, Peter made a personal loan to Jake McBride. (1/27/26 Tr. p.69) At trial, the court commented that $120,000 seemed like a lot of money for software licensing. (1/27/26. Tr. p.75) Tiffany testified that she agreed, and that her father said it would be fine as long as she placed a lien on Jake McBride's cabin in Wisconsin. (1/27/26. Tr. p.76)

Jake McBride testified that he acquired Riverside Management for $1.25 million dollars. (1/27/26 Tr. p. 149) He borrowed $120,000 from Peter as the down payment of the acquisition. (1/27/26 Tr. p.150) The $120,000 was not for the purchase of software licenses, but rather it was for 10% of the purchase price. (1/27/26 Tr. p.150)

Tiffany's testimony regarding her misunderstanding as to the purpose for the loan her father gave to Jake McBride highlights her lack of experience in managing a business. Tiffany testified that the purpose of the loan was to purchase software licensing agreements. Her understanding was incorrect. Peter loaned $120,000 to Jake to cover the downpayment for his acquisition of Riverside. Tiffany cannot use the excuse that her father was in control of the business and, therefore, she did not know the intimate details, because she testified that she is the person that facilitated the loan between Jake McBride and her father. As the Director of VIP and the Trustee of the Trust, Tiffany is the primary decision maker. As such, she has a fiduciary responsibility to understand the nature of the loans extended by VIP to third parties. The fact that Tiffany testified confidently under oath that she, like the court, was surprised that Jake McBride needed $120,000 to purchase software licenses demonstrates her failure to either read and understand the terms of the McBride loan document, or even more egregious, a failure to educate herself about the loan. The court relies on this testimony as further evidence that Tiffany has little to no experience with respect to the administration of trusts, operation of business entities, or the management of real properties. (01/26/26 Tr. pp. 76-78).

Tiffany testified that she was displeased with Riverside's work, and she sent Riverside a termination notice on September 19, 2025. (01/26/26 Tr. p. 239). Part of her displeasure is due to Riverside's failure to communicate with tenants and make repairs.

In a move which backfired against the Petitioners, Petitioners called Jennifer Pioch, a former tenant, to testify about problems with her rental unit. Ms. Pioch testified that she had to beg Riverside Management to come out and do something. (01/27/26 Tr. p. 275). She testified it was hard to get Riverside to come and take care of problems. (01/27/26 Tr. p.277). Ms. Pioch tried to get a hold of Tiffany, but Riverside never gave her Tiffany's number. (01/27/26 Tr. pp. 277-278). Ms. Pioch's testimony is consistent with Tiffany's testimony that Riverside was not responsive to tenant repair issues.

**Tiffany Delegated Additional Authority to Jake McBride as Agent of the Trustee**
Tiffany delegated certain responsibilities held by VIP to Riverside. (1/26/26 Tr. p. 237) As Agent of the Trustee, Jake served in an advisory capacity to Tiffany. (1/27/26 Tr. p.239) He initiated, scheduled and attended multiple meetings with accountants and law firms. (1/27/26 Tr. p.239) Jake helped Tiffany process documentation, understand documentation and worked through requests from the law firms. He also compiled things for the estate tax return and for other tax return purposes. (1/27/26 Tr. p.239) He was included on all accounting and legal calls with counsel. (1/27/26 Tr. p.178) Jake was heavily involved in coordinating, fact finding and putting together information that would have been needed by the attorneys or the accountants or Tiffany to help make informed decisions. (1/27/26 Tr. p.178)

Page **4** of **44**

**Tiffany Sold off the Trust's Largest Single Asset and then Made a Distribution to Herself and Tony**

In December of 2023, one day after Peter died, the Trust sold off its largest single asset, Chemblend, for $1,300,000. (1/26/26 Tr. p.189) By selling the Chemblend building, the Trust lost the rental income stream it enjoyed from the building. (1/26/26 Tr. p.190)  Tiffany was aware that the loss of the rental from Chemblend would impact the portfolio, thus, she purchased another commercial property named Ashely to make up for the lost Chemblend income. (1/26/26 Tr. p.191) Ashly generates about $45,000.00 per year in income whereas Chemblend generated about $250,000.00 per year in income. (1/26/26 Tr. p.192)

Tiffany made a distribution to herself in the amount of $600,000 and to her brother in the amount of $600,000. (1/26/26 Tr. p.151)

**Tiffany Cannot Recall Why She Issued a Cashier's Check Made Payable to Herself in the Amount of $100,00 Shortly after her Father's Death**

Two days after her father died, Tiffany made a distribution to herself in the amount of $100,000 via a cashier's check from the VIP Trust account. (1/26/26 Tr. p.153) She testified that she could not recall the purpose for which she withdrew the money. (1/26/26 Tr. p.153) She testified that she could not, "(r)ecall if I cashed it or if it went to something else." (1/26/26 Tr. p.153)  Tiffany's reason that she could not recall was because, "My dad died two days before (the transaction)." The transcript cannot capture tone, but the court made a note that Tiffany's tone was one of righteous indignation when she testified, "My apologies that I don't remember one transaction two days after I watched my father died." (1/26/26 Tr. p.153)

The court finds that Tiffany was not credible in her inability to recall why she withdrew $100,000.00 from the account two days after her father's death. The cashier's check was made payable to her. That is a large amount of money, and, while the death of a parent is traumatizing, it is unbelievable to this court that Tiffany Vole cannot recall the purpose for the withdrawal. Moreover, because Tiffany has failed to provide an accounting, she has never accounted for the $100,000.00. If Tiffany elected to give herself a six figure distribution, two days after taking control of the company, that decision raises the question why she would have given herself a distribution, but not one to Tony, considering they have an equal ownership interest. The court concludes that, in her capacity as the trustee of the Trust and in her capacity as the President of VIP, Tiffany put her hand into the company till and helped herself to $100,000.00 without any documentation or explanation as to why.

As of February 25, 2025, the trust account held $5,039.16. (1/26/26 Tr. p.230)  Tiffany did not know whether the Trust made any money in 2024 or 2025. (1/26/26 Tr. p.195)  In the Spring of 2025, Riverside did not have any assets available for an owner's draw. (1/26/26 Tr. p.198) (1/27/26. Tr. p.263)

**Tiffany Failed to Account for the Properties She Sold**

Tiffany is the president and secretary of VIP. (01/27/26, Tr. p. 104 ).Tiffany has sold between 10-12 properties since she became president. (1/26/26 Tr. p.218) With respect to sales that occurred after her father's death, Tiffany did not give any of those closing statements to Tony. (01/26/26, Tr. p.218).

**Tiffany's Failure and Refusal to Provide Required Accountings**

Tiffany testified that she owes a "specific reporting" to a shareholder of VIP. (01/26/26 Tr. p. 76-216). When counsel asked her what specific reporting is owed, Tiffany said that her corporate attorneys handled that. (01/26/26 Tr. p.216). In response to the question, "What obligations does VIP and its management owe to a shareholder in terms of books and records and reporting?" Tiffany responded that she did not fully know. (01/26/26 Tr. p. 216). She explained further, "So what I understand is exactly what I was taught, that our corporate attorneys handle that portion along with the trust attorneys who administer the trust. And I was to focus on the business." (01/26/26 Tr. p.216). She explained that her father taught her that, as she was the only one improving the business, and her father wanted her to focus on it. (01/26/26 Tr. p.216).

Petitioner Tony Vole is a beneficiary of the Trust, under both the currently disputed Second Restatement and the preceding First Restatement. (01/26/26 Tr. p.88; 01/27/26 Tr. p.135; 1/28/26 Tr. p.6; PEX. 21; PEX. 22). Tony is also a shareholder of VIP. (01/27/26 Tr. p 135; 01/28/26 Tr. p. 6). Tony testified that, during the pendency of these proceedings, and while Tiffany was serving as both trustee of the Trust and as President/Secretary and director of VIP, Tony requested an accounting of Tiffany's administration of the Trust, as well as access to books and records of VIP. (01/28/26 Tr. pp.47-48). Tiffany refused to provide such information, telling Tony that she was "too busy" to account and stating that Tony "wasn't entitled to" the information he was seeking. (01/28/26 Tr., pp. 44, 48). Tony further testified that, when he pressed the point with Tiffany, she stated that he ". . . would never receive an accounting." (01/28/26 Tr. p. 46). When Tony indicated that he might involve his attorney, Tiffany stated that if his attorney got involved, she would ". . . never allow [Tony] to be in any meeting regarding VIP Holding Company." (01/28/26 Tr. p. 49). Tony's testimony was credible on this issue. His frustration with his sister and her lack of response to his legitimate queries rang true. For the reason explained in the section entitled, "A Key Moment at Trial," the court finds that Tony's testimony bolsters the court's conclusion that Tiffany exploited her perceived position of power.

On or about August 22, 2025, Tony's counsel sent correspondences to: (1) Tiffany's counsel in her capacity as trustee of the Trust; and (2) Tiffany's separate counsel in her capacity as President/Secretary President/Secretary and director of VIP. (01/26/26 Tr. p. 100; 01/28/26 Tr. pp. 49-50; Pet. Ex. 1; Pet. Ex 2). In those correspondences, Tony's counsel made written demands on Tony's behalf for a trust accounting from Tiffany, as well as access to books and records including, but not limited to shareholder and owner records/certificates, financial statements, balance sheets, account ledgers and the like for VIP. (PEX. 1; PEX 2). In response, Tiffany provided neither, and her attorneys subsequently withdrew from representing her both with respect to the Trust and VIP. (01/26/26 Tr. pp. 100, 240-41). Tiffany admitted at hearing that she does not know if Tony was ever provided with access to any of the corporate records of VIP. (01/26/26 Tr. p. 215). Tony testified he was never afforded access to Trust or VIP records. (01/28/26 Tr. p. 50).

During her testimony at hearing, Tiffany admitted that she had not produced numerous documents demanded in discovery. (01/26/26 Tr. pp. 101, 114, 116, 129-30, 150, 159-60, 233, 235). Tiffany asserted that she provided responsive documents to her prior counsel, and that her prior counsel apparently failed to circulate such documents. (*Id*). Nevertheless, Tiffany admitted to possessing her own copies of relevant and responsive documents, yet she provided no clear explanation as to

how or why she did not produce such documents through her current counsel, particularly given that multiple Court orders required her to do so. (*Id*).

At the hearing, Tiffany admitted that she never personally prepared an annual accounting and further admitted that no annual accounting has been given to Tony for the years 2024 or 2025. (01/26/26 Tr. pp. 93-94). When asked if she kept track of the income and expenses for VIP and the Trust properties, Tiffany responded that "[t]he income and expenses are reported every month from Riverside . . . ." (01/26/26 Tr. p. 82). Tiffany also admitted that she does not know whether the Trust or VIP made money in 2024 and 2025. (01/26/26 Tr. pp. 189, 195). She further testified that there was no money going from end of 2024 into 2025 to pay 2025 VIP and Trust taxes, including estate, corporate and real estate taxes. (01/27/26 Tr. pp. 131-132). In fact, she stated that "We had not received the funds to be able to even accumulate that much money."

**Co-Mingling of Trust Income with VIP Income into the Huntington Account**
Tiffany testified that she never opened any checking account for the Trust, and she permitted Trust income to be deposited into a VIP account, thereby commingling Trust and VIP assets. (01/26/26 Tr. p. 97; 01/27/26 Tr. pp. 129-131.) She deposited payments from debtors into the VIP checking account because she did not have a trust checking account. (01/26/26, Tr. p.211). She testified that she suggested to her father that they should put debtor payments back into the VIP Money Market account, but her father "just wanted to do stuff his way." So, the deposits went into the VIP checking account, and she followed suit. (01/26/26, Tr. p211.). Tiffany thought that there might be a better way, but it was her father's business. (01/26/26, Tr. p. 212). Tiffany testified that if a payment is made on a loan that was due to her father, that she thought it was appropriate to put that collection into the VIP account instead of into the trust account. (01/26/26, Tr. p. 213). Her reasoning was that she continued to do things the way her father had them set up. (01/26/26 Tr p. 97)

**A Key Moment at Trial Revealed Tiffany's Belief that There are no Checks in Place to Curb her Authority**
Sometimes at trial, a key moment happens where a witness unintentionally drops his/her guard and reveals his/her true motivation. Such a moment happened in this hearing. In general, Tiffany presented herself as submissive and apologetic. She presented herself as a victim: a victim of her attorneys, a victim of her siblings and a victim of Riverside. Yet, in one moment of unveiled honesty, Tiffany's true personality showed when she was questioned about her failure to call a shareholder's meeting in 2025.

Q:     Do you know what a shareholder's meeting is?
A:     I do.
Q:     That is, in this case, a meeting, pretty simple, between you and Tony in your capacity as shareholders.
A:     And we have never had one because everyone signed off.
Q:     That's what a shareholder's meeting is in this case.
A:     I understand.
Q:     Did you have a shareholder's meeting in 2025?
A:     Not to my knowledge.
Q:     Do you know what the purpose of a shareholder's meeting is?

A: No.

Q: Do you know that the purpose of a shareholder's meeting is to elect a director?

A: You wouldn't be able to in this case.

Q: You probably would be deadlocked, is that what you mean, that you couldn't agree on one person to serve as director?

A: My father already made me director.

Q: Do you think that's a lifetime appointment, ma'am, you're the Pope of VIP?

A: I never said that.

Q: Do you think you hold that from year to year?

A: I hold it as long as - - I don't even know what that means. Yeah, he put me in that position. He didn't put Tony in that position.

Q: Do you understand ma'am, that every year you're supposed to have a shareholder's meeting and that at shareholder's meetings, the shareholder's elect the next director? Do you understand that?

A: I do.

Q: Is one of the reasons that you didn't you convene a shareholder's meeting was that you thought the parties would deadlocked and that you wouldn't be elected as the sole director?

A: The parties couldn't be deadlocked.

Q: Pardon me?

A: The parties could not be deadlocked.

Q: Why is that?

**A: Because, yes, my brother owns 25 percent and, yes, I do, but I am the only trustee who owns 50 percent of the trust.**

Q: Do you think that you as trustee could objectively vote as to whether or not you should continue on as president?

A: I do. (1/26/26. Tr.pp.223-225)

The transcript does not record facial expressions or tone of voice. In this "gotcha" moment, when Tiffany testified that she was untouchable based upon her controlling position as the Trustee of the Trust, her tone of voice was smug and self-satisfied. She smiled sweetly at counsel when she explained her position of power and she smirked when she testified that she could objectively vote as a Trustee to continue her position as president. In that moment, it was clear to the court that Tiffany feels invincible, emboldened and empowered to the exclusion of her brother Tony, which explains much of her decision making.

**Delegations to Riverside Management, Counsel, and Accountants, and Reservation of Discretionary and Supervisory Authority**

Prior to Peter's passing, and continuing thereafter, real property management service Riverside Management & Leasing Corp. ("Riverside") served as property manager for the numerous residential and commercial real properties owned by VIP and the Trust. (01/26/26 Tr. pp. 237-38). Tiffany also delegated responsibilities with respect to the Trust and VIP to: (1) her counsel; and (2) the accounting firm MMA. (01/26/26 Tr. pp. 239-41). Concerning the acts of misconduct and breaches of fiduciary duty alleged by Petitioners, at hearing, Tiffany asserted that such failings were attributable not to her, but rather to the third parties to whom she had delegated her responsibilities. Tiffany admitted at hearing that each of those third parties had been selected to serve by Tiffany, and Tiffany further admitted that she explicitly retained discretionary and

Page **8** of **44**

supervisory authority over all such third parties, be they Riverside, attorneys, or accountants. (01/26/26 Tr. pp. 238-39, 244). Such authority included the authority to terminate for insufficient performance. (01/26/26 Tr. pp. 242-43).

**Failure To File Trust and VIP Income Tax Returns and Pay Estate Taxes**
With respect to income and estate taxes, when asked ". . . do you know, as you sit here today, whether or not VIP has filed a federal income tax return for 2022?" Tiffany responded: "I have not been able to get that information from my accountants. I apologize." (10/26/26 Tr. p. 105). Tiffany admitted that she did not know if the 2023 federal income tax return has been filed for VIP, and as to whether the VIP federal income tax return for 2024 has been filed. Tiffany responded: "I don't believe so." (01/26/26 Tr. p. 106). Tiffany likewise testified that she believed that state income tax returns had not been filed for VIP for tax years 2023 and 2024 (01/26/26 Tr. p. 108). With respect to estate taxes, Tiffany admitted that Peter's estate had incurred ". . . around $141,000-ish" in penalties for failure to pay federal estate taxes in full when due. (01/26/26 Tr. p. 109). Tiffany claimed that she did not learn that federal estate taxes were still overdue ". . . until very recently." (01/26/26 Tr. p. 111). Tiffany did not know if state estate taxes were addressed at all. (01/26/26 Tr. p. 109).

Tiffany also admitted that she had not filed her personal tax return for 2024. (01/26/26 Tr. p. 204). (01/27/2026 Tr. p. 154).

Tony testified that as 25% shareholder of VIP, he was due a K-1 statement. (01/28/26, Tr. p.44). Tiffany told him that he does not get a K-1. Tony told her, "I need that because if there was any profit due to the shareholders or any profit is taken out, that is technically split between the shareholders, that would show up on my K-1, and I would have to pay taxes on it, and I have never seen a dollar of profit from VIP Holding Company." (01/28/26, Tr. p.45). Tiffany told Tony that he was incorrect, and he did not know what he was talking about. (01/28/26, Tr. p.45). Tony has never received a K-1 for 2024 or 2025. (01/28/26, Tr. p.47).

The purpose of a K-1 is to report the shareholder's share of the corporation's income, deductions, credits and other items. (2025 IRS Shareholder's Instructions for Schedule K-1) The court shares Tony's concerns as to why he did not receive a K-1 statement for his interest in VIP. There was no testimony as to whether VIP enjoyed income, deductions, credits or other items that would have necessitated a K-1 for Tony in 2024 or 2025. However, again, because Tiffany failed to provide an accounting, and because VIP did not file its taxes for 2023 or 2024, the court assumes that VIP did not issue a K-1 statement for Tony because the accountants did not have sufficient information to do so. The court finds that Tony is justified in his concern over the failure to receive a K-1 and the court further finds that Tiffany's ignorance about the need for a K-1, and her failure to make sure that 2023, 2024 and 2025 taxes were filed, further highlights her lack of competence in running a company and acting as the Trustee of a Trust. At this point, the parties do not know what tax consequences VIP may be facing.

**Failure to Pay Trust and Vip Real Estate Taxes on Numerous Rental Properties**
As previously noted, the primary holdings of both VIP and the Trust have been and remain residential and commercial real properties. Jake McBride, Executive Property Manager for Riverside, testified that he received no direction from Tiffany to keep liquid reserves on hand to

pay real estate taxes for the many residential and commercial real properties owned by the Trust and VIP. (01/27/26 Tr. pp. 147, 155, 159, 161). Tiffany, likewise, admitted that she did not ensure that sufficient money was held to pay real estate taxes. (01/27/26 Tr. pp. 130-131).

In 2023, Tiffany relied upon a bank teller at Huntington Bank to prepare a list of 2022 tax payments required for the real properties. (01/26/26 Tr. p. 120). Thereafter, for 2023 real estate taxes, Jake McBride of Riverside began tracking and listing the tax payments owed on the real properties. (01/26/26 Tr. p. 121). Riverside compiled the reporting of real estate taxes due, collected funds from payment from Tiffany, and processed the tax payments through Riverside.

Jake McBride offered to perform the same services through Riverside with respect to 2024 real estate taxes, but Tiffany did not accept the offer. (01/27/26 Tr. p. 157).

In June of 2025, the first installment of 2024 real estate taxes were due for the residential and commercial real properties owned by the Trust and VIP. (01/26/26 Tr., p. 130). Tiffany failed to timely pay those taxes, and Tiffany also failed to pay the second installment on those real estate taxes, which came due in or about September of 2025. (01/26/26 Tr. p. 253).

Tiffany testified that Jake McBride was supposed to make the payments for the 2024 Real Estate taxes. (01/26/26 Tr., p. 123) She testified that he was supposed to make the payment from all the money they get from their tenants. (01/26/26 Tr. p. 123) She testified that Jake did not have reserve set up to pay the real estate taxes in 2025. (01/26/26 Tr. p. 123) Then she testified that Jake put an allocation aside for the taxes. (01/26/26 Tr. p. 127) She testified, "I sent him many emails regarding paying the taxes. He had the tax bills, so he was supposed to be paying the taxes, that was his responsibility this year as allocated in the budget." (01/26/26 Tr. p. 129) When counsel asked Tiffany if she had produced those emails as part of discovery, she said she didn't know. (01/26/26 Tr. p. 130)

Jack McBride testified that Riverside's obligation to reserve funds depends upon the portfolio's ownership, and VIP did not elect to have Riverside reserve for real estate taxes (01/27/26 Tr. pp. 158-159). Jake McBride testified that in 2023, the year that Peter Vole died, Riverside had no involvement in the payment of taxes for 2022. (01/27/26 Tr. p. 153) In 2024, Riverside compiled the reporting of all the taxes that were due at that time. Tiffany gave Riverside the funds for those payments and then Riverside processed the payment. (01/27/26 Tr. p. 154) Tiffany testified that in 2024, Riverside gave her a list of the real estate taxes that had to be paid and then she went and paid the taxes herself. (01/26/26, Tr. p.125). There were not sufficient funds in the Riverside account to pay those taxes. (01/27/26 Tr. p. 155) Jake McBride testified that in 2025, Riverside offered to pull together the spreadsheet and make the payments again, but Tiffany did not accept the offer because she told Riverside that Sean Weppler's office would handle the tax payments. (01/27/26 Tr. p. 157)

The parties agree that in 2023 and 2024, Tiffany in her capacity as director of VIP and trustee of the Trust provided the funds to pay the property taxes and that Riverside did not reserve funds in the budget for property taxes. Tiffany agrees that prior to 2025, the owners were responsible for paying the real estate taxes. Therefore, Tiffany's testimony that in 2025, Riverside was supposed to be reserving funds to pay the property taxes is a deviation from past practice. Whenever there

is a substantial change in operating procedure, the court would expect to see documentation of the change in procedure. Thus, to the extent that Tiffany elected to change the prior course of conduct, the court would expect to see letters or emails advising Riverside that the operating budget needed to include reserved funds for property taxes. If the parties' relationship was contractual on this issue, the court would have expected to see an addendum to the contract that VIP and Riverside executed in 2021. (01/27/26 Tr. p. 184). And, if Tiffany had made such a request, the court would expect Riverside's revised budget to include a line item for property tax reserves.

The court reviewed Plaintiff's Exhibits 16 and 17 which are the Riverside Management Owner Monthly Reports dated January 2025 and May 2025. The court does not see a line item holding back funds for portfolio expenses to be paid by Riverside. On cross examination, counsel asked Jake McBride if he ever sent an email or any type of communication to Ms. Vole indicating that Riverside was in fact responsible for taxes, to which Jake replied, "I don't recall." (01/27/26 Tr. p. 224) If Tiffany had sent such an email, then the court would have expected defense counsel to either refresh Jake McBride's recollection or to impeach him with the email. As stated earlier in the trial, a document used to impeach is different from a document offered as evidence and the court would not preclude defense counsel from using documents to impeach. (01/26/26 Tr. pp 27-28).

In weighing the credibility of Tiffany versus the credibility of Jake McBride on the issue of which party had the responsibility to pay the 2024 real estate taxes for the properties contained within the portfolio, the court finds that Jake McBride is the more credible witness. Although Tiffany testified that Riverside was responsible for paying the 2024 real estate taxes, her testimony is belied by the undisputed past practice between VIP/Trust and Riverside where the owner was responsible for paying the taxes. Moreover, there was no documentary evidence supporting Tiffany's position that she shifted the responsibility to reserve to Riverside.

Tiffany further admitted that it was her decision to sell "underperforming assets" rather than selling or withdrawing brokerage account assets, and that she did not know how much in penalties and increased costs were accruing while the real estate taxes remained unpaid. (01/26/26 Tr. p. 131).

Presently, the unpaid taxes for the real properties are estimated to total in excess of $320,000, exclusive of interest, penalties, and redemption fees. (01/27/26 Tr. p. 260). To date, the real estate taxes remain unpaid, with interest accruing at a 2% interest rate for every 6 months until September of 2026 at which time the interest rate increases to 12% annually. Tiffany testified that she was aware of the costs and penalties, and she is aware that interest is compounded. (01/26/26 Tr. p. 253-254). Tiffany further testified that a tax lien is placed on the property when the taxes are purchased. (01/26/26 Tr. p. 257). The 2025 taxes are coming due with the first installment due September 2026. Should these taxes remain unpaid it is extremely likely that the tax buyers will purchase 2025 taxes as well. (01/27/26 Tr. pp. 249-5)

**The Investment Accounts**
Tiffany admitted that she first inquired about the brokerage accounts in September and October of 2025. (01/26/27 Tr. pp. 32-33, 105, 258, 267). At the hearing, Tiffany offered evidence regarding her efforts to liquidate investments held in Charles Schwab and 1492 brokerage accounts to

Page **11** of **44**

generate funds to pay outstanding real estate taxes. Tiffany testified that she encountered substantial difficulty in doing so. (01/26/26 Tr. p. 132).

With respect to the issues she encountered with the 1492 account, Tiffany testified that Jake McBride suggested that she transfer the funds from the Aegis account to an account called 1492 when they were looking for a different investment firm. (01/27/26, Tr. p.28). She testified that Jake advised her that 1492 is a reputable firm with which he was familiar, and he facilitated the process. (01/27/26, Tr. p.29). The transfer took longer than Tiffany expected. She thought it would be completed in February of 2024, but the account was not opened until September of 2024. (01/27/26, Tr. pp. 28 &30). 1492 emailed account statements to Tiffany. (01/27/26, Tr. p.26). Because 1492 is not associated with a bank, an account was opened at U.S Bank. (01/27/26, Tr. p.29).

Tiffany also testified that VIP had an investment account with Charles Schwab. (01/27/26, Tr. p.31). In October of 2025, Tiffany attempted to access fund from the Charles Schwab account, and the request was denied because her sister, Dolores Vole, rescinded the transfer. (01/27/26, Tr. pp. 32-37). Dolores Vole's access to that account was terminated on November 24, 2021. (01/27/26, Tr. p. 38).

Tiffany called Sara Putz as a witness. Ms. Putz is a financial advisor, a fiduciary with LPL Financial. She has 30 years of experience. (01/28/26, Tr. p. 146). Ms. Putz met with Tiffany in August of 2025. (01/28/26, Tr. p. 147) Ms. Putz testified that the Trust has an account with Aegis and that those assets were moved to US Bank/1492. (01/28/26, Tr. p. 150-151) There was also an account with Charles Schwab. (01/28/26, Tr. p. 151) When Ms. Putz attempted to transfer the assets out of 1492 to an account at LPL Financial, irregularities arose. (01/28/26, Tr. p. 155) The portfolio appraisal and portfolio summary are just internal numbers that do not correspond to an actual account number. (01/28/26, Tr. p. 155) The account numbers on the 1492 statement did not reflect an account number at US Bank. (01/28/26, Tr. p. 156) Ms. Putz asked Tiffany to provide her with the 1099 issued last year that was issued off of this account because the 1099 would show the initiating institution as well as the account number; however, there was no record of a 1099 form. (01/28/26, Tr. p. 157). When Ms. Putz looked at the originating paperwork, the account numbers were blank. (01/28/26, Tr. p. 159) Ms. Putz testified that the paperwork for 1492 is irregular in that it is missing basic customer control information such as: the name of the investment advisor and a phone number to contact that person; an address to whom the statement is being mailed; and the account number. (01/28/26, Tr. p. 164)

Ms. Putz also tried to move the assets from the Charles Schwab account to LPL Financial. (01/28/26, Tr. p. 167) The transaction did not go through. (01/28/26, Tr. p. 169)

Dolly testified that she is familiar with the Charles Schwab account. (01/28/26 Tr. p. 127). She is the one who opened the account. (01/28/26 Tr. p. 127). Dolly was an authorized signatory on the account. (01/28/26 Tr. p. 127). In October of 2025, Dolly received a phone call from David Joseph, an account representative from Charles Schwab. (01/28/26 Tr. p. 128). He told her that there was a transfer made that needed approval and Dolly told him that she did not approve any transaction. (01/28/26 Tr. p. 128). Dolly did not approve the transaction because she felt that Tiffany was taking money out and pilfering the account. (01/28/26 Tr. p. 128). Dolly Vole testified that she

learned she was disinherited at least a month or so after her father passed. (01/28/26 Tr., p. 131). Dolly made no effort to remove herself from the Schwab account (01/28/26 Tr. p. 132). At the time of the attempted transfer in October of 2025, the account had between $470,000 - $500,000 in the account. (01/28/26 Tr. p. 132)

Ms. Putz testified that the account holder has an obligation to notify the financial institution where there is a substantive change such as death. Likewise, a formerly authorized person that continues to receive statements has an obligation to notify the financial institution that he/she is no longer authorized to receive statements. And finally, the financial institution has an obligation to verify whether there has been a change to the accounts. (01/28/26, Tr. pp. 188-189).

Therefore, with respect to this litigation, Tiffany had an obligation to notify Schwab that her father died and that she was the Trustee of the Trust. Dolly had an obligation to notify Schwab that she was no longer an authorized agent on the account and, finally, Schwab had an obligation to contact the identified account holders to confirm whether there have been any changes to the account. Here, Tiffany failed to notify Schwab and Dolly failed to notify Schwab. It is unknown whether Schwab reached out to Dolly to verify whether there had been any changes to the account.

Dolly's gamesmanship with respect to the Charles Schwab account highlights the ongoing dysfunction in this family. Dolly had no authority to refuse to authorize the transfer of the Charles Schwab account. Although Dolly was previously a signatory to the account, that right was extinguished once Peter stripped her of her authority to act on behalf of VIP. Ms. Putz testified that Dolly had an obligation to reach out to Charles Shwab and notify it that she was no longer a signatory to the account. Dolly's fear that Tiffany intended to strip the accounts of their funds does not justify her action. Particularly, because unless and until Dolly prevails in her will contest and trust dispute, her father excluded her from inheriting.

**Tiffany's Compensation**

Tiffany testified about the compensation that she paid herself as trustee of the Trust and as an officer of VIP. Tiffany collectively paid herself an annual salary of approximately $175,000 from VIP and the Trust. 01/26/26 Tr. pp. 84, 188). Tiffany also paid herself a "holiday bonus" of $10,000. (01/26/26 Tr. p. 170). Tiffany admitted that, when she disclosed to Tony—a beneficiary of the Trust and VIP shareholder—the compensation she intended to pay herself, Tony objected to it as excessive. (01/26/26 Tr. p. 173). Tony testified that Tiffany told him that she believed she deserved $250,000 in annual compensation, to which Tony objected, specifically explaining that he could not understand why Tiffany was seeking compensation after delegating her responsibilities to third parties who were themselves already receiving compensation from the Trust and/or VIP. (01/28/26 Tr. pp. 40, 42, 53). Tiffany responded to Tony's objections by stating that Tony was ". . . not the Trustee" and by hanging up on him. (01/28/26 Tr. pp. 42, 55). Tony testified that he told Tiffany that her salary was ridiculous, "especially because the Trust is not bringing in that amount of money now that the one asset was sold for the Trust . . . meaning Chemblend." Tony told his sister that she should not get paid wages if the business can't sustain the salary, to which Tiffany responded, "Whether the business can sustain the salary or not, I should be getting paid for my services." (01/28/27 Tr. p. 54 ). Tony responded, "You don't pay yourself a salary if the business cannot sustain a salary. That is business 101." (01/28/27 Tr. p. 55 ) "I tried to explain that business owners can't always pay themselves right away because you have

to wait until it can sustain that. She did not like my response, and she hung up on me." (01/28/27 Tr. p. 55 ) When Tony later asked Tiffany how much she was paying herself, she told him that it was none of his business. (01/28/27 Tr. p. 55) Tony asked Tiffany at least five times how much she was paying herself, the final time being on July 29, 2025. (01/28/27 Tr. p. 56)

**Tiffany Resides Rent Free at a Property Owned by VIP/Trust**
Tiffany admitted that, since January of 2024, she has and continues to reside rent-free at a residence owned by the Trust and located at 21791 W. Illinois Route 120, Grayslake, IL 60030 ("Grayslake Residence"). (01/26/26 Tr. pp.76,198,203). The Grayslake Residence is approximately 4,000 square feet, located on a more than 47 acre lot. (01/26/26/ Tr. p. 197). Tiffany herself estimated that the income the Grayslake Residence could have generated for the Trust was approximately $5,000-$6,000 per month, totaling $60,000 - $72,000 to rental income to the Trust each year. (01/26/26 Tr. pp. 197, 204). Tiffany admitted that she has and continues to pay no rent for her use of the Grayslake Residence, despite the fact that it is owned by Trust of which she is a trustee. (01/26/26 Tr. pp. 196, 198). Tiffany also admitted that from January of 2024 through the Spring of 2025, VIP paid other expenses associated with the Residence, including electric costs, insurance premiums and Dish Network. (01/26/26 Tr. pp. 198-99). Tiffany also admitted that her rent-free use of the Residence was not a form of compensation for her purported services for VIP or the Trust. (01/26/26 Tr. p. 195-96).

VIP paid for other personal expenses of Tiffany, including auto insurance premiums, vehicle repair expenses, and gas for travel. (01/26/26 Tr. p. 219).

Tiffany also admitted that her former romantic partner, Ivan Purnell, was performing services at the Residence at no cost to her while simultaneously securing contract work with VIP and the Trust. (01/26/26 Tr. p. 199). Tiffany claimed to see no conflict or controversy in these arrangements. (01/26/26 Tr. p. 200).

**Tiffany's Substantial Payments to Gil Bacus**
Tiffany paid substantial sums of money from the Trust and/or VIP to Gil Bacus ("Bacus"), Peter's former caretaker. (01/26/26 Tr. pp. 185-86; PEX 12; PEX 14). According to Tiffany, after her father died, Tiffany hired Bacus to serve as "Director of Operations" for VIP, but she designated him as an "independent contractor." (01/26/26 Tr. pp. 231-32). Tiffany testified that Bacus had a nursing degree, and that he did not have experience in connection with buying selling, renting or leasing real estate. (01/26/26 Tr. p. 181). To justify why she would a hire a nurse to act as "Director of Operations" Tiffany testified that Mr. Bacus, "had been a caregiver for many years to the gentleman who owned and founded Berkshire Hathaway. So just from spending lots of time with that gentleman, he learned a lot. Not obviously education. And he had worked as an accountant briefly, so he knew QuickBooks and things like that." (01/26/26 Tr. p. 181). Tiffany paid Mr. Bacus $37 per hour for his services from the Trust and/or VIP, at an average of 40 hours a week, totaling $85,000 in 2024 alone. (01/26/26 Tr. pp. 185-86).

In terms of work that Mr. Bacus performed for VIP, Tiffany testified that Mr. Bacus scanned VIP records into PDF format (01/26/26 Tr. p. 124). Mr. Bacus also cataloged Peter's personal possessions. (01/26/26 Tr. p. 182). He would help Tiffany with day to day tasks such as dropping off a payment to an accountant or to scan something in and then dropping it off. (01/26/26 Tr. p.

Page **14** of **44**

183). Tiffany testified that her plan was to have Gil Bacus perform the accounting after Tiffany did not renew Riverside's contract. (01/26/26 Tr. p. 122). Tiffany testified that Gil Bakus logged his hours on time sheets, and he shared those time sheets with her. (01/26/26 Tr. p. 232). Tiffany did not produce Mr. Bakus' timesheets as part of discovery. (01/26/26 Tr. p. 233).

Tiffany admitted that Mr. Bacus performed personal errands and childcare for her (01/26/26 Tr. pp. 183-85, 233). Tony testified that Bacus ran errands for Tiffany, performed babysitting services for Tiffany, and otherwise served as—in Tiffany's words—the "personal assistant" of Tiffany. (01/28/26 Tr. pp. 57-58). When Tony asked how much Bacus was being paid from the Trust, Tiffany responded that it was none of his business. (01/28/26 Tr. p. 58).

**Tiffany's Failure to Pursue Loans Owed to the Estate and Trust**
Tiffany also admitted that certain loans have been and remain due and owing to the Estate and/or Trust. (01/26/26 Tr. pp. 2078-08). Tiffany's testimony also made clear that she has taken little to no action to pursue certain loans due and owing to the Estate and/or Trust, including loans owed by Steven Vole totaling approximately $100,000. (01/26/26 Tr. pp. 208-10; 01/27/26 Tr. pp. 114-15). Similarly, in one instance, Tiffany asserted that she only recently "got that file" for a particular debtor owing approximately $75,000, notwithstanding that she has been sole trustee of the Trust for more than two years. (01/26/26 Tr. p. 214).

Tiffany also testified that Ivan Purnell has been advancing expenses during the pendency of the TRO in this matter, rather than those expenses being forwarded to and paid by Jake McBride of Riverside, and that she believes that Ivan Purnell is going to record a mechanic's lien on Trust or VIP property after the TRO is resolved. (01/27/26 Tr. p. 119).

**STANDARD FOR A PRELIMINARY INJUNCTION**

In order for the court to issue a preliminary injunction, the party moving for the injunction

must demonstrate a fair question as to:

    a.   An ascertainable right in need of protection;
    b.   A likelihood of success on the merits;
    c.   Irreparable harm in the absence of injunctive relief, and,
    d.   The lack of an adequate remedy at law.

*Glancy v. Brown*, 2021 IL App (3d) 200468.

A party seeking a preliminary injunction faces a lower burden of proof than that required

to prevail on the ultimate issue; the plaintiff need only prove a *prima facie* case that there is a fair

belief that the plaintiff probably will be entitled to relief sought, and that the matters should be

kept in the status quo until the case be decided on the merits. *Smith v. Edward D. Jones and*

*Company, LP,* 2017 Ill.App (2d) 170172-U,¶ 28; *Hutsonville Cmty Unit Sch. Dist. No.1 v. Illinois High School Ass'n,* 2021 Ill App (5th) 210308,¶ 1.

Once the trial court establishes the requirements for a preliminary injunction, the court must then balance the equities to determine the relative inconvenience to the parties and whether the burden on defendant should the injunction issue outweighs the burden on the plaintiff should it be denied. *Franz v. Calaco Development Corp.*, 322 Ill. App. 3d 941, 946, 256 Ill.Dec. 413, 751 N.E.2d 1250 (2001).

When considering whether there is a fair question as to a reasonable likelihood of success of the merits of Tony's counterclaim, the court considers the proven facts in conjunction with the language of the Trust, the provisions of the Illinois Trust Code and the provisions of the Illinois Business Act. The relevant sections upon which the court rely are set forth below.

**The Language of the Trust**

The court reviewed the Trust Instrument which Tiffany and Tony argue is the controlling instrument, namely, "The Second Amendment and Restatement of the Living Trust Agreement of Peter Vole, Jr. dated October 30, 2022." (PEX 22) The Trust provides, in pertinent part, as follows:

> (a) That the Trustee shall pay "the estate and inheritance taxes … payable in any jurisdiction by reason of my death…." (Art. III (B) (iv), p. 14).
> * * *
>
> (c) That "the Trustee shall then distribute the remaining Trust principal … as follows: 50% to Tony and 50% to Tiffany." (Art. IV (B), p. 17-19.)
>
> (d) That "any Trustee shall be entitled to reasonable compensation for services rendered in administering and distributing the Trust property hereunder and to reimbursement for expenses related to same." (Art. V (M), p. 26; emphasis added.)
>
> (e) The Trustee shall prepare an annual accounting of the Trust assets, income and disbursements and shall deliver a copy thereof to each person having any interest in any Trust Estate created hereunder (Art. V. (O), p.26)

(f) That "the Trustee of this Trust, … shall send, at least annually, a Trust accounting to all of the current beneficiaries of income and principal…" (Art. VII (J), p. 45-46; emphasis added)
***

(g) "A 'Trust accounting' is a detailed, written document for a specific period of time, which provides detailed information regarding the finances of the Trust that occurred during that period of time. The accounting may be an annual accounting, an accounting from the date of the most recent accounting or an accounting upon the occurrence of an event. The accounting should include: (a) a list of the Trust assets including approximate values, and liabilities as of the first date of the accounting period; (b) a detailed chronological itemization of all the receipts, expenditures, and distributions, including the amount of the Trustee's compensation, occurring since the beginning of the date of the accounting period through the date of the accounting; (c) a list of and value of the Trust assets to the extent feasible, as well as the liabilities and the amounts thereof, on hand at the close of the accounting period; and (d) all other material facts related to the Trustee's administration of the Trust during the accounting period." (Art. VII (I), p. 45; emphasis added.)

(h) "The term 'current beneficiary' shall mean a beneficiary that on the date of the beneficiary's qualification is determined is a distributee or permissible distributee of Trust income or principal…." (Art. VII (S), p. 48-49.)

(i) That if Tiffany does not serve as Trustee, then Tony shall serve as successor Trustee. (Art. VII (A)(2), p. 39.)

## The Illinois Trust Code

The following provisions of the Illinois Trust Code apply to this matter:

**Duty to Inform and Account 760 ILCS 3/813.1**
(2) A trustee shall send at least annually a trust accounting to all current beneficiaries.

**Prudent Administration 760 ILCS 3/804**
A trustee shall administer the trust as a prudent person would, by considering the purposes, terms, distribution requirements, and other circumstances of the trust. In satisfying this standard, the trustee shall exercise reasonable care, skill and caution.

**Recordkeeping and identification of trust property. 760 ILCS 3/810**
(a) A trustee shall keep adequate records of the administration of the trust.

**Enforcement and defense of claims. 760 ILCS 3/811**
A trustee shall take reasonable steps to enforce claims of the trust and to defend claims against the trust. It may be reasonable for a trustee not to enforce a claim, not to defend an

Page **17** of **44**

action, to settle an action, or to suffer a default, depending upon the likelihood of recovery and the cost of suit and enforcement.

**Removal of trustee  760 ILS 3/706**
(a) A settlor, co-trustee, or a qualified beneficiary may request the court to remove a trustee, or a trustee may be removed by the court on its own initiative

(b) The court may remove a trustee if:
(1) The trustee has committed a  serious breach of trust

 *
(3) because of unfitness, unwillingness, or persistent failure of the trustee to administer the trust effectively, the court determines that removal of the trustee best serves the purposes of the trust and the interests of the beneficiaries.

(c) pending a final decision on a request to remove a trustee, or in lieu of or in addition to removing a trustee, the court may order such appropriate relief under section (b) of Section 1001 as may be necessary to protect the trust property or the interests of the beneficiaries.

**Remedies for breach of trust 760 ILCS 3/1001**
(a) A violation by a trustee of a duty the trustee owes to a beneficiary is a breach of trust.

(b) To remedy a breach of trust that has occurred or may occur, the court may:
(1) compel the trustee to perform the trustee's duties;
(2) enjoin the trustee from committing a breach of trust;
(3) compel the trustee to redress a breach of trust by paying money, restoring property, or other means;
(4) order a trustee to account;
(5) appoint a special fiduciary to take possession of the trust property and administer the trust;
(6) suspend the trustee;
(7) remove the trustee as provided in Section 706;
(8) reduce or deny compensation to the trustee; or
(9) subject to Section 1012, void an act of the trustee, impose a lien or a constructive trust on trust property, or trace trust property wrongfully disposed of and recover the property or its proceeds.
* * *
(d) Nothing in this Section limits the equitable powers of the court to order other appropriate relief.

**The Illinois Business Corporation Act**

The Illinois Business Corporation Act is pertinent to the analysis because VIP is a corporation.  The following provisions of the Code apply to this matter:

Page **18** of **44**

**Meeting of shareholders.  805 ILCS 5/7.05**
An annual meeting of the shareholders shall be held at such time as may be provided in the by-laws or in the resolution of the board of directors pursuant to authority in the by-laws.

**Notice of shareholder's meetings.  805 ILCS 5/7.15**
Written notice stating the place, if any, day, hour of the meeting . . . shall be delivered not less than 10 no more than 60 days before the date of the meeting.

**Officers 805 ILCS 5/8.50**
A corporation shall have such officers as shall be provided in the by-laws, each of whom shall be elected by the board of directors at such time and in such manner as may be prescribed by the by-laws.

**Board of directors  805 ILC 5/8.05**
(a) (E)ach corporation shall have a board of directors and the business and affairs of the corporation shall be managed by or under the direction of the board of directors.
*
(c) Unless otherwise provided in the article of incorporation, the board of directors, . . . shall have authority to establish reasonable compensation of all directors for services to the corporation as directors, officers or otherwise, notwithstanding the provisions of Section 8.6.

**Corporate records – Examinations by shareholders. 805 ILCS 5/7.75**
(a) Each corporation shall keep correct and complete books and records of account and shall also keep minutes of the proceedings of its shareholders and board of directors and committees thereof; and shall keep at its registered office or principal place of business in this State, or at the office of a transfer agent or registrar in this State, a record of its shareholders, giving the names and addresses of all shareholders and the number and class of the shares held by each. A record of shareholders certified by an officer or transfer agent shall be competent evidence in all courts of this State.

(b) Any person who is a shareholder of record shall have the right to examine, in person or by agent, at any reasonable time or times, the corporation's books and records of account, minutes, voting trust agreements filed with the corporation and record of shareholders, and to make extracts therefrom, but only for a proper purpose. In order to exercise this right, a shareholder must make written demand upon the corporation, stating with particularity the records sought to be examined and the purpose therefor.

(c) If the corporation refuses examination, the shareholder may file suit in the circuit court of the county in which either the registered agent or principal office of the corporation is located to compel by mandamus or otherwise such examination as may be proper. If a shareholder seeks to examine books or records of account the burden of proof is upon the shareholder to establish a proper purpose. If the purpose is to examine minutes or the record of shareholders or a voting trust agreement, the burden of proof is upon the corporation to establish that the shareholder does not have a proper purpose.

Page **19** of **44**

(d) Any officer, or agent, or a corporation which shall refuse to allow any shareholder or his or her agent so to examine and make extracts from its books and records of accounts, minutes and records of shareholders, for any proper purpose, shall be liable to such shareholder, in a penalty of up to ten per cent of the value of the shares owned by such shareholder, in addition to any other damages or remedy afforded him or her by law. It shall be a defense to any action for penalties under this Section that the person suing therefor has within two years sold or offered for sale any list of shareholders of such corporation or any other corporation or has aided or abetted any person in procuring any list of shareholders for any such purpose, or has improperly used any information secured through any prior examination of the books and records of account, or minutes, or records of shareholders of such corporation or any other corporation.

(e)  Upon the written request of any shareholder of a corporation, the corporation shall mail to such shareholder within 14 days after receipt of such request a balance sheet as of the close of its latest fiscal year and a profit and loss statement for such fiscal year; provided that if such request is received by the corporation before such financial statements are available, the corporation shall mail such financial statements within 14 days after they become available, but in any event within 120 days after the close of its latest fiscal year.

**Shareholder remedies: Non-public corporations. 805 ILCS 5/12-56**

(a) In an action by a shareholder in a corporation that has no shares listed on a national securities exchange . . . the Circuit Court may order one or more of the remedies listed in subsection(b) if it is established  that:
*
*
(3) The directors or those in control of the corporation have acted, are acting or will act in a manner that is illegal, oppressive, or fraudulent with respect to the petitioning shareholder whether in his or her capacity as a shareholder, director, or officer or

(4) The corporation assets are being misapplied or wasted.

(b) The relief which the court may order in an action under subsection (a) includes, but is not limited to the following:

*
*
(3) The removal from office of any director or officer;
*
(5) An accounting with respect to any matter in dispute
(6) The appointment of a custodian to manage the business and affairs of the corporation to serve for the term and under the conditions prescribed by the court.

**TIFFANY'S POSITION THAT SHE WAS PREJUDICED BY THE COURT CONDUCTING A PRELIMINARY INJUNCTION HEARING IS NOT FOUNDED**

Tiffany argues that Preliminary Injunction hearing is based upon a sham perpetrated upon the court at the TRO hearing. At the TRO hearing, Tony alleged that Tiffany took an alleged draw of $334,413.20 in January of 2025 and an alleged draw of $968,671.22 in May of 2025. In his opening at the Preliminary Injunction hearing, Tony conceded that his representation at the TRO was inaccurate in that he now understands that the entry contained within the record documents the cumulative distributions Tiffany took, rather than a single distribution. Tiffany argues that based upon that misstatement the court should have denied the TRO. However, the alleged draw was only one factor upon which the court granted the TRO. The court also granted the TRO upon Tiffany's refusal to give Tony access to the books and records of VIP, Tiffany's failure to provide a Trust accounting and her failure to pay the real estate taxes on real estate owned by the Trust. (See the Order entered 11-5-25) The court would have granted the TRO even Tony's counsel had not raised the issue of the draws.

Tiffany further argues that the court has unfairly prejudiced her by proceeding to a TRO hearing and a preliminary injunction before she has access to the records that are allegedly being held hostage by her former attorneys. The court has a different perspective. The court believes that Tiffany's perceived crisis is one of her own makings. Once Tiffany refused to allow Tony access to the book and records in the summer of 2026, like a house of cards, the walls began tumbling down. Tiffany has spent (but not accounted for) the financial reserves of VIP and the Trust. On July 16, 2025, the court ordered Tiffany to produce records. About six weeks later, on September 12, 2026, and as Tiffany's actions as the Director of VIP and the Trustee of the Trust finally faced the scrutiny of her siblings and the court, Tiffany and her attorneys parted ways. On September 30, a new law firm filed an appearance on behalf of Tiffany. After the court granted the TRO on

October 31, 2026, and, after the court set the preliminary injunction hearing for January 26-29, 2026, Tiffany again parted ways with her new attorneys. The attorneys withdrew on December 10th. The court granted Tiffany 21 days, or up to December 31, 2025, to seek new counsel. The court retained the hearing date of January 26 for the Preliminary Injunction hearing.

Tiffany argues that she could not be prepared for the preliminary injunction hearing because her former attorneys were holding her documents hostage. Even if that statement is true, it does not provide grounds for continuing the hearing on the Preliminary Injunction. Tiffany has been the Director of VIP and the Trustee of the Trust since 2024, and she has been in control of the books and records for the duration of that time. The reasons articulated by Tiffany as a basis as to why she was prejudiced by holding the preliminary injunction hearing in January of 2026 were conditions manufactured by herself. She refused to allow Tony access to the books and records. She refused to produce records until the court entered an order compelling her to do so. All of those actions happened before her attorneys withdrew. After the court ordered Tiffany to turn over the records on July 16th, her attorney withdrew on September 12th. She had about 6 weeks to produce the records before her attorneys withdrew, but she failed to do so. After Tiffany retained new counsel on September 20, she never came into court to advise the court that she could not produce the records because they were being held hostage by her first firm. Instead, a month later, after the court granted the TRO and set the matter for a Preliminary Injunction hearing, Tiffany's new attorney withdrew. This attorney withdrew before producing the documents. Each time the court took steps to move the litigation forward, Tiffany stalled that progress by another 21 days to obtain new counsel. Frankly, Tiffany should have produced the records well before her opposing counsel had to file a Motion to Compel. Moreover, Tiffany testified at the Preliminary Injunction hearing that she had some responsive documents in her possession that never produced.

Page **22** of **44**

The evidence presented at the Preliminary Injunction highlighted the need for an expedited Preliminary Injunction hearing. The Petitioner's presented ample evidence that exposed the outermost layers of Tiffany's poor decision making and mishandling of VIP and the Trust.

**THE ELEMENTS OF A PRELIMINARY INJUNCTION IN CONJUNCTION WITH THE FACTS OF THE CASE AND THE APPLICATION OF THE TRUST INSTRUMENT, THE TRUST CODE AND THE ILLINOIS BUSINESS CORPORATION ACT**

**An Ascertainable Right in Need of Protection**

Tony Vole is a beneficiary of the Trust under both the challenged Second Restatement and the preceding First Restatement. He has rights as beneficiary of the Trust empowering him to seek injunctive relief. Moreover, because the Trust is a VIP shareholder, improper administration of the assets of VIP adversely impacts the Trust which is highly invested in VIP. The court finds that Tony is an interested party and he has an ascertainable right in need of protection with respect to the Trust.

The also court finds that Tony has an ascertainable right in need of protection with respect to VIP because Tony is a direct shareholder in VIP.

The remaining Petitioners, Dolly, Peter III and Robert argue that as beneficiaries of a prior instrument, they are "interested persons" where they seek to set aside a more recently disputed interest. They further argue that the Trust is a VIP shareholder, as such, the improper administration of the assets of VIP, by extension, adversely impacts and constitutes improper administration of the Trust which is highly invested in VIP. This assertion may be true, but a preliminary injunction is always tethered to the underlying complaint. In this matter, the court heard no evidence regarding the Will Contest or the Trust dispute, thus, the granting or denial of the Preliminary Injunction order rests solely upon the counter claim filed by Tony against Tiffany.

**A Likelihood of Success on the Merits**

Here, the request for the entry of a Preliminary Injunction is tethered to Tony's counterclaim, brought individually and derivatively which seeks to remove Tiffany as Trustee for her breach of fiduciary duties and failure to respond to corporate records.

At the close of evidence of the preliminary injunction hearing, the court weighs the credibility of the witnesses and the credibility of the evidence and then stiches the testimony and evidence into a cohesive story. Here, the story is one of a daughter who took her father's multimillion dollar business and, in two short years, transformed it into a business saddled with liens and insufficient income flow to cover expenses.

Peter Vole ran his real estate empire without the assistance of a property management company. As he got older, and he needed more assistance, his daughter Dolly stepped in to help him. Tiffany left Florida and came to Illinois to help care for her aging father. In addition to caring for her father, Tiffany helped Dolly run the business and she would perform the tasks that Dolly directed her to perform.

In 2021, Peter took control of the business from Dolly. Dolly instituted a guardianship proceeding against her father. Peter's attorney suggested that Peter should hire a management company because Peter was struggling with his health and Tiffany did not have broker's license, so she could not write leases. Therefore, in 2021, Peter entered into a management contract with Riverside, with the contract expiring in 2023.

Riverside took over the management of the properties. The management included collecting rents, signing leases and maintaining the properties. Tiffany continued in her role as an assistant, but to her father, instead of Dolly. Tiffany ran errands, delivered supplies to jobs, and made sure tradesmen had transportation to job sites. Tiffany did not run the company or make the business decisions for the company, rather, Peter did, and Riverside managed the portfolio. In this

Page **24** of **44**

position, her father believed a fair salary for Tiffany was $5,000 per month, which amount included compensation for the caregiving of her father. Tiffany acknowledged that her father made the decisions, and he liked to do things his way, even if she disagreed with decisions, like having a singular operating account for VIP and the Trust.

At the time of Peter's death, under the contested Trust instrument, VIP was owned 50% by the Trust, 25% by Tony, and 25% by Tiffany. Tiffany and Peter were equal beneficiaries under the Trust. When Tiffany's father died, she assumed control of the company because her father put her in the position as the Trustee of the Trust and the director of VIP. When Peter was operating VIP, although the Trust owned 50% of VIP, Peter had ownership of the other 50% of VIP and he was the Trustee of the Trust, therefore, he controlled VIP and the Trust.

Tiffany testified that after Peter's death, she continued running the business as her father did. Unfortunately, Tiffany failed to understand that under the disputed Trust instrument, once her father died, the power structure changed. Peter set up his Trust and VIP such that he alone had complete control. During Peter's lifetime, the Trust directed the Trustee (Peter) and the Co-Trustee (Tiffany) to distribute the net income and principal to Peter, even to the extent of exhausting principal. Significantly, Peter's trust assets were not distributed to Tiffany and Tony until the date of Peter's death. Unlike Peter, who effectively enjoyed 100% interest in the trust assets and VIP, upon Peter's death, Tiffany and Tony shared equally: Peter's 50% ownership of VIP was divided equally between Tiffany and Tony and Tiffany and Tony shared equally under the Trust. This new structure is why Tiffany's moment on the stand was pivotal: Tiffany's testimony revealed that she believed that because she owned 25% of VIP and because she was the Trustee of the Trust, such that she controlled the Trust's 50% ownership of VIP, that position of power secured her position as Director and Secretary of VIP for all eternity. She believed that she could hold the

Page **25** of **44**

position forever because Tony would never have enough voting power to vote her off as Director. She believed that in her capacity as the Trustee, she could meet her fiduciary duty by always voting for herself to remain as Trustee. As such, Tiffany believed that she was invincible, and, with this belief, she began running the company as if she owed no fiduciary duties to VIP, the Trust or her brother. And, with that belief system firmly entrenched, Tiffany treated the assets of VIP and the Trust as if they were hers to spend without checks or balances.  She treated the assets of VIP and the Trust as if she were Peter Vole, 100% owner, instead of her actual status as Tiffany Vole, 50% owner.

Tiffany's breached her fiduciary duty by a number of her actions/inactions. Her first breach of fiduciary duty was her refusal to allow Tony to inspect the books and record of VIP. As a shareholder of VIP, Tony has a right to inspect the records, after making a formal demand. Tony made informal requests, and Tiffany refused. Those informal requests were not actionable. However, once Tony exercised his statutory right as a shareholder of VIP by having his counsel make a formal, written demand to inspect the records, Tiffany breached her fiduciary duty when she refused to allow Tony to review the records. Tiffany admitted that Tony has never had access to the books and records of VIP.

Tiffany also breached her fiduciary duty by failing to provide an annual accounting of the Trust. The Trust instrument requires an annual accounting, and, during her tenure as Trustee, Tiffany never provided an accounting of the Trust.  Tiffany argues that the failure to provide an accounting is not her fault because she delegated the task to her attorneys/accountants and the professionals failed to complete the task. Tiffany is the Director and Secretary of VIP. She is the Trustee of the Trust. She had the authority to  hire and fire legal counsel and accountants. She had the responsibility to oversee their work. If legal counsel and accountants were not completing the

tasks that Tiffany delegated to them, their failure to perform does not absolve Tiffany of her fiduciary duties. Tiffany is correct that she had authority to delegate tasks, but the responsibility to complete the annual Trust accounting still rests upon her shoulders. Tiffany testified that her father taught her that she should hire professionals to handle legal matters and her job was to focus on growing the business. While that statement is partially true, it is shortsighted of Tiffany to interpret her father's guidance to mean that she can also delegate her fiduciary duties. Tiffany's authority to delegate duties to professionals did not alleviate Tiffany of the fiduciary duties that she owed VIP and the Trust and, therefore, the failure to provide an accounting of the Trust is a breach of her fiduciary duty.

Tiffany's breach of her fiduciary duty to prepare a Trust accounting and the breach of her fiduciary duty to give Tony access to the books and records of VIP leaves many unanswered questions as to how Tiffany was using the funds generated by VIP and the Trust, particularly because the funds were co-mingled into one operating account. For example, days after her father's death, Tiffany made a distribution to herself in the amount of $100,000.00. The act of taking a distribution in and of itself may not have been a breach, but the court cannot make that determination today because Tiffany never accounted for the distribution, and she can no longer allegedly recall why she took the money. Given Tiffany's incredulous testimony that the trauma of her father's death resulted in an inability to recall why she took the $100,000.00, the court draws the inference that Tiffany knowingly made a distribution to herself, for her own benefit. Again, if the Trust and/or VIP had sufficient assets to make the distribution and to continue operating in a fiscally responsible manner after making the distribution, the distribution may not have been a breach, but the court cannot make that inference because Tiffany failed to provide a Trust accounting and she failed to allow Tony access to the books and records of VIP. Additionally,

Tiffany may have breached a duty to Tony by making a $100,000.00 distribution to herself, but not making an equal distribution to Tony, who owns an equal interest in the Trust and VIP.

Another example of the consequences that flow from Tiffany's breach of her fiduciary duty to prepare a Trust accounting and her breach of fiduciary duty in refusing to give Tony access to the books and records of VIP, is the court's inability to understand the full impact of the sale of the Chemblend property. For purpose of this analysis, the court assumes that selling Chemblend was a good business decision made by her father prior to his death. The property sold for $1.3 million dollars. However, the sale of the property also meant that VIP lost $250,000 of rental income per year. It doesn't take an accounting degree to understand that the loss of that rental income would impact VIP and the Trust's future profit. An overly simple math calculation reveals that after 5.2 years, VIP would deplete the funds from the sale of Chemblend if the operating expenses and if the owner's draws remained the same as they were prior to the sale ($1,300,000/$250,000). Knowing that the loss of annual rent in the amount of $250,000 would impact the overall profitability of VIP and the Trust, as the Director and Trustee, Tiffany, should have had a business plan as to how VIP was going to remain profitable and continue to grow given the loss of the rental income before she took owners draws and other distributions. Tiffany testified that VIP purchased a commercial property known as "Ashely," but Ashly only generates about $45,000 per year in rental income, and that amount is clearly insufficient to bridge the financial gap from the lost rental income from Chemblend. Outside of purchasing Ashely, Tiffany offered no testimony as to how the loss of $250,000 per year in rental income would impact the profitability of VIP/Trust and how she planned to make up for the deficit. This is an important detail, because if VIP had no plan for replacing the lost rental income, then as the Director of VIP, perhaps Tiffany should not have been taking an owners draw and making distributions.

Page **28** of **44**

Along those same lines, because Tiffany failed to provide a Trust accounting and because she refused to allow Tony access to the books and records of VIP, the court does not know with certainty what happened to the $1,300,000.00 in sale proceeds from Chemblend. The court does know that shortly after the sale of Chemblend, Tiffany made a $600,000 distribution to herself and a $600,000 distribution to Tony. The court assumes, but does not know for certain, that at least some of the funds for the distributions came from the proceeds of the sale of Chemblend. As before, without more context, the court cannot find, as a matter of law, that the distribution of $1.2 million dollars was a breach of fiduciary duty. However, the court questions why Tiffany chose to distribute $600,000 to herself and $600,000 to Tony, which is very close to the sale price of the Chemblend property, when she knew that VIP would no longer enjoy $250,000 per year in rental income from Chemblend. The court lacks this critical information because Tiffany breached her fiduciary duty to provide a Trust Accounting and to give Tony access to the Books and Records of VIP.

In a similar vein, Tiffany had authority under the Trust instrument to sell at public or private sale any real or personal property of the Trust. Tiffany exercised that power by selling 10 pieces of real property owned by the Trust and/or VIP. The court cannot find as a matter of law, that the sale of the real property was a breach of fiduciary duty. However, given the current financial state of VIP and the Trust, the court has many questions as to what Tiffany did with the sale proceeds. Once again, because Tiffany has failed to provide a Trust account and because she failed to allow Tony to inspect the books and records of VIP, neither the court nor Tony knows how or for what purpose Tiffany used the sale proceeds of 10 pieces of property.

The court finds there is a fair probability that Tiffany refused to provide a Trust accounting and she refused to allow Tony to have access to the corporate records of VIP, because to do so

would document the financial failure of VIP and the Trust while under her control. Tony is entitled to know how VIP started out with over $2 million in its operating account and now has less than $5,000. Tony is entitled to know how VIP allocated the funds from the 10 or more properties that Tiffany sold and whether the properties were owned by VIP or the Trust. Tony is entitled to know how much Tiffany spent on attorneys that she hired to defend her in the Trust dispute and the Probate challenge. Tony is entitled to know how much Tiffany paid her attorneys and other professionals for the services they performed for VIP and the Trust. Tony is entitled to know the amount that Tiffany took in owner's draws. Tony is entitled to know how much Tiffany made in distributions. Tony is entitled to know if Tiffany continued to take Owner's draws when she knew there were insufficient funds to pay the 2024 property taxes. Tony is entitled to an explanation for every withdrawal of funds Tiffany made and for what purpose the funds were used, including the $100,000 Tiffany distributed to herself shortly after her father's death. Tiffany's refusal to provide an accounting is a breach of her fiduciary duty.  Tiffany's failure to allow Tony to inspect the books and records of VIP was a breach of her fiduciary duty.

Tiffany is correct that as the Director of VIP and the Trustee of the Trust, she is entitled to draw a salary. Tony wisely told Tiffany that it is "Business 101" that the owners of the business cannot take an owner's draw if the business is not generating a profit. This truism leads to Tiffany's third breach of fiduciary duty, the determination that she would take $175,000 per year salary. While an owner may draw a salary, the salary must be reasonable. An owner/trustee who pays herself an unreasonable salary breaches her fiduciary duty. Tiffany argues that her attorneys told her that a salary range between $175,000 to $250,000 would be an appropriate salary for the director of the company, and that she satisfied her fiduciary duty by taking the lower end of the scale.

Tiffany cites to *The Estate of Ross Workman v. Flanary*, 2018 Ill App (1st) 180249 ¶10 for the proposition that her salary was reasonable. This case sets forth the factors the court may consider when making a decision as to whether a salary is reasonable. The court may consider the size of the estate, the work involved, the skill evidenced by the work, the time expended, the success of the efforts, and the good faith and efficiency in which the estate was administered. In applying and giving weight to these factors, the court finds that Tiffany's salary was not reasonable.

Tiffany has a college degree, but she has never held a job involving the operation of business. She worked in law firm as clerical staff, and she worked as a waitress. She took care of her father. She does not have the background or experience that justifies the salary drawn by an experienced executive. Tiffany gained hands on experience on the day to day operations of VIP by following Dolly's instructions and then her Father's instructions to complete certain tasks. Nevertheless, completing a punch list of specific activities is not akin to running a company. When Peter's lawyer determined that Peter could no longer run the business, the lawyer did not suggest that Tiffany should transition into running VIP, rather, he suggested that Peter should hire a property manager. The responsibility of a property manager includes the day to day responsibilities of running the portfolio such as entering into leases, collecting the rent, and maintaining the properties. Per the contract with VIP, Riverside had discretion to make repairs up to a certain dollar amount, but Riverside needed owner permission to exceed that amount. Thus, Peter/Tiffany retained the authority to make major financial decisions and run the finances of the company, but Riverside handled the day to day work.

When Tiffany testified to the work she performed for VIP after she became Director, curiously, her stated job duties matched exactly what she described when Dolly and/or Peter were

in control before VIP hired Riverside. Tiffany did not identify any job duties she performed as a Director running a multimillion dollar business. Tiffany testified that in her position as Director for VIP she ran errands, spoke with tenants, made sure tradespeople had transportation to job sites, cleaned up, and handled utility issues. Thus, most of her days were filled with running the day to day operation of the rental properties, which were the same tasks she performed for Dolly and Peter. Her description also matches the duties she delegated to Riverside. Thus, the majority of the job duties that Tiffany described she performed for VIP in her role as Director were duties that Peter, prior to his death, delegated to Riverside and that Tiffany extended. At the preliminary injunction hearing, the court commented that it did not have a clear grasp of the tasks Tiffany performed in her position as Director, and despite being given the opportunity to explain in more detail, Tiffany testified that her job duties involve the day to day operation of the portfolio.

Tiffany also delegated certain job duties in her position as Director of VIP to others. After Peter died, Tiffany made Jake McBride an agent of the Trustee, which means she delegated the tasks that traditionally rest upon the shoulder of the director of VIP, to Jake McBride. Tiffany also delegated tasks to outside professionals such as lawyers and accountants. The court is not critical of this outsourcing, as the duties Tiffany delegated required an expertise that Tiffany did not possess. (The fact that Tiffany told Tony that he was not entitled to a K-1 statement highlights her inexperience. The fact that Tiffany did not understand the basis of the loan that she negotiated for Jake McBride highlights her inexperience). Critically, however, when Tiffany described her duties as the Director of VIP, she did not include oversight of outside counsel and other professionals. Tiffany blames her legal counsel for much of VIP's current predicament, and yet, if she had been monitoring and overseeing their work as an experienced Director would do, she would have known that certain tasks were not allegedly being completed.

In her role as Director of VIP, Tiffany testified that VIP has not filed Income Taxes for 2024 or 2025. Tiffany admitted that Peter's estate had incurred around $141,000.00 in penalties for failure to pay federal estate taxes in full when due. By failing to timely fail federal income tax and by failing to pay the Estate Tax, Tiffany is incurring additional costs and penalties at a time when VIP is struggling financially. These were tasks that Tiffany delagated to others. If Tiffany had been monitoring and overseeing the accountant's work as an experienced Director would do, she would have known that certain tasks were not allegedly being completed. Tiffany was unable to explain why the taxes have not been filed.

The court finds that Tiffany did not have the experience or skill to run the business side of the property folio. That lack of skill is shown by the fact that when Tiffany took control of the company the company had over $2 million in its trust account and generated sufficient income for Peter to lead a comfortable life on his owner's draws. In two short years, only $5,000 remains in the account. The portfolio has not generated a profit since 2024. Tiffany has failed to pay property taxes. She has failed to file Federal Tax Returns. She has failed to fully pay the estate taxes. She has sold ten properties. She paid a salary to Gil Bakus. The sharp decline in profits during her leadership of the company is sufficient evidence that Tiffany lacked the skill and experience to run VIP and, therefore, her decision to pay herself an annual salary of $175,000 plus a $10,000 bonus was not reasonable. The court finds that Tiffany breached her fiduciary duty by drawing a salary that was not commensurate with her skill level or the services she performed on behalf of VIP.

Tiffany also breached her fiduciary duty by living in a property owned by VIP without paying rent. Her rationale for living in the house rent free was that she lived there while she was caring for her father and so when he died, she did not move out of "our" house. (01/26/26, Tr. p. 196 ). Apparently, her justification was that because her father lived in the house rent free,

therefore, she too was entitled to live the house rent free, because it was her "home." Once again, Tiffany falls victim to her incorrect perception that she stepped into her father's shoes and was entitled to everything he had. Tiffany and Tony have an equal interest in the Trust and VIP. Her excuse for living rent free was that she offered Tony the same opportunity, but he declined (01/26/26,Tr. p. 203). This rationale further accentuates Tiffany's misunderstanding of her fiduciary duties. She appears to believe that she did not breach a fiduciary duty because she offered Tony the same deal and he refused. She does not seem to appreciate that she breached her fiduciary to VIP by depriving VIP of income. Offering Tony the opportunity to also deprive VIP of income, does not erase her breach. By using VIP property as her home without paying rent, Tiffany deprived VIP of rental income between $60,000 to $72,000 per year. Tiffany further compounded her breach by having VIP pay for other housing expenses such as utilities and insurance. By 2024, VIP was no longer generating profit. VIP would have benefited greatly from the added inflow of $60,000 - $72,000 rental income per year. By living in an asset of VIP for free and by having VIP pay for expenses related to the home, Tiffany breached her fiduciary duty to VIP.

Tiffany breached her fiduciary to VIP by hiring Gil Backus as her "Director of Operations." Mr. Bakus is a skilled nurse. The fact that he nursed a founder of Berkshire Hathaway and "learned a lot" does not give him the experience necessary to help run a real estate business in the position of "The Director of Operations." (The fact that Tiffany testified that Gil's former position of nursing a founder of Berkshire Hathway qualified him to help run VIP, is further evidence that Tiffany did not have the experience to run VIP.) More disturbing is the fact that Mr. Bakus' stated job duties mirror the job responsibilities that Tiffany described as her job responsibility as Director of VIP, namely, the day to day operations of property management, which VIP had already delegated to Riverside. Taking Tiffany's testimony as true, that means that Riverside, Tiffany and

Mr. Bakus were all managing the day to day responsibilities for the properties in the portfolio. It appears that Mr. Bakus also assisted Tiffany with matters outside of her duties related to VIP such as picking up her daughter and running personal errand. There was no legitimate business purpose that served VIP by hiring Gil Bakus as "the Director of Operations" or as Tiffany's personal assistant, and by placing Gil Bakus in that position, Tiffany breached her fiduciary duty to the Trust and VIP.

Tiffany's mismanagement of the company is best demonstrated by her failure to pay the 2024 real estate taxes on the properties owned by the portfolio. By failing to do so, she placed at risk the assets of VIP and the Trust. Tiffany's testimony that Jake McBride was supposed to reserve the funds is not credible for the reasons stated within the fact section. Tiffany failed to reserve sufficient funds to pay the 2024 property taxes. By failing to reserve funds to protect the assets of VIP and the Trust, Tiffany has placed the entire business model of VIP in jeopardy. Despite knowing when the real estate taxes were due, and despite knowing that there were insufficient funds in the operating account to pay the taxes, Tiffany waited until October of 2025, after the property taxes were sold to a third party, to investigate whether she could cash out the Charles Schwab account and the 1457 account to pay the real estate taxes. Paying the real estate property taxes should have been her first priority since VIP and Trust's business model is based upon the income stream generated from rental properties. Because Tiffany had a source of funds to pay the real estate taxes, and yet she waited to draw from the funds until after the real estate taxes had already been sold, Tiffany violated her fiduciary duty.

For all of the reasons set forth above, the court finds that Tony has proven that he has a fair chance of a likelihood of success on the merits of his counterclaim against Tiffany for breaches of fiduciary duty and his request to remove her as trustee.

**Irreparable Harm in the Absence of Injunctive Relief, and the Lack of an Adequate Remedy at Law.**

Tiffany argues that the petitioners have an adequate remedy in the form of money damages. *Franz v. Calaco Development Corporation.* 322 Ill.App.3d 941 (2nd 2001). In the *Franz* case a limited partner brought an action against the general partner alleging a breach of contract and breach of fiduciary duty after the partnership sold vacate lots without the consent of the limited partner. The purpose of the limited partnership was to develop and sell vacant land for the construction of single family residences and town homes. The trial court entered a preliminary injunction enjoining the sale or conveyance of lots. The appellate court reversed on the basis that the only reliefs sought was monetary damages and therefore injunctive relief was inappropriate. As a basis for its ruling the appellate court held, "However, Plaintiff's entitlement based on the partnership agreement is to profits in the partnership, not to an interest in real estate." *Id* at. 948.

The holding in *Franz* can be distinguished. Unlike the *Franz* case, where the goal of the partnership was to acquire real property for the sole purpose of selling the lots to make a profit, here, VIP's business model is based upon its continued interest in holding title to the real estate. This is because VIP's income stream is dependent upon the rental income coming from the real property. VIP business model is built upon retaining ownership of the real property and making a profit from the rental stream. When Tiffany sold 10 properties, she forever lost the income stream from those properties. While VIP may have enjoyed a momentary bump in profit from the sales of real property, that enjoyment is heavily offset by the loss of future rental income. The nature of the business of VIP is the reason why Tiffany's failure to pay the 2024 real estate taxes has such a devasting impact upon VIP. Each time Tiffany sells a piece of real property owned by VIP or the Trust, and each year she fails to pay the property taxes, she places VIP at risk of going out of business. An action by a party which will ultimately result in putting another party out of business

constitutes irreparable harm. *Gold v. Ziff Communications Company,* 196 Ill.App.3d 425 (1st Dist. 1989). The testimony and evidence admitted at the hearing support a finding that under Tiffany's leadership, VIP has suffered a downward trend in profitability. Once VIP's right to a piece of real property is extinguished by sale, that sale leaves Tony with no adequate remedy at law. Finally, Tiffany offered no testimony that she has the financial ability to satisfy a future money judgment. Currently she is borrowing money from Ivan Purnell. The continued operation of VIP is at a critical juncture, and without judicial oversight and redemption of the real estate taxes, real property may become victim to a future tax sale.

The court finds that Tony shall suffer irreparable harm in the absence of injunctive relief because due to Tiffany's mismanagement, VIP is facing the loss of the real property, which is the foundation of its business model. Additionally, the court finds that Tony has an inadequate remedy at law because Tiffany does not appear to have the ability to pay money damages, and, as stated above, money damages is not adequate compensation for the loss of real property.

**Balancing the Equities**

The court finds that Tiffany's interest in continuing her position as Director and Secretary of VIP as well as her position as Trustee of the Trust is outweighed by the Petitioner's concern that her continued control of VIP and the Trust will result in the complete loss of the real estate empire developed by Peter. Based upon the evidence admitted at the Preliminary Injunction hearing the court finds that the balance of the equities favors the entry of the injunction.

**THE REMOVAL OF TIFFANY AS THE DIRECTOR OF VIP**

Tony's counterclaim seeks more than monetary damages. He also seeks to remove Tiffany in her role as Director of VIP, as Trustee of the Trust and as Executor of the Estate based upon her mismanagement.

Under the Business Act, 805 ILCS 5/12-56, as a shareholder, Tony has the right to ask this court to remove a Director where, "(3) The directors or those in control of the corporation have acted, are acting or will act in a manner that is illegal, oppressive, or fraudulent with respect to the petitioning shareholder whether in his or her capacity as a shareholder, director, or officer or (4) The corporation assets are being misapplied or wasted."

Under the Business Corporation Act, where the court finds that directors have acted, are acting, or will act in a manner that is illegal, oppressive, or fraudulent or where corporation assets are being misapplied or wasted, the court may order relief by ordering an accounting and appointing a custodian to manage the business and affairs of the corporation to serve for the term and under the conditions prescribed by the court.

The evidence at the preliminary injunction hearing supports a finding that under Tiffany's leadership and control, she has misapplied and wasted the corporation assets of VIP and the Trust. VIP has not made a profit in 2024 or 2025. VIP has insufficient funds to pay the property taxes for 2024. There are no funds reserved to pay the 2025 taxes. Tiffany has made distributions to herself and to Tony, such that the operating account which held over $2 millions dollars upon the death of her father, now contains only $5,000 dollars. VIP owes the government estate taxes. Tiffany has not filed the 2024 or 2025 Federal or State income taxes for VIP. Tiffany has never provided an accounting for the Trust. Tiffany refused access to Tony to review the corporate records.

These facts support a finding that Tiffany, in her capacity as the Director of VIP has acted, is acting or will act in a manner such that corporation assets are being misapplied or wasted. Therefore, the court grants the Petitioner's request to move Tiffany as the Director and Secretary of VIP and the court shall appoint a Receiver to run VIP.

**THE REMOVAL OF TIFFANY AS THE TRUSTEE OF THE TRUST**

Pursuant to the Trust Code, Tony, a beneficiary, has the right to file an interim petition to remove the Trustee. 760 ILS 3/706 As part of the relief sought in the Preliminary Injunction, Tony asks this court to relieve Tiffany as the Trustee because she committed a serious breach of trust by: failing to provide a Trust Accounting; co-mingling trust income into the VIP operating account; and mismanaging Trust Assets including VIP. Given that this court has found that Tiffany has committed a serious breach of trust, the court has the authority to take action under Section 1001, which includes the right to remove Tiffany as a trustee.

Under the Trust Code, pending a final decision on a request to remove a trustee, the court may order such appropriate relief under subsection (b) of section 1001 as may be necessary to protect the trust property. 760 ILCS 3/706. The remedies for breach of trust include appointing a special fiduciary to take possession of the trust property and administer the trust. 760 ILCS 3/1001

For the reasons stated above, the court grants the Petitioners' request to remove Tiffany as the Trustee of the Trust and the court shall appoint a Special Fiduciary.

**THE REMOVAL OF TIFFANY AS THE EXECUTOR OF THE ESTATE**

On the petition of an interested person, or on the court's own motion, the court may remove a representative if the representative wastes or mismanages the estate or for other good cause. 755 ILCS 5/23-2. *Estate of Abbott v. First National Bank of Woodstock,* 38 Ill.App.3d 141 (2nd Dist. 1976) and *Estate of O'Brien v. Hartigan* 166 Ill.App.3d 285 (1st Dist. 1988). For the reasons set forth above, the court finds that there was sufficient evidence presented at the Preliminary Injunction hearing to find that Tiffany has wasted and mismanaged the estate. She has failed to pay the full amount of the estate taxes. She has failed to pay the real estate taxes on the properties owned by VIP and the Trust and, as a consequence, the taxes were sold to third party buyer. In

order to redeem them, the Estate and the Trust will incur penalties. Tiffany has lived in one of the properties owned by the Estate and or VIP without paying rent. The estate has paid living expenses when those expenses were not included in Tiffany's compensation. Tiffany has paid herself a wage which is not reasonable, in that she has no prior experience running a corporation. Tiffany co-mingled the assets of VIP and the Trust into one operating accounting. Under Tiffany's control, the balance of the operating account dropped from over $2 million dollars to $5,000 dollars. All of these facts support a finding that Tiffany has wasted and mismanaged the assets of the estate.

Tiffany is correct that the court cannot remove her as the executor of the estate for failing to file an inventory or accounting until the court first orders her to do so. 755 ILCS 5/23-2(a)(7). The court, however, is not removing her based upon her failure to account, although she has unquestionably failed to do so.

Based upon the testimony and evidence presented at the preliminary injunction hearing, the court grants the Petitioners' request to remove Tiffany as the Executor of the Estate and to appoint a Special Fiduciary.

**THE APPOINTMENT OF A SPECIAL FIDUCIARY AND A RECEIVER**

Tony asks the court to appoint him as the Executor of the Estate, the Trustee of the Trust and the Director of VIP. Considering that Tony is a 25% owner of VIP and 50% beneficiary of the Trust, the court can understand why Tony would like to be appointed to these positions. Nevertheless, after litigating this case for the past two years, the court is well aware of the deep distrust and anger that runs through the 5 siblings of this family. Tiffany has filed an action against Tony in Federal Court alleging, among other things, that he has committed insurance fraud with respect to the properties owned by VIP. While allegations in a complaint are not proof of wrongdoing, the court finds that elevating Tony to management at this time would likely cause

more problems than it would solve. In a similar vein, Tiffany also testified that Jake McBride and Tony are friends, and that Jake is the one who recommended the investment in 1492. This is the investment that Sara Putz said had irregularities including no account number and no 1099 form. Although Tiffany has not made direct allegations against Tony with respect to this account, her testimony left the implication that Jake and Tony were the architect of this investment and, therefore, were implicitly to blame for Tiffany's inability to transfer the funds. Again, these implications were unspoken and unproven, but given the mistrust between the siblings and the extensive litigation filed between them, the court finds that a neutral third party is necessary.

Provided he has no conflict and provided he is willing to accept the appointment, the court will appoint Jack Mardoian as the Special Fiduciary for the Trust and the Special Administrator for the Estate.

As for VIP, the court has the right to appoint a receiver pursuant to the Business Act as well as the Illinois Receiver Act (765 ILCS 1090). The court has the authority to appoint a receiver before judgment, to protect a party that demonstrates an apparent right, title, or interest in property that is the subject of the action, if the property or its revenue-producing potential: a) is being subjected to or is in danger of waste, loss, dissipation, or impairment. 765 ILCS 1090/6 The appointment of Receiver is an interim solution which takes the issue of trust administration and operation of VIP from the hands of battling siblings into the calm and neutral hands of a disinterested third party.

The court has worked with two receivers in the context of commercial mortgage foreclosures who are highly competent, namely Mathew S. Tarshis of Frontline RE Partners and Matthew Brash of Newpoint Advisors Corporation. Either one would be an excellent choice (if they are willing) but the court is open to hearing suggestions from the parties. The court directs

Page **41** of **44**

the parties to submit their proposed receivers as well as a copy of their Curriculum Vitae to the court before the next hearing date of May 1, 2026. We will discuss the appointment at the next hearing date. Once the receiver has accepted the appointment, the parties will prepare an order that sets the full scope of the Receiver's authority.

In order to save costs, the court will keep Riverside as the property manager. Riverside is familiar with the portfolio. Under the watchful eye of the Receiver, the court is confident that the Receiver will ensure that Riverside is running the business in way that meets industry standards. Riverside will have to make its books and records, including its rent rolls, available for inspection. The Receiver can address Tiffany's concerns that Jake is not making monthly payments on his loan by reviewing the books and records to confirm that Jake is making the monthly payment. The court acknowledges that Tiffany fired Riverside and that she has concerns about Riverside's competency and ethics. The court heard testimony from one renter that Riverside was not responsive to its repair request. By keeping Riverside as the property manager, the court makes no findings on the competency of Riverside. The court is, however, confident that the appointed Receiver will closely monitor the actions of Riverside and that Riverside's familiarity with the portfolio will cut down on the Receiver's costs.

ACCORDINGLY, IT IS HEREBY ORDERED AS FOLLOWS:

1.  The Petitioners' Request for a Preliminary Injunction Order against Tiffany is granted.

2.  The court shall appoint a Receiver for VIP after the parties submit names and resume of individual they believe are qualified. The parties must provide the court with the names and resumes within 5 business days of the entry of this order so that the court may appoint a Receiver at the May 1, 2026 hearing. The court shall make the decision after reviewing the CV's of the Receivers.

3.  Provided he accepts the appointment, the Court shall appoint Mr. Jack Mardoain as the Special Fiduciary for the Trust and the Special Administrator for the Estate. The

court shall provide Mr. Mardoian with a copy of this order and ask if he can appear at the May 1, 2026 1:30 p.m. hearing by Zoom in C-301.

4. Riverside Management Company ("Riverside"), the current real estate manager, shall continue to manage the real estate for the Trust and for VIP with oversight by the Receiver. Riverside shall not incur or pay any expenses which are outside the ordinary course of business without the consent of the Receiver, or if the expense exceeds the Receiver's authority, this Court's further order.

5. Tiffany is removed from serving as the Trustee of the Trust.

6. Tiffany is enjoined from taking any action to obligate the Trust under any contract, agreement or other undertaking, including, but not limited to, the sale of any real estate owned by the trust.

7. Tiffany is enjoined from taking and/or receiving any assets or funds from the Trust.

8. Tiffany is removed as President, Secretary and Director of VIP and from assuming any other office with VIP.

9. Tiffany is enjoined from taking and/or receiving any assets or funds from VIP, including not limited to an owner's draw or distributions.

10. Tiffany is enjoined from taking any action to obligate VIP under any contract, agreement, or other undertaking including, but not limited to, the sale of any real estate owned by VIP.

11. Tiffany is removed as the executor of the estate.

12. Tiffany is enjoined from taking or receiving any assets or funds from the Estate.

14. Tiffany is enjoined from taking any action to obligate the Estate under any contract, agreement, or other undertaking including, but not limited to, the sale of any real estate owned by the Estate.

15. Tiffany is ordered to vacate the Grayslake property on or before July 1, 2026. If she refuses to leave voluntarily, then the Receiver is authorized to initiate eviction proceedings.

16. Tiffany shall deliver a verified inventory and a verified accounting for the Trust for the period beginning December 25, 2023, and ending on October 31, 2025, within 45 days after the date upon which this Order is entered.

17. Tiffany shall deliver a verified inventory for VIP as of December 25, 2023, and as of October 31, 2025, within 45 days of the date on which this Order is entered.

Page **43** of **44**

18. Tiffany shall deliver a verified inventory and a verified accounting for the Estate for the period beginning December 25, 2023, and ending on October 31, 2025, within 45 days after the date on which this Order is entered.

19. Tiffany shall retain, assemble and deliver all documents which are in her possession or under her control (which includes documents she provided to her former counsel and accountants) and which are responsive to the document requests served upon her in this consolidated matter within 30 days after the date upon which this order is entered.

20. Tiffany shall retain, assemble and deliver copies all documents upon which she relies in preparation of the accounting for the Trust, the Estate and VIP to counsel of record in this consolidated matter within 45 days of today's date.

DATED:
ENTERED:

_Janelle K Christensen_
Judge

# EXHIBIT 3

# *(SEPTEMBER 27, 2021, LETTER FROM ATTORNEY JAMES SEIBERT TO ATTORNEY THOMAS HOOD)*

# EXHIBIT 4

# (*VIP AND RIVERSIDE MANAGEMENT AGREEMENT*)

DocuSign Envelope ID: B8272E58-2665-4C41-8676-6E040E1B2192



# PROPERTY MANAGEMENT, LEASING AND ASSET MANAGEMENT AGREEMENT

**THIS PROPERTY MANAGEMENT, LEASING AND ASSET MANAGEMENT AGREEMENT** ("Agreement") is made and entered into as of the 7th day of December, 2023, between **The Second Amendment and Restatement of the Living Trust Agreement of Peter Vole Jr.** and **V.I.P. Holding Company**, an Illinois corporation, collectively ("Owner"), and **Riverside Management & Leasing Corp**, an Illinois corporation ("Agent").

## WITNESSETH:

**WHEREAS,** Owner intends to retain Agent to manage and coordinate the leasing, maintenance, development, property management, sales, and acquisition of the real estate properties acquired by or owned by Owner under the terms and conditions set forth herein; and

**NOW, THEREFORE,** in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound hereby, do hereby agree that the above recital is incorporated into and made a part of this Agreement and, further, as follows:

## ARTICLE I. DEFINITIONS

Except as otherwise specified or as the context may otherwise require, the following terms have the respective meanings set forth below for all purposes of this Agreement, and the definitions of such terms are equally applicable both to the singular and plural forms thereof:

1.1 **"Affiliate"** means a person who is (i) in the case of an individual, any relative of such person, (ii) any officer, director, trustee, partner, Agent, employee or holder of ten percent (10%) or more of any class of the voting securities of or equity interest in such person; (iii) any corporation, partnership, limited liability company, trust or other entity controlling, controlled by or under common control with such person; or (iv) any officer, director, trustee, partner, Agent, employee or holder of ten percent (10%) or more of the outstanding voting securities of any corporation, partnership, limited liability company, trust or other entity controlling, controlled by or under common control with such person. For purposes of this definition, the term "controls," "is controlled by," or "is under common control with" shall mean the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of an entity, whether through the ownership of voting rights, by contract or otherwise.

1.2 **"Improvements"** means buildings, structures, equipment from time to time located on the Properties and all parking and common areas located on the Properties.

1.3 **"Lease"** means, unless the context otherwise requires, any lease or sublease made by Owner as landlord or by its predecessor.

1.4 **"Management Fees"** has the meaning set forth in Section 4.I (a) hereof.

1.5 **"Owner"** means V.I.P Holding Company and any joint venture, limited liability company or other Affiliate of V.I.P. Holding Company.

1.6 **"Ownership Agreements"** has the meaning set forth in Section 2.4(xi) hereof.

1.7 **"Properties"** means all real estate properties owned by Owner and all tracts acquired by Owner in the future containing income-producing improvements or on which Owner will construct income-producing Improvements.

DocuSign Envelope ID: B8272E58-2665-4C41-8676-6E040E1B2192

**ARTICLE II. APPOINTMENT OF AGENT; SERVICES TO BE PERFORMED**

2.1 **Appointment of Agent.** Owner hereby engages and retains Agent as the sole and exclusive Agent, as tenant coordinating agent of the Properties and as Asset Manager (see 2.3, below) of the portfolio of Owner's Properties, and Agent hereby accepts such appointment on the terms and conditions hereinafter set forth, it being understood that this Agreement shall cause Agent to be, at law, Owner's agent upon the terms contained herein.

2.2 **General Duties.** Agent shall devote its best efforts to performing its duties hereunder to administer, promote, manage, operate, maintain, improve and lease the Properties in a diligent, careful and vigilant manner. The services of Agent are to be of scope and quality not less than those generally performed by professional Asset and Property Managers of other similar properties in the area. Agent shall make available to Owner the full benefit of the judgment, experience and advice of the members of Agent's organization and staff with respect to the policies to be pursued by Owner relating to the management, sales, operation and leasing of the Properties.

2.3 **Specific Duties as Asset Manager.** Agent's duties as Asset Manager of the portfolio of Owner's Properties shall include the following:

(i) **Oversight of Property Management.** Agent shall oversee the performance by the property manager of each Property of its duties, including collection and proper deposits of rental payments, payment of Property expenses, Property maintenance, etc.

(ii) **Conduct On-Site Visits.** Agent shall conduct periodic on-site property visits to each Property to inspect the physical condition of the Property and to evaluate the performance of the property manager of its duties. Safe and sanitary inspections will be performed at least annually and, if a particular Property fails such inspection, the Agent shall remedy the defects within a commercially reasonable time period and thereafter perform such inspections on a quarterly basis.

(iii) **Preparation of the Budget.** Agent shall review, analyze and comment upon the operating budgets, capital budgets and leasing plans prepared and submitted by the property manager of each Property.

(iv) **Review and Analysis of Financial Information.** Agent shall review and analyze on-going financial information pertaining to each Property and the overall portfolio of Properties owned by Owner.

(v) **Asset Management Strategies.** Agent shall formulate and oversee the implementation of strategies for the administration, promotion, management, operation, maintenance, improvement, financing and refinancing, leasing and disposition of Owner's Properties on an overall portfolio basis.

2.4 **Specific Duties as Property Manager:** Agent's duties as property manager of the Properties shall include the following:

(i) **Lease Obligations.** Agent shall perform all duties of the landlord under all leases insofar as such duties relate to operation, maintenance, and day-to-day management. Agent shall also provide or cause to be provided, at Owner's expense, all services normally provided to tenants of like premises, including where applicable and without limitation, gas, electricity or other utilities required to be furnished to tenants under leases, normal repairs and maintenance, and cleaning and janitorial service. Agent shall arrange for and supervise the performance of all installations and improvements in space leased to any tenant which are either expressly required under the terms of the lease of such space or which are customarily provided to tenants. Agent shall cause all of Owner's Properties to be in compliance with all applicable federal, state and local statutes, rules, regulations and ordinances.

(ii) **Maintenance.** Agent shall cause the Properties to be maintained in the same manner as similar properties in the area. Agent's duties and supervision in this respect shall include, without limitation, cleaning of the interior and the exterior of the Improvements and the public common areas on the Properties and the making and supervision of repairs, alterations, and decoration of the Improvements, subject to and in strict compliance with this Agreement and the Leases. Construction activities undertaken by the Agent, if any, will be limited to activities related to the management, operation, maintenance, and leasing of the Property (e.g., repairs, renovations, and leasehold improvements).

(iii) **Leasing Functions.** Agent shall coordinate the leasing of the Properties and shall negotiate and use its best efforts to secure executed leases from qualified tenants, and to execute same on behalf of Owner, if requested, for available space in the Properties, such leases to be in form and on terms approved by Agent, and to bring about complete leasing of the Properties. Agent shall be responsible for the hiring of all leasing agents, as necessary for the leasing of the Properties, and to otherwise oversee and manage the leasing process on behalf of the Owner. Prior to the execution of any lease and no later than the commencement of the lease term, Agent will provide back up for the credit, income, previous landlord and background checks

2

DocuSign Envelope ID: B8272E58-2665-4C41-8676-6F040E1B2192

of any tenant proffered by Agent pursuant to this Agreement. Agent shall coordinate, supervise and perform all move-in inspections with the proposed tenant and all move-out inspections for tenants vacating including, but not limited to, all move-outs where a security deposit is being returned. The Agent will provide the Owner the written checklist prepared and reviewed during all move-in and all move-out inspections within 48 hours of each such inspection.

(iv) **Notice of Violations.** Agent shall forward to Owner promptly upon receipt all notices of violation or other notices from any governmental authority, and board of fire underwriters or any insurance company, and shall make such recommendations regarding compliance with such notice as shall be appropriate.

(v) **Personnel.** The agent shall employ, discharge, supervise and pay, on behalf of the Owner, all employees or contractors considered by the Agent as necessary for the efficient management of the Premises. Such services shall include the institution of legal action, in the name and at the expense of the Owner, to enforce the collection of rent or other terms of the Premises' leases, and to dispossess tenants or other persons from the Premises. In connection with any such legal action, the Agent may engage counsel at the Owner's expense. The Agent shall not be responsible for employees or contractor's acts, defaults or negligence if reasonable care has been exercised in their appointment and retention. In connection will major maintenance and remodeling work, Agent shall utilize Owner's preferred contractor for such work upon confirmation with Owner; day to day maintenance work may be performed by Agent maintenance staff.

(vi) **Utilities and Supplies.** Agent shall be authorized to enter into or renew contracts for electricity, gas, water, sanitation, landscaping, fuel, oil, maintenance and other services as are customarily furnished or rendered in connection with the operation of similar rental property in the area.

(vii) **Expenses.** Agent shall analyze all bills received for services, work and supplies in connection with the maintaining and operating the Properties, pay all such bills, and, if requested by Owner, pay, when due, utility and water charges, sewer, rent and assessments, and any other amount payable in respect to the Properties. All bills shall be paid by Agent within the time required to obtain discounts, if any. Owner may from time-to-time request that Agent forward certain bills to Owner promptly after receipt, and Agent shall comply with any such request. If requested, it is understood that the payment of real property taxes and assessment and insurance premiums will be paid out of the Account (as hereinafter defined) by Agent. All expenses shall be billed at net cost (i.e., less all rebates, commissions, discounts and allowances, however designed).

(viii) **Monies Collected.** Agent shall collect all rent and other monies from tenants and any sums otherwise due to Owner with respect to the Properties in the ordinary course of business. Owner authorizes Agent to request, demand, collect and receipt for all such rent and other monies and to institute legal proceedings in the name of Owner for the collection thereof and for the dispossession of any tenant in default under its Lease.

(ix) **Banking Accommodations.** Agent shall establish and maintain a bank account (the "Account") for funds relating to the Properties. All monies deposited from time to time in the Account shall be deemed to be trust funds and shall be and remain the property of Owner and shall be withdrawn and disbursed by Agent for the account of Owner only as expressly permitted by this Agreement for the purposes of performing the obligations of Agent hereunder. No monies collected by Agent on Owner's behalf shall be commingled with funds of Agent. The Account shall be maintained, and monies shall be deposited therein and withdrawn therefrom, in accordance with the following:

- All sums received from rents and other income from the Properties shall be promptly deposited by Agent in the Account. Agent shall have the right to designate persons who shall be authorized to draw against the Account, but only for purposes authorized by this Agreement.

- All sums due to Agent hereunder, whether for compensation, reimbursement for expenditures, or otherwise, as herein provided, shall be a charge against the operating revenues of the Properties and shall be paid and/or withdrawn by Agent from the Account prior to the making of any other disbursements therefrom.

- By the 15th day of the month following each calendar month, Agent shall forward to Owner net operating proceeds from the preceding month, retaining at all times, however a reserve of $25,000.00, in addition to any amounts otherwise provided in the budget.

(x) **Tenant Complaints.** Agent shall maintain business-like relations with the tenants of the Properties.

(xi) **Ownership Agreements.** Agent must receive copies of agreements of limited partnership, joint venture partnership agreements, operating agreements and all other relevant organizational documents of Owner and its Affiliates (the "Ownership Agreements") and should be familiar with the terms thereof. Agent shall use reasonable care to avoid any act or omission which, in the performance of its

duties hereunder, shall in any way conflict with the terms of the Ownership Agreements.

(xii) **Signs.** Agent shall place and remove, or cause to be placed and removed, such signs upon the Properties as Agent deems appropriate, subject, however, to the terms and conditions of the Leases and to any applicable ordinances and regulations.

2.5 **Approval of Leases, Contracts, Etc.:** In fulfilling its duties to the Owner, Agent may and hereby is authorized to enter into any leases, contracts or agreements on behalf of the Owner in the ordinary course of the management, operation, maintenance and leasing of the Property.

2.6 **Accounting, Records and Reports.**

(i) **Records.** Agent shall maintain all office records and books of account and shall record therein, and keep copies of, each invoice received from services, work and supplies ordered in connection with the maintenance and operation of the Properties. Such records shall be maintained on a double entry basis. Owner and persons designated by Owner shall at all reasonable time have access to and the right to audit and make independent examinations of such records, books and accounts and all vouchers, files and all other material pertaining to the Properties and this Agreement, all of which Agent agrees to keep safe, available and separate from any records not pertaining to the Properties, at a place recommended by Agent and approved by Owner.

(ii) **Quarterly Reports.** On or before the 30th day of the first month following each calendar quarter for which such report or statement is prepared and during the term of this Agreement, Agent shall prepare and submit to Owner the following reports and statements:

- Rental collection record

- Monthly operating statement;

- Copy of cash disbursements ledger entries for such period, if requested;

- Copy of cash receipts ledger entries for such period, if requested;

- The original copies of all contracts entered into by Agent on behalf of Owner during such period, if requested; and

- Copy of ledger entries for such period relating to security deposits maintained by Agent, if requested.

(iii) **Budgets and Leasing Plans.** Not later than November 15 of each calendar year, Agent shall prepare and submit to Owner for its approval an operating budget and a marketing and leasing plan on the Properties for the calendar year immediately following such submission. The budget and leasing plan shall be in the form of the budget and plan approved by Owner prior to the date thereof. As often as reasonably necessary during the period covered by any such budget, Agent may submit to Owner for its approval an updated budget or plan incorporating such changes as shall be necessary to reflect cost over-runs and the like during such period. If Owner does not disapprove any such budget within 30 days after receipt thereof by Owner, such budget shall be deemed approved. If Owner shall disapprove any such budget or plan, it shall so notify Agent within said 30-day period and explain the reasons therefor. Agent will not incur any costs other than those estimated in any budget except for:

- Tenant improvements and real estate commissions required under a Lease or Sale;

- Maintenance or repair costs.

- Costs incurred in emergency situations in which action is immediately necessary for the preservation or safety of the Property, or for the safety of occupant or other person (or to avoid the suspension of any necessary service of the Property);

- Expenditures for real estate taxes and assessment; and

- Maintenance supplies.

DocuSign Envelope ID: B8272E58-2665-4C41-8676-6F040E1B2192

(iv) **Notices.** Promptly after receipt, Agent shall deliver to Owner all notices, from any tenant, or any governmental authority, that are not a routine nature. Agents shall also report expeditiously to Owner notice of any extensive damage to any part of the Properties.

## ARTICLE III. EXPENSES

3.1 **Owner's Expenses.** Except as otherwise specifically provided, all costs and expenses incurred hereunder by Agent in fulfilling its duties to Owner shall be for the account of and on behalf of Owner. Such costs and expenses may include reasonable wages and salaries and other employee-related expenses of all on-site and off-site employees of Agent who are engaged in the operation, management, maintenance and leasing or access control of the Properties, including taxes, insurance and benefits relating to such employees, and legal, travel and other out-of-pocket expenses which are directly related to the management of specific Properties. All costs and expenses for which Owner is responsible under this Agreement shall be paid by Agent out of the Account. In the event said account does not contain sufficient funds to pay all said expenses, Owner shall fund all sums necessary to meet such additional costs and expenses.

3.2 **Agent's Expenses.** Agent shall, out of its own funds, pay all of its general overhead and administrative expenses.

## ARTICLE IV. AGENT'S COMPENSATION

4.1 **Property Management, Leasing and Asset Management Fees:**

i. **Management Fees:** Commencing on the date hereof, Owner shall pay Agent for the property management, property accounting, and asset management services described in Article II hereof fees payable monthly ("Management Fees"): $6,000.00 per month

ii. **Reimbursement for Maintenance and Repairs:** Owner shall reimburse Agent for costs of maintenance and repairs. Use of internal Agent maintenance staff shall be bill at the then current maintenance rate (currently $65/hour). Materials shall be billed at cost. Any change in maintenance rates will be given to Owner in writing 30 days before any change is made.

iii. **Leasing Administration:** Commencing on the date hereof, Owner shall pay Agent for the management and administration of leases described in Article II hereof fees payable monthly ("Leasing Fee"): $1,500.00 per month; shall apply to the administration, execution, and compliance of all new leases, renewals, extensions or expansions of Leases. Prior to entering into any such lease, Agent shall provide Owner with all necessary background, credit, income, previous landlord experience checks for any such proposed tenant prior to the execution of the lease or commencement of the lease term. In the event any proposed tenant has a pet being housed at the Property, then Agent shall collect from tenant a $300 non-refundable pet deposit for one pet and $100 for a second pet prior to the pet's occupancy. Tenant shall pay monthly pet rent, in addition to the deposit, of $50 per pet, or current market rate. Maximum 2 pets allowed.

iv. **For Vendor/Contract Supervision:** A fee of 10% of the cost of contracted services shall be applied for the use of outside vendors for maintenance and repairs on the Property costing less than $5,000.00. A fee for the use of outside vendors for maintenance and repairs on the property costing more than $5,000.00 shall be the greater of $750.00 or 7.5% of the cost of contracted services. This fee does not apply to regularly scheduled contract services including landscaping, janitorial, snow removal and elevator maintenance. The use of internal maintenance staff will be billed at the then current maintenance labor rates (currently $60 per hour).

v. **For Sale:** If the Owner(s) decide to sell the any of the Property owned by Owner during the term of this agreement or any extension of said agreement, Riverside Management and Leasing Corp. shall be the listing office and the terms of said listing shall be agreed upon in a separate agreement at the time a decision is made to list the property. The Agent's obligations under this agreement cease with the sale and closing of the Property in question.

vi. **For Mortgage Brokerage:** Agent also provides commercial mortgage brokerage services.

vii. **Additional Staff:** Services requested outside the scope of this agreement will be billed at $65.00 per hour.

5

DocuSign Envelope ID: B8272E58-2665-4C41-8676-6F040E1B2192

### ARTICLE V. INSURANCE AND INDEMNIFICATION

5.1 **Insurance and Indemnification.** The Owner shall indemnify and hold the Agent harmless from all suits for damages in connection with the management of the Premises, and from liability for injuries suffered by any person while in, on or about the Premises, except to the extent that a claim involves an intentional act on the part of the Agent. The Agent also shall not be liable for any error of judgment or for any mistake of fact or law, or for anything that it may do or refrain from doing hereinafter, except in cases of willful misconduct or gross negligence. The Owner shall be responsible for payment of the property's public liability, and workman's compensation insurance (workers comp policy to be carried through agent) in amounts adequate to protect the interests of the parties hereto, which policies shall be so written as to protect the Agent in the same manner and to the same extent they protect the Owner, and will name the Agent as one of the insureds. The Owner shall indemnify and hold the Agent harmless from all liability arising from non-compliance with any laws, rules and regulations of any governmental entity having jurisdiction over the use and occupancy of the Premises. The indemnity set forth in this paragraph shall include, but not be limited to, costs of defense, reasonable legal fees, disbursements, court costs, fines, and any monetary judgment or settlement, including interest and penalties, if any. The Owner shall provide the Agent with a certificate of insurance evidencing coverage adequate to fund the contractual liability set forth above. The policy shall contain a provision requiring notice to the Agent at least ten (10) days prior to the effective date of the policy's cancellation. Agent shall maintain insurance in reasonable amounts and provide a certificate of insurance to Owner.

    i.    **Cooperation with Insurers.** Agent shall cooperate with and provide reasonable access to the Properties to representatives of insurance companies and insurance brokers or agents with respect to insurance which is in effect or for which application has been made. Agent shall use its best efforts to comply with all requirements of insurers.

    ii.    **Accidents and Claims.** Agent shall promptly investigate and shall report in detail to Owner all accidents, claims for damage relating to the ownership, operation or maintenance of the Properties, and any damage or destruction to the Properties and the estimated costs of repair thereof, and shall prepare for approval by Owner all reports required by an insurance company in connection with any such accident, claim, damage, or destruction. Such reports shall be given to Owner promptly and any report not so given within 10 days after the occurrence of any such accident, claim, damage or destruction shall be noted in the monthly report delivered to Owner. Agent is authorized to settle, with notice to Owner, any claim against an insurance company arising out of any policy and, in connection with such claim, to execute proofs of loss and adjustments of loss and to collect and receipt for loss proceeds.

### ARTICLE VI. TERM, TERMINATION

6.1 **Term.** This Agreement shall commence on **January 1, 2024** and shall continue until terminated in accordance with the earliest to occur of the following:

    i.    One (1) year from the date of the commencement of the term hereof. However, this Agreement will be automatically extended for an additional one-year period at the end of each year unless Owner or Agent gives sixty (60) days written notice of its intention to terminate the Agreement; or

    ii.    In the event of a bona fide sale or demolition of the any of the Properties owned by Owner, the Owner may terminate this agreement, with respect to such Property, upon not less than 30 days' written notice by electronic mail or registered mail to the Agent; or

    iii.    If the Owner shall fail to comply with any rule, order, determination, ordinance or law of any federal, state, or municipal authority, the Agent may terminate this agreement (with respect to the Property affected) by giving 10 days' written notice by registered mail to the Owner; or

    iv.    Owner is solely responsible to provide any information regarding the redemption of the property or any extension or negotiations with the lender or trustee in order to delay the foreclosure sale. All information shall be supplied in writing to Agent in sufficient time so Agent may find a mutually beneficial termination date. Should Owner fail to notify Agent, then Agent reserves the right to terminate this agreement at an appropriate time to be decided solely by Agent, prior to the foreclosure sale; or

    v.    Immediately upon the occurrence of any of the following:

6

DocuSign Envelope ID: B8272E58-2665-4C41-8676-6F040E1B2192

a.  A decree or order is rendered by a court having jurisdiction (A) adjudging Agent as bankrupt or insolvent, or (B) approving as properly filed a petition seeking reorganization, readjustment, arrangement, composition or similar relief for Agent under the federal bankruptcy laws or any similar applicable law or practice, or (C) appointing a receiver or liquidator or trustee or assignee in bankruptcy or insolvency of Agent or a substantial part of the property of Agent, or for the winding up or liquidation of its affairs, or

b.  Agent (A) institutes proceedings to be adjudicated a voluntary bankrupt or an insolvent, (B) consents to the filing of a bankruptcy proceeding against it, (C) files a petition or answer or consent seeking reorganization, readjustment, arrangement, composition or relief under any similar applicable law or practice, (D) consents to the filing of any such petition, or to the appointment of a receiver or liquidator or trustee or assignee in bankruptcy or insolvency for it or for a substantial part of its property, (E) makes an assignment for the benefit of creditors, (F), is unable to or admits in writing its inability to pay its debts generally as they become due unless such inability shall be the fault of Owner, or (G) takes corporate or other action in furtherance of any of the aforesaid purposes.

Upon termination, the obligations of the parties hereto shall cease, provided that Agent shall comply with the provisions hereof applicable in the event of termination and shall be entitled to receive all compensation which may be due Agent hereunder up to the date of such termination, and provided, further, that if this Agreement terminates pursuant to clause (b) above, Owner shall have other remedies as may be available at law or in equity.

6.2  **Agent's Obligations after Termination.** Upon the termination of this Agreement, Agent shall have the following duties:

i.  Agent shall deliver to Owner, or its designee, all books and records with respect to the Properties.

ii.  Agent shall transfer and assign to Owner, or its designee, all service contracts and personal property relating to or used in the operation and maintenance of the Properties, except personal property paid for and owned by Agent. Agent shall also, for a period of sixty (60) days immediately following the date of such termination, make itself available to consult with and advise Owner, or its designee, regarding the operation, maintenance and leasing of the Properties.

iii.  Agent shall render to Owner an accounting of all funds of Owner in its possession and shall deliver to Owner a statement of Management Fees claimed to be due Agent and shall cause funds of Owner held by Agent relating to the Properties to be paid to Owner or its designee.

## ARTICLE VII. MISCELLANEOUS

7.1  **Notices.** All notices, approvals, consents and other communications hereunder shall be in writing, and, except when receipt is required to start the running of a period of time, shall be deemed given when delivered in person, or via email to the last known email address or on the fifth day after its mailing by either party by registered or certified United States mail, postage prepaid and return receipt requested, to the other party, at the addresses set forth after their respect name below or at such different addresses as either party shall have theretofore advised the other party in writing in accordance with this Section 7.1.

Owner: The Second Amendment and Restatement of the Living Trust Agreement of Peter Vole Jr. and  V.I.P.
Holding Company
21791 W. Route 120
Grayslake, IL  60050
Attn:  Tiffany Vole

Agent:  RIVERSIDE MANAGEMENT & LEASING CORP.
28100 N. Ashley Circle  Suite 101A
Libertyville, IL 60048
Attention: Jacob McBride

7

DocuSign Envelope ID: B8272E58-2665-4C41-8676-6E040E1B2192

7.2 **Governing Law – Venue – Attorney Fees:** This agreement shall be construed in accordance with, and governed by, the laws of the State of Illinois. The parties agree that proper venue for any lawsuit filed hereunder shall be the Court of the Nineteenth Judicial Circuit, Lake County, Illinois. In the event either party employs attorneys to protect or enforce its rights hereunder and prevails, then the non-prevailing party agrees to pay the prevailing party reasonable attorney's fees so incurred.

7.3 **Assignment.** Agent may delegate partially or in full its duties and rights under this Agreement but only with the prior written consent of Owner, which consent may not be unreasonably withheld by Owner. Except as provided in the immediately preceding sentence, this Agreement shall be binding upon and shall inure to the benefit of the parties and their respective successors and assigns.

7.4 **No Waiver**. The failure of Owner to seek redress for violation or to insist upon the strict performance of any covenant or condition of this Agreement shall not constitute a waiver thereof for the future.

7.5 **Amendments.** This Agreement may be amended only by an instrument in writing signed by the party against whom enforcement of the amendment is sought.

7.6 **Headings.** The headings of the various subdivisions of this Agreement are for reference only and shall not define or limit any of the terms or provisions hereof.

7.7 **Counterparts.** This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, and it shall not be necessary in making proof of this Agreement to produce or account for more than one such counterpart.

7.8 **Entire Agreement.** This Agreement contains the entire understanding and all agreements between Owner and Agent respecting the management of the Properties. There are no representations, agreements, arrangements or understandings, oral or written, between Owner and Agent relating to the management of the Properties that are not fully expressed herein. This agreement, together with any other written agreements and instruments executed concurrently herewith or pursuant to the provisions hereof, contains the entire agreement between the parties respecting the matters herein set forth and supersedes all prior agreements between them respecting such matters. This agreement may be modified only by a written document signed by both parties.

7.9 **Disputes**. If there shall be a dispute between Owner and Agent relating to this Agreement resulting in litigation, the prevailing party in such litigation shall be entitled to recover from the other party to such litigation such amount as the court shall fix as reasonable attorneys' fees.

7.10 **Activities of Agent.** The obligations of Agent pursuant to the terms and provisions of this Agreement shall not be construed to preclude Agent from engaging in other activities or business ventures, whether or not such other activities or ventures are in competition with the Owner or the business of Owner.

7.11 **Independent Contractor.** Agent and Owner shall not be construed as joint venturers or partners of each other pursuant to this Agreement, and neither shall have the power to bind or obligate the other except as set forth herein. In all respects, the status of Manager to Owner under this Agreement is that of an independent contractor.

7.12 **Binding Effect:** THIS IS A LEGAL AND BINDING CONTRACT. The provisions of this agreement shall be binding upon and inure to the benefit of both parties and their respective legal representatives, successors and assigns.

7.13 **Discrimination:** Agent and Owner agree that it is illegal for either of them to refuse to display or lease owner's property to any person on the basis of race, age, color, religion, sex, ancestry, order of protection status, marital status, physical or mental handicap, familial status, national origin, sexual orientation, military status, dishonorable discharge from the military service, or any other class protected by the Illinois Human Rights Act. The parties agree to comply with all applicable federal, state, and local fair housing laws.

[Signatures appear on next page]

IN WITNESS WHEREOF, the parties have executed this Property Management, Leasing and Asset Management Agreement as of the date first above written.

Owner (s): The Second Amendment and Restatement of the Living Trust Agreement of Peter Vole Jr.

Agent: Riverside Management & Leasing Corp

Signature: _____

423F186CF99942F...

Signature: _____

ED7FC03F0CEE440...

Date: 12/7/2023

Date: 12/8/2023

Owner (s): V.I.P. Holding Company

Signature: _____

423F186CF99942F...

Date: 12/7/2023

9

# EXHIBIT 5

# (*DOCUSIGN DATA*)

**DocuSign**

## Certificate Of Completion

Envelope Id: 22267DA5EFC64EE3A5B8F9550663F3EA
Subject: Complete with DocuSign: VOLE - 1492 Agreement (4.1.2024).pdf
Source Envelope:
Document Pages: 40
Certificate Pages: 2
AutoNav: Enabled
EnvelopeId Stamping: Enabled
Time Zone: (UTC-08:00) Pacific Time (US & Canada)

Signatures: 1
Initials: 3

Status: Completed

Envelope Originator:
Jacob McBride
1054 Limb Ct.
nll
Gurnee, IL 60031
jake@riverside-mgmt.com
IP Address: 96.95.83.164

## Record Tracking

Status: Original
    4/1/2024 10:12:10 AM

Holder: Jacob McBride
jake@riverside-mgmt.com

Location: DocuSign

| Signer Events | Signature | Timestamp |
|---|---|---|
| Tiffany Vole<br>tav987@yahoo.com<br>Security Level: Email, Account Authentication (None) | *[signature]*<br><br>Signature Adoption: Drawn on Device<br>Using IP Address: 172.58.167.7<br>Signed using mobile | Sent: 4/1/2024 10:17:40 AM<br>Viewed: 4/1/2024 10:58:30 AM<br>Signed: 4/1/2024 10:58:51 AM |
| Electronic Record and Signature Disclosure:<br>   Not Offered via DocuSign | | |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|
| Jacob McBride<br>jake@riverside-mgmt.com<br>Director of Operations & Property Development<br>Riverside Management & Leasing Corp.<br>Security Level: Email, Account Authentication (None) | COPIED | Sent: 4/1/2024 10:59:04 AM<br>Resent: 4/1/2024 10:59:17 AM<br>Viewed: 4/1/2024 11:13:20 AM |
| Electronic Record and Signature Disclosure:<br>   Not Offered via DocuSign | | |
| Kathleen Daley<br>kdaley@1492cm.com<br>Security Level: Email, Account Authentication (None) | COPIED | Sent: 4/1/2024 10:59:04 AM<br>Viewed: 4/1/2024 11:19:41 AM |
| Electronic Record and Signature Disclosure:<br>   Not Offered via DocuSign | | |

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 4/1/2024 10:17:40 AM |
| Certified Delivered | Security Checked | 4/1/2024 10:58:30 AM |
| Signing Complete | Security Checked | 4/1/2024 10:58:51 AM |
| Completed | Security Checked | 4/1/2024 10:59:04 AM |

| Payment Events | Status | Timestamps |
|---|---|---|

# Envelope History

X

---

**Subject**
Complete with DocuSign: VOLE - 1492 Agreement (4.1.2024).pdf

**Enclosed Documents**
VOLE - 1492 Agreement (4.1.2024).pdf

**Envelope ID**
22267da5-efc6-4ee3-a5b8-f9550663f3ea

**Envelope Recipients**
Tiffany Vole

**Date Sent**
4/1/2024 | 12:17:40 pm

**Status**
Completed

**Date Created**
4/1/2024 | 12:12:10 pm

**Status Date**
4/1/2024 | 12:59:17 pm

**Time Zone**
My computer's time zone

**Holder**
Jacob McBride

---

| Print | Download Certificate |

OWNER..

☐  From:
Jacob
McBride

⊘ Voided

12/19/2024
08:20:20 am



# Envelope History



X

---

**Subject**
Complete with DocuSign: VOLE - 1492 Agreement (4.1.2024).pdf

**Envelope ID**
22267da5-efc6-4ee3-a5b8-f9550663f3ea

**Date Sent**
4/1/2024 | 12:17:40 pm

**Date Created**
4/1/2024 | 12:12:10 pm

**Time Zone**
My computer's time zone

**Enclosed Documents**
VOLE - 1492 Agreement (4.1.2024).pdf

**Envelope Recipients**
Tiffany Vole

**Status**
Completed

**Status Date**
4/1/2024 | 12:59:17 pm

**Holder**
Jacob McBride

---

Print        **Download Certificate**

☐    OWNER...
     From:           ⊘ Voided        12/19/2024
     Jacob                           08:20:20 am
     McBride



**DocuSign**

## Certificate Of Completion

Envelope Id: 22267DA5EFC64EE3A5B8F9550663F3EA  
Subject: Complete with DocuSign: VOLE - 1492 Agreement (4.1.2024).pdf  
Source Envelope:  
Document Pages: 40  
Certificate Pages: 2  
AutoNav: Enabled  
EnvelopeId Stamping: Enabled  
Time Zone: (UTC-08:00) Pacific Time (US & Canada)

Signatures: 1  
Initials: 3

Status: Completed

Envelope Originator:  
Jacob McBride  
1054 Limb Ct.  
nil  
Gurnee, IL 60031  
jake@riverside-mgmt.com  
IP Address: 96.95.83.164

## Record Tracking

Status: Original  
    4/1/2024 10:12:10 AM

Holder: Jacob McBride  
jake@riverside-mgmt.com

Location: DocuSign

| Signer Events | Signature | Timestamp |
|---|---|---|
| Tiffany Vole<br>tav987@yahoo.com<br>Security Level: Email, Account Authentication (None) | *[signature]*<br>Signature Adoption: Drawn on Device<br>Using IP Address: 172.58.167.7<br>Signed using mobile | Sent: 4/1/2024 10:17:40 AM<br>Viewed: 4/1/2024 10:58:30 AM<br>Signed: 4/1/2024 10:58:51 AM |
| Electronic Record and Signature Disclosure:<br>   Not Offered via DocuSign | | |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|
| Jacob McBride<br>jake@riverside-mgmt.com<br>Director of Operations & Property Development<br>Riverside Management & Leasing Corp.<br>Security Level: Email, Account Authentication (None) | COPIED | Sent: 4/1/2024 10:59:04 AM<br>Resent: 4/1/2024 10:59:17 AM<br>Viewed: 4/1/2024 11:13:20 AM |
| Electronic Record and Signature Disclosure:<br>   Not Offered via DocuSign | | |
| Kathleen Daley<br>kdaley@1492cm.com<br>Security Level: Email, Account Authentication (None) | COPIED | Sent: 4/1/2024 10:59:04 AM<br>Viewed: 4/1/2024 11:19:41 AM |
| Electronic Record and Signature Disclosure:<br>   Not Offered via DocuSign | | |

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 4/1/2024 10:17:40 AM |
| Certified Delivered | Security Checked | 4/1/2024 10:58:30 AM |
| Signing Complete | Security Checked | 4/1/2024 10:58:51 AM |
| Completed | Security Checked | 4/1/2024 10:59:04 AM |

| Payment Events | Status | Timestamps |
|---|---|---|

# EXHIBIT 6

# (*DELEGATION AGREEMENT BETWEEN VIP AND RIVERSIDE*)

TIFFANY000443

**The Living Trust Agreement of Peter Vole, Jr. u/a/d 10/30/2017,
as amended and/or restated**

**DELEGATION AND ACCEPTANCE OF DUTIES AND POWERS OF AGENT**

Pursuant to ARTICLE VI, paragraph A(8), of The Living Trust Agreement of Peter Vole, Jr. u/a/d 10/30/2017, as amended and/or restated (the "Trust") and Section 807 of the Illinois Trust Code ("ITC"), <u>Tiffany A. Vole</u>, as Trustee of the Trust (the "Trustee"), hereby appoints <u>Jacob McBride</u>, as the agent (the "Agent") of the Trustee, with respect to the following powers:

(a) Real estate transactions.
(b) Financial institution transactions.
(c) Stock and bond transactions.
(d) Tangible personal property transactions.
(e) Safe deposit box transactions.
(f) Insurance and annuity transactions.
(g) Retirement plan transactions.
(h) Social Security, employment and military service benefits.
(i) Tax matters.
(j) Claims and litigation.
(k) Commodity and option transactions.
(l) Business operations.
(m) Borrowing transactions.
(n) Estate transactions.
(o) All other property powers and transactions.

The powers granted above shall be subject to the limitations specified in Section 807 of the ITC and shall specifically exclude the power to perform any act involving the exercise of judgment and discretion.

In performing any delegated function, the Agent shall owe a duty to the Trust to exercise reasonable care to comply with the terms of this delegation and to comply with the terms and purpose of the Trust. By accepting these delegated functions, the Agent hereby submits to the jurisdiction of the court of Illinois.

The Living Trust Agreement of Peter Vole, Jr. u/a/d 10/30/2017, as amended and/or restated

Tiffany A. Vole, Trustee

1/26/24
Date

CLARKHILL\M1961\473993\275371147.v3-1/25/24

TIFFANY000444

## ACKNOWLEDGEMENT AND AGREEMENT

I, <u>Jacob McBride</u>, as agent, hereby accepts all the powers and duties delegated to me by Tiffany A. Vole, as Trustee, with respect to the The Living Trust Agreement of Peter Vole, Jr. u/a/d 10/30/2017, as amended and/or restated (the "Trust"), and hereby submits to the jurisdiction of the court of Illinois. I further accept and acknowledge my duty to the Trust to exercise reasonable care to comply with the terms of the delegation provided to me and to comply with the purpose of the Trust.

The Living Trust Agreement of Peter Vole, Jr.
u/a/d 10/30/2017, as amended and/or restated

Jacob McBride, Agent

Date 1/26/2024

CLARKHILL\M1961\473993\275371147.v3-1/25/24

# EXHIBIT 7

# (*AFFIDAVIT OF TIFFANY A. VOLE*)

## <u>AFFIDAVIT OF TIFFANY A. VOLE</u>

I, TIFFANY A. VOLE, being first duly sworn, depose and state as follows:

1. I am aware that certain properties belonging to my father Peter Vole Jr., were improperly titled in the name of my half sister Dolores Ann Marie Vole, without my father's knowledge or consent. For example, Dolores would list Peter Vole, Jr. or VIP as the person responsible for the taxes on properties titled to her or properties she had interest in to taxing authorities. Dolores would also deposit the rent on these properties into Peter Vole Jr. or VIP account for a period of time.

2. In March of 2022, I was advised by Jacob McBride that he was contacted by the Lake County Housing Authority concerning the management of a property believed by Peter to be owned by him and that Dolores had physically gone to the LCHA with the deed to the property reflecting that the deed was in her name and demanding that the rent be deposited into her account.

3. My father's legal counsel at the Elder Law & Estate Planning Attorneys of Illinois, P.C., notified me they sent Dolores Ann Marie Vole notices of termination as well as emails to tenants advising them Dolores had no authority and to send rent payments to Riverside. Exhibit A.

4. My Elder Law & Estate Planning Attorneys of Illinois, P.C., also notified me that they sent a letter to Dolores Ann Marie Vole's attorneys at Hood Law P.C. demanding a turn over of all documents or other property of my father's, his corporation and Trust and that all that was turned over was dirty clothes and miscellaneous items.

5. The Delegation and Acceptance of Duties and Powers of Agent executed on January 26, 2024 between myself and Jacob McBride did not make Jacob McBride an Agent of the Trust. Instead it made and was intended to make Jacob McBride my Agent as provided in the Delegation and Acceptance of Duties and Powers of Agent, that provides I appointed him "as the agent (the "Agent") of the Trustee…"

6. I am aware through communications with Jacob McBride that properties owned by the Trust and VIP that were/are receiving section 8 assistance/housing vouchers yet at the same time McBride through his company Riverside Management was collecting inflated rent amounts on these properties. I am also aware through communications with Jacob McBride and reviewing his reports with my financial advisor Sarah Putz that properties were collecting State subsidies despite being vacant, sold, or now longer owned by either the Trust or VIP.

7. I am aware through communication with Jacob McBride that he manages and deals directly with the Lake County Housing Authority in regards to the management of VIP, the Trust, and other properties/entities.

8. My siblings disrespected my daughter because she is African American and routinely made racist remarks/comments in her presence while I was also present when my daughter was only three years old. My siblings routinely excluded us from family get togethers such dinners, vacations birthdays etc., because of my daughter's race.

9. Dolores Ann Marie Vole, Peter Vole III, and Robert Vole have disrespected my daughter, because her father is African American . Anytime that my daughter and I were present it was exemplified to us that we did not belong. It was common practice among them to make racist remarks/comments in her presence, before she was even two years old. My siblings routinely excluded us from family dinners, vacations, holidays, birthdays, even neglecting to let us know when they were in town so we may try to visit them at bare minimum etc., because my daughter is a product of a now single mother, living a nearly decade long relationship with an African American man, who's existence my family always has, and still entirely ignores.

10.

11. In 2023, Signal Werks Technologies installed surveillance cameras on my property located in Grayslake, Illinois. Additional cameras were subsequently added over multiple visits, completing the project. The surveillance equipment requires both a username and password for viewing the cameras.

12. In 2024, I requested Signal Werks Technologies to change my account credentials to further ensure no one else had access. Signal Werks Technologies did not retain a record of these new credentials. I informed Signal Werks Technologies that Jacob McBride of Riverside Management & Leasing Corporation would be performing all home maintenance while I was away on family business.

13. On approximately August 2, 2025, it was discovered that the credentials to my camera system had been changed. These new credentials were different from those saved on my old cell phone and laptop, and the system was locked to a new, unknown email account. This unknown account was then receiving all security system and email notifications. The equipment displayed a new unknown email address, which was obscured by asterisks by the manufacturer. I had no knowledge of who changed the credentials or who owned this new unknown email address. Direct access to my cell phone and/or email account would have been sufficient to change the equipment credentials.

14. Upon discovering the unauthorized change, I requested Eric Braun of Signal Werks Technologies contact the manufacturer and bypass all existing credentials, which was

accomplished with technical support assistance. Through conversions, it was determined that my main email account and password had been shared with Defendant Jacob McBride several times over previous months.

15. I contend that the only other person with access to my security system credentials necessary in accessing my email account was Defendant Jacob McBride.

I, TIFFANY A. VOLE, being first duly sworn oath, deposes and states that I have read the attached affidavit, by me subscribed, and that the same is true and correct to the best of my information, knowledge, and belief.

[x] **Under penalties as provide by law pursuant to 735 ILCS 5/1-109, I certify that the statements set forth herein are true and correct.**

_____
Tiffany A. Vole

Signature: _Tiffany Vole (Jun 3, 2026 23:02:18 CDT)_

Email: tiffanyamber@vipholdingcompany.com

# EXHIBIT 8

## *(COPY OF COUNTRY FINANCIAL CLAIMS CHECK NUMBER 680836 FOR $127,163.54 CONTAINING PLAINTIFF'S FORGED SIGNATURE AND CLAIMS CHECK NUMBER 6899661 IN THE AMOUNT OF $66,637.91 CONTAINING PLAINTIFF'S ACTUAL SIGNATURE)*

5:11

**COUNTRY** FINANCIAL.

← Back

## Claim Details

## Property Claim

**Claim #:** 600-1083775

**Policy #:** P008577446

**Loss Date:** Jan 11, 2025

## Progress

Start  ⌄

Appraisal  ⌄

Payments  ⌃

**Payments have been issued:**

✓  Feb 10, 2025 - $127,163.54  paid to Tiffany Vole

✓  Jul 18, 2025 - $66,637.91  paid to Anthonio Vole

*Please note more payments may be issued.*

**What to expect:**  Depending on your chosen coverages, an estimate for your damages will be prepared and a payment will then be issued (minus your deductible).



Privacy - Terms

5:11



← Back

## Claim Details

## Property Claim

**Claim #:** 600-1090897

**Policy #:** P010462422

**Loss Date:** Jan 26, 2025

## Progress

Start ⌄

---

Appraisal ⌄

---

Payments ⌃

**Payments have been issued:**

✓ Feb 13, 2025 - $72,032.56 paid to Anthonio Vole

✓ Oct 20, 2025 - $36,178.26

*Please note more payments may be issued.*

**What to expect:** Depending on your chosen coverages, an estimate for your damages will be prepared and a payment will then be issued (minus your deductible).



Privacy - Terms

# EXHIBIT 9

# *(COUNTRY FINANCIAL DECLARATION PAGES WRONG NAME)*



# PREMIUM NOTICE
Rental Dwelling

**COUNTRY FINANCIAL.**

Notice Date: January 19, 2024
Account Number: 0001940716

## YOUR PREMIUM DETAILS

| RENTAL DWELLING INSURANCE | Policy number P010462422 | Property 37 Kings Cross Dr Lincolnshire IL 60069 | Your policy activity Renewal effective date 02/24/24 | Amount billed $2,016.20 |
|---|---|---|---|---|
| | Policy term 02/24/24 - 02/24/25 | | Personal Property Limit Changed effective date 02/24/24 | |
| | | | Additional Living Expense & Fair Rental Value Limit Changed effective date 02/24/24 | |
| | | | Dwelling Coverage Limit Changed effective date 02/24/24 | |
| | | | Auxiliary Private Structure Limit Changed effective date 02/24/24 | |

## CONTACT US

Avoid mail delays and pay online!

### Contact COUNTRY®

**Phone**
1-866-COUNTRY (1-866-268-6879)

**Mailing Address**
COUNTRY Mutual Insurance Company®
P.O. Box 2100
Bloomington, IL 61702-2100

**Online**
COUNTRYfinancial.com

### Contact your COUNTRY Financial® representative

Ed Macek
906 Hillside
Antioch, IL 60002
(847) 395-4100
Email: ed.macek@countryfinancial.com
Online: www.countryfinancial.com/ed.macek

# Rental Dwelling Insurance Declarations

COUNTRY Preferred Insurance Company®
1701 Towanda Ave.
PO Box 2100
Bloomington, IL 61702-2100

866-COUNTRY
countryfinancial.com



| | |
|---|---|
| **Policy Number:** P010462422 | **Policy State:** Illinois |
| Billing Account Number: 0001940716 | Policy Effective Date: Feb 24, 2024 |
| Policy Term: 12 Months | Policy Expiration Date: Feb 24, 2025 at 12:01 a.m. standard time at your address |
| Payment Plan: Annual | |
| Declarations Effective Date: Feb 24, 2024 | Declarations Reason: Renewal |

Tiffany A. Vole
21791 W Il Route 120
Grayslake, IL   60030-9596

**Total Premium: $2,016.20**

---

## Contact us. We're here to help!

| Your representative | Online Client Support | Call 866-COUNTRY |
|---|---|---|
| Ed A Macek | View your policy, bill | Call 866-268-6879 anytime for |
| (847) 395-4100 | payment, claims, chat and | claims assistance and |
| ed.macek@countryfinancial.com | more! | customer service. |
| http://www.countryfinancial.com/ed.macek | countryfinancial.com | |

---

## Named Insured

| Contact(s) | Date of Birth | Farm Bureau # |
|---|---|---|
| Tiffany A. Vole | 01/06/1988 | 8422 |
| VIP Holdings Inc | | |

## Policy Discounts
**Savings Amount $582.09**

Preferred Payment, Safe Heat

## Policy Deductible

$2,000 (Applies separately to covered property at each location listed on the declarations damaged by an occurrence. Different/additional deductibles may apply. Please refer to your policy.)

## Location Insured – 37 Kings Cross Dr, Lincolnshire, IL, 60069-3340

### Risk Characteristics

| Year Built: | 1971 | Exterior Type: | Wood Framing |
|---|---|---|---|
| Building Type: | Single Family Detached | Garage Type: | Attached/Built-In |
| Occupancy: | Rental | Number of Garage Stalls: | 2.0 |
| Number of Family Units: | 1 | Detached Garage: | None |

# Rental Dwelling Insurance Declarations

COUNTRY Preferred Insurance Company®
1701 Towanda Ave.
PO Box 2100
Bloomington, IL 61702-2100

866-COUNTRY
countryfinancial.com



| | |
|---|---|
| **Policy Number:** P010462422 | **Policy State:** Illinois |
| Billing Account Number: 0001940716 | Policy Effective Date: Feb 27, 2025 |
| Policy Term: 12 Months | Policy Expiration Date: Feb 27, 2026 at 12:01 a.m. standard time at your address |
| Payment Plan: Auto Monthly Payment | |
| Declarations Effective Date: Sep 12, 2025 | Declarations Reason: Policy Change |

Tiffany A. Vole
21791 W Il Route 120
Grayslake, IL   60030-9596

**Total Premium: $3,199.24**

**Total Change Premium: $0.00**

This is not a bill, do not pay this amount. Any balance will be included with your next billing notice.

---

## Contact us. We're here to help!

**Your representative**

Ed A Macek
(847) 395-4100
ed.macek@countryfinancial.com
http://www.countryfinancial.com/ed.macek

**Online Client Support**

View your policy, bill payment, claims, chat and more!
countryfinancial.com

**Call 866-COUNTRY**

Call 866-268-6879 anytime for claims assistance and customer service.

---

## Named Insured

| Contact(s) | Date of Birth | Farm Bureau # |
|---|---|---|
| Anthonio P Vole | 07/04/1986 | |
| Tiffany A Vole | 01/06/1988 | 8422 |

The Second Admendment and Restatement of the living Trust Agreement of

## Policy Discounts

Safe Heat

**Savings Amount $775.46**

## Policy Deductible

$2,000 (Applies separately to covered property at each location listed on the declarations damaged by an occurrence. Different/additional deductibles may apply. Please refer to your policy.)

# EXHIBIT 10

# (*COUNTRY FINANCIAL DECLARATION PAGES CORRECT NAME*)



# Rental Dwelling Insurance Declarations

**COUNTRY Preferred Insurance Company®**
1701 Towanda Ave.
PO Box 2100
Bloomington, IL 61702-2100

866-COUNTRY
countryfinancial.com



**Policy Number:** P010460170
Billing Account Number: 0001934320
Policy Term: 12 Months
Payment Plan: Annual
Declarations Effective Date: Feb 24, 2023

**Policy State:** Illinois
Policy Effective Date: Feb 24, 2023
Policy Expiration Date: Feb 24, 2024 at 12:01
a.m. standard time at your
address
Declarations Reason: New Business

Peter Vole Jr.
21791 W Il Route 120
Grayslake, IL   60030-9596

**Total Premium: $989.26**

This is not a bill, do not pay this amount. Any balance will
be included with your next billing notice.

## Contact us. We're here to help!

**Your representative**
Ed A Macek
(847) 395-4100
ed.macek@countryfinancial.com
http://www.countryfinancial.com/ed.macek

**Online Client Support**
View your policy, bill
payment, claims, chat and
more!
countryfinancial.com

**Call 866-COUNTRY**
Call 866-268-6879 anytime for
claims assistance and
customer service.

## Named Insured

| Contact(s) | Date of Birth | Farm Bureau # |
|---|---|---|
| Peter Vole Jr. | 09/09/1938 | 8422 |
| Tiffany A. Vole | 01/06/1988 | |
| VIP Holdings Inc | | |

## Policy Discounts

Savings Amount $254.26

Preferred Payment, Safe Heat

## Policy Deductible

$2,000 (Applies separately to covered property at each location listed on the declarations damaged by an
occurrence. Different/additional deductibles may apply. Please refer to your policy.)

## Location Insured – 618 N Cedar Lake Rd, Round Lake, IL, 60073-2902

### Risk Characteristics

| Year Built: | 1953 | Exterior Type: | Wood Framing |
|---|---|---|---|
| Building Type: | Single Family Detached | Garage Type: | None |
| Occupancy: | Rental | Number of Garage Stalls: | None |

# Rental Dwelling Insurance Declarations

**COUNTRY Preferred Insurance Company®**
1701 Towanda Ave.
PO Box 2100
Bloomington, IL 61702-2100

866-COUNTRY
countryfinancial.com



**COUNTRY** FINANCIAL

**Policy Number:** P010460170
Billing Account Number: 0001934320
Policy Term: 12 Months
Payment Plan: Annual
Declarations Effective Date: Feb 24, 2024

**Policy State:** Illinois
Policy Effective Date: Feb 24, 2024
Policy Expiration Date: Feb 24, 2025 at 12:01 a.m. standard time at your address
Declarations Reason: Renewal

Peter Vole Jr.
21791 W Il Route 120
Grayslake, IL   60030-9596

**Total Premium: $1,104.82**

---

## Contact us. We're here to help!

**Your representative**

Ed A Macek
(847) 395-4100
ed.macek@countryfinancial.com
http://www.countryfinancial.com/ed.macek

**Online Client Support**
View your policy, bill payment, claims, chat and more!
countryfinancial.com

**Call 866-COUNTRY**
Call 866-268-6879 anytime for claims assistance and customer service.

---

## Named Insured

| Contact(s) | Date of Birth | Farm Bureau # |
|---|---|---|
| Peter Vole Jr. | 09/09/1938 | 8422 |
| Tiffany A. Vole | 01/06/1988 | 8422 |
| VIP Holdings Inc | | |

## Policy Discounts

**Savings Amount $285.41**

Preferred Payment, Safe Heat

## Policy Deductible

$2,000 (Applies separately to covered property at each location listed on the declarations damaged by an occurrence. Different/additional deductibles may apply. Please refer to your policy.)

## Location Insured – 618 N Cedar Lake Rd, Round Lake, IL, 60073-2902

### Risk Characteristics

| Year Built: | 1953 | Exterior Type: | Wood Framing |
|---|---|---|---|
| Building Type: | Single Family Detached | Garage Type: | None |
| Occupancy: | Rental | Number of Garage Stalls: | 0.0 |

---

# Rental Dwelling Insurance Declarations

**COUNTRY Preferred Insurance Company®**
1701 Towanda Ave.
PO Box 2100
Bloomington, IL 61702-2100

866-COUNTRY
countryfinancial.com



| | |
|---|---|
| **Policy Number:** P010460170 | **Policy State:** Illinois |
| Billing Account Number: 0001934320 | Policy Effective Date: Feb 24, 2025 |
| Policy Term: 12 Months | Policy Expiration Date: Feb 24, 2026 at 12:01 |
| Payment Plan: Auto Monthly Payment | a.m. standard time at your address |
| Declarations Effective Date: Sep 12, 2025 | Declarations Reason: Policy Change |

Tiffany Vole
21791 W Il Route 120
Grayslake, IL 60030-9596

**Total Premium: $1,758.94**

**Total Change Premium: $0.00**

This is not a bill, do not pay this amount. Any balance will be included with your next billing notice.

---

## Contact us. We're here to help!

**Your representative**
Ed A Macek
(847) 395-4100
ed.macek@countryfinancial.com
http://www.countryfinancial.com/ed.macek

**Online Client Support**
View your policy, bill payment, claims, chat and more!
countryfinancial.com

**Call 866-COUNTRY**
Call 866-268-6879 anytime for claims assistance and customer service.

---

## Named Insured

| Contact(s) | Date of Birth | Farm Bureau # |
|---|---|---|
| Anthonio P Vole | 07/04/1986 | |
| Tiffany A. Vole | 01/06/1988 | 8422 |
| VIP Holdings Inc | | |

---

## Policy Discounts

Safe Heat

**Savings Amount $399.89**

---

## Policy Deductible

$2,000 (Applies separately to covered property at each location listed on the declarations damaged by an occurrence. Different/additional deductibles may apply. Please refer to your policy.)

---

## Location Insured – 618 N Cedar Lake Rd, Round Lake, IL, 60073-2902

### Risk Characteristics

| | | | |
|---|---|---|---|
| Year Built: | 1953 | Exterior Type: | Wood Framing |
| Building Type: | Single Family Detached | Garage Type: | None |
| Occupancy: | Rental | Number of Garage Stalls: | None |

---

# EXHIBIT 11

# (*PLAINTIFF'S UNAUTHORIZED ELECTRONIC SIGNATURE*)

010460170

Anthonio Vole

| Number of Family Units: | 1 | Detached Garage: | None |
|---|---|---|---|
| Construction Type: | Wood Shingle/Shake | Number of Detached Garage Stalls: | None |
| Unique Construction: | No | Age of Roof: | 20 years |
| Number of Stories: | 1 | Roof Shape: | Gable |
| Square Footage: | 1300 | Roof Type: | Architectural Composite Shingle |
| Number of Bathrooms: | 2 | Solar Panels: | No |
| Auxiliary Heat: | Wood Fireplace | Pool or Spa on Premises: | No |

| | Limit Of Liability | Perils Insured Against | Premium |
|---|---|---|---|
| Liability Coverage - Premises Only | $1,000,000 | | $71.87 |
| Medical Payments Coverage - Each Person/Each Occurrence | $25,000/$125,000 | | Included |
| Dwelling Coverage - Homeowners | $283,561 | 1 | $1,656.77 |
| Loss Settlement Selection Form 7: Replacement Cost | | | Included |
| Rental Dwelling Endorsement | | | Included |
| Personal Property Coverage | $1,131 | 2-19 | $30.30 |
| Loss Settlement Selection Form 5: Actual Cash Value | | | Included |
| Auxiliary Private Structures Coverage | $28,356 | 1 | Included |
| Loss Settlement Selection Form 7: Replacement Cost | | | Included |
| Additional Living Expense & Fair Rental Value Coverage | $28,356 | 1 | Included |
| Additional & Special Coverages | | | Included |

Location Premium: $1,758.94

## Total Premium: $1,758.94

For a complete description of your coverages, perils insured against, and loss settlement selection(s), please refer to your policy.

Please refer to coverage forms for the perils insured against and applicable loss settlement when not specifically listed above.

### We're looking out for you!

- Save more! Contact your representative to review all of our money saving discounts like the Multi-Policy Discount.
- Make a Payment! COUNTRY Financial® offers many convenient options including online payment. Go to countryfinancial.com and log in to MyCOUNTRY to learn more.
- Follow us on Facebook and Twitter! Find out what we're doing in your community, tell us what's on your mind or get tips to help you achieve your goals. We're here to talk whenever you need us.

## Your Policy Documents

Your policy is available upon request and consists of these declarations pages, policy packet (including schedules, forms, and addenda), application, and any endorsements. Please keep them together. This policy is effective at 12:01 a.m. on the date shown or the time the policy/change was purchased/requested, whichever is later. Additionally, your policy coverages and coverage limits listed above are subject to all terms, exclusions, and conditions described in your policy.

| | |
|---|---|
| General Policy Packet | 21224IL (00-10/22) |
| Liability Coverage - Premises Only | 22201IL (00-10/22) |
| Medical Payments Coverage | 22202 (00-05/19) |
| Section 1 Policy Packet | 22217IL (00-10/22) |
| Dwelling Coverage - Homeowners | 22203 (00-11/21) |

12043/03472

005041 1990887 0000000 019189 038378 02/03

## Your Policy Documents (continued)

| | |
|---|---|
| Personal Property Coverage | 22205 (00-05/19) |
| Additional Living Expense & Fair Rental Value Coverage | 22206 (00-05/19) |
| Auxiliary Private Structures Coverage | 22207 (00-11/21) |
| Additional & Special Coverages | 22209 (00-05/19) |
| Section 2 Policy Packet | 22218IL (00-10/22) |
| Loss Settlement Selection Form 5: Actual Cash Value | 22214 (00-05/19) |
| Loss Settlement Selection Form 7: Replacement Cost | 22216 (00-11/21) |
| Rental Dwelling Endorsement | 20334 (00-11/21) |

## Important Notices

Replacement Cost - Subject to policy terms and provisions, this coverage provides 100% replacement cost coverage for the dwelling up to a maximum of the amount shown on the Declarations page.

**Please contact your representative if you have any questions or would like further explanation regarding your policy coverages or the premium charged.**



| | |
|---|---|
| Company Representative Name | Sep 13, 2025 |
| | Date Countersigned |

# EXHIBIT 12

# (*AFFIDAVIT OF ERIC BRAUN*)

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

TIFFANY A. VOLE, Individually, as the )
Executor of the Will of Peter Vole Jr., dated April )
6, 2022, as Trustee of the Second Amendment and )
Restatement of the Living Trust Agreement of Peter )
Vole, Jr., Dated October 30, 2017, derivatively on behalf )
of VIP Holding Company, and The Estate of Peter Vole Jr. )
                        )

Plaintiffs, )
                        )

vs. )
                        )

ANTHONIO VOLE, JACOB F. McBRIDE, )
RIVERSIDE MANAGEMENT & LEASING )
CORPORATION, BRIAN BAVARO, MID )
AMERICAN RESTORATION SERVICES INC., )
LAWRENCE GEMPP and EDWARD MACEK )
                        )

Defendants. )

## AFFIDAVIT OF ERIC BRAUN

I, ERIC BRAUN, being first duly sworn, depose and state as follows:

1. In 2023, surveillance cameras were installed at Tiffany Vole's property in Grayslake, Illinois by Signal Werks Technologies, with additional cameras added over multiple visits. The equipment required a username and password for viewing.

2. In 2024, Ms. Vole requested a change to her account credentials to ensure no one else had access, and Signal Works kept no record of these new credentials.

3. In approximately August 2025, it was discovered that the credentials to Tiffany Vole's camera system had been changed, and the system was locked to a new unknown account. The equipment displayed a new unknown email address, which was obscured by asterisks by the manufacturer.

4. Tiffany Vole had no knowledge of who changed the credentials or who owned this new unknown email address.

5. I was advised by Tiffany Vole that she had shared her email account and password with her business partner over the previous months.

1

6.     Direct access to Tiffany's cellphone and/or email account would have been sufficient to change the equipment credentials.

7.     Upon learning of the credential changes, Tiffany Vole requested that Signal Werks forcibly take over the equipment, and with the manufacturer assistance, all existing credentials were bypassed.

STATE OF ILLINOIS         )
                               ) SS.
COUNTY OF __LAKE__        )

____ERIC  BRAUN____, being first duly sworn oath, deposes and states that I have read the attached affidavit, by me subscribed, and that the same is true and correct to the best of my information, knowledge, and belief.

_____
Eric Braun
Signal Werks Technologies
President

SUBSCRIBED AND SWORN TO

before me this ___9___ day of
__December____, 2025

_____

OFFICIAL SEAL
MICHELLE N LINDGREN
Notary Public, State of Illinois
Commission No. 989945
My Commission Expires April 26, 2028

Notary Public

Case 25-15190 Document 64 Filed 06/13/25 Page 34 of 205 Page ID #5536

# EXHIBIT 13

# (*COPIES OF COUNTRY FINANCIAL CLAIM CHECKS*)

# Check Paid

Account: 0386 - CMIC Draft Account

Bank #: 550804684

Customer #: 6808360

Posting: Mar 7th, 2025

Amount: $127,163.54

---

THE FACE OF THIS DOCUMENT HAS A GREEN COLORED BACKGROUND ON WHITE PAPER AND A TRUE WATERMARK. A36-812-09

February 10, 2025

**COUNTRY FINANCIAL** Company®

P.O. Box 2100, Bloomington, Illinois 61702-2100

**6808360**

36-1870/1012

COMMERCE BANK, KANSAS CITY/ST. JOSEPH MO.

| CLAIM NUMBER | POLICY NUMBER | BILLING NUMBER | DATE OF LOSS |
|---|---|---|---|
| 600-1083775 | P008577446 | 4236054 | 01/11/2025 |

| Payment on Account of Claim Against (Insured) Anthonio Vole | INVOICE NUMBER/PATIENT NAME | DATE OF SERVICE |
|---|---|---|

One hundred twenty seven thousand one hundred sixty three and 54/100

DOLLARS $ 127,163.54

PAY TO THE ORDER OF

Tiffany Vole &
Anthonio Vole &
Mid American Restoration Services Inc

VOID IF NOT CASHED WITHIN
180 DAYS OF THE DATE OF ISSUE

⑆6808360⑆ ⑈1012187041⑈ 43000038 6⑆

JPMorganChaseBank 030608 150272 910110095774

PAY TO THE ORDER OF
JPMORGAN CHASE BANK required above this line.
VOLO, IL 60073
P 071000013 4
FOR DEPOSIT ONLY
MID AMERICAN RESTORATION
8887311169

This payment order must be endorsed individually by all payees shown on the front of this document. Each payee must be shown. Handwritten endorsements on behalf of business must include the name of the payee. Signature of the authorized person signing for the business and their title or capacity to sign on behalf of the business

000036

# Check Paid

Account: 0386 - CMIC Draft Account

Bank #: 550295051

Customer #: 6899661

Posting: Aug 1st, 2025

Amount: $66,637.91

THE FACE OF THIS DOCUMENT HAS A GREEN COLORED BACKGROUND ON WHITE PAPER AND A TRUE WATERMARK A36-812-09

COUNTRY FINANCIAL Company®

P.O. Box 2100, Bloomington, Illinois 61702-2100

6899661

36-1870/1012

COMMERCE BANK, KANSAS CITY/ST. JOSEPH MO.

| CLAIM NUMBER 600-1083775 | POLICY NUMBER P008577446 | BILLING NUMBER 4236054 | DATE OF LOSS 01/11/2025 |

| Payment on Account of Claim Against (Insured) Anthonio Vole | INVOICE NUMBER/PATIENT NAME | | DATE OF SERVICE |

Sixty six thousand six hundred thirty seven and 91/100

DOLLARS  $  66,637.91

PAY TO THE ORDER OF

Anthonio Vole &
Tiffany Vole &
Mid American Restoration Services Inc

VOID IF NOT CASHED WITHIN
180 DAYS OF THE DATE OF ISSUE

⑈6899661⑈ ⑆101218704⑆ 430000386⑈

For Deposit Only - JPMC

000038

# EXHIBIT 14

# (*LAKE COUNTY CIRCUIT COURT ORDER GRANTING TRO*)

FILED

4/24/2026 3:55 PM

Erin Cartwright Weinstein
Clerk of the Court
Lake County, Illinois

IN THE CIRCUIT COURT OF THE NINETEENTH JUDICIAL CIRCUIT
LAKE COUNTY, ILLINOIS - CHANCERY DIVISION

| | | |
|---|---|---|
| ESTATE OF | ) | |
| PETER VOLE, JR., | ) | |
| Deceased. | ) | |
| | ) | |
| DOLORES VOLE, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | **Case No. 2023 CH 232** |
| v. | ) | into which Case No. 24 PR 26 |
| | ) | has been consolidated |
| TIFFANY VOLE, Individually and as | ) | |
| Executor of the Will of Peter Vole, Jr. | ) | |
| Dated April 6, 2022, et al., | ) | |
| Defendants. | ) | |
| | ) | |
| ANTHONIO VOLE, individually and derivatively | ) | |
| on behalf of V.I.P. Holding Company, | ) | |
| | ) | |
| Counter-Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| TIFFANY VOLE, individually and as Trustee | ) | |
| of the "Second Amendment And Restatement Of | ) | |
| The Living Trust Agreement Of Peter Vole, Jr. | ) | |
| Dated October 30, 2017" executed on April 6, 2022, | ) | |
| and V.I.P. HOLDING COMPANY, | ) | |
| | ) | |
| Counter-Defendants. | ) | |

## <u>MEMORANDUMN  ORDER PRELIMINARY INJUNCTION</u>

THIS CAUSE COMING ON TO BE HEARD on a Preliminary Injunction hearing on January 26-29, 2026, the court having heard the testimony, reviewed the evidence as well as the arguments submitted by counsel in closing and in rebuttal, finds as follows:

### THE PENDING MOTION FOR PRELIMINARY INJUNCTION

Anthonio Vole (hereinafter "Tony") filed a Motion for Temporary Restraining Order against Tiffany Vole. That motion was joined by Dolly Vole and Robert Vole.  In the prayer for relief, the parties asked the court to:

1) Restrain Tiffany from causing the Trust to make any distributions to her or for her personal benefit, including, but not limited to, the payment of (i) a salary as Trustee, (ii) the retention of loan payments due to the Trust, (iii) the receipt of so-called "Owner's

Page **1** of **44**

Draws," and (iv) personal expenses including payment of credit card charges for personal expenses; and

2) Restrain Tiffany from making any distributions from the Trust which are outside the ordinary course of the business of the Trust.

Every Motion for TRO must be supported by an underlying pleading. Tony filed a counter complaint against Tiffany, both individually and derivatively, sounding in the following causes of action:

| | |
|---|---|
| Count I: | Removal of Tiffany as Trustee |
| Count II: | Breach of Fiduciary Duty |
| Count III: | Failure to Respond to Statutory Request for Corporate Records |
| Count IV: | Derivative claim on behalf of VIP against Tiffany |
| Count V: | Derivative claim on behalf of VIP against Tiffany for breaches of Fiduciary Duty |

Petitioners Dolly, Peter III and Robert have filed suit to set aside Peter Jr.'s last known purported Will, as well as the Second Amendment and Restatement for the Trust. (Pet. Ex. 22). However, as the facts of those complaints are not pertinent to the TRO, the court heard no evidence on their complaints.

On October 31, 2025, the court granted the Temporary Restraining Order and set the matter for Preliminary Injunction hearing.

**FINDING OF FACTS**

The Decedent, Peter Vole, Jr. (hereinafter "Peter") has five children: Dolly, Peter III, Robert, Tiffany and Tony. Peter died on December 25, 2023. (01/26/26 Tr. p. 271). Peter developed his wealth by building an empire of residential and commercial real properties over the course of his life. Peter leased these real properties to tenants, generating substantial income streams, as well as millions of dollars in underlying property value. By the time of Peter's passing, the assets of the Trust and VIP collectively included, inter alia: (1) more than 100 residential real properties as well as 10 commercial properties and parcels of land; (2) brokerage accounts held by financial institutions Charles Schwab and 1492; and (3) accounts held by Huntington Bank, Fifth Third Bank, and Chase Bank. (01/26/26 Tr. p. 85). The ending balance of the trust account in January of 2024 (the month after Peter died) was **$** 2, 576,644.45. (1/26/26. Tr. p.230 and PEX 12)

**VIP and the Trust**
Prior to his passing, Peter established the Trust, for which he served as initial trustee. (See PEX 21; PEX 22). On or about April 16, 2021, pursuant to the First Amendment and Restatement of the Trust, Tiffany Vole began serving as co-trustee of the Trust with Peter. (01/26/26 Tr. p. 88; Pet. Ex. 21). Thereafter, upon Peter's passing in December of 2023, Tiffany began serving as sole successor trustee of the Trust. (01/26/26 Tr. p. 88). Additionally, by the time of Peter's passing, Tiffany was acting as both the sole director and only officer of Peter's primary business, VIP. (01/26/26 Tr. p. 224). Significantly, assets of VIP have been and remain, by extension, assets of the Trust, which holds a 50% ownership interest in VIP. (01/26/26 Tr. p. 25).

**Dolly Managed Peter's Business Until November 2021 at Which Point Peter Terminated Dolly's Services**

In 2019, Dolly was in charge of Peter's businesses. (1/26/26. Tr. p 80). In 2019, Tiffany left Florida and returned to Illinois to help her father. (1/26/26. Tr. p.79) Tiffany began assisting Dolly in her father's business. Tiffany described her position as Dolly's errand girl. (1/26/26. Tr. p.80) Tiffany sanded drywall; she picked up materials and people; she drove workers to job sites; she paid workers; she collected rent (1/26/26. Tr. p.80) Tiffany was treated as an independent contractor and initially she was paid $1,800 bi-weekly or about $3,600 per month. (1/26/26. Tr. p.82-83). Later, her father increased her pay to $2,500 biweekly or $5,000 per month. (1/26/26. Tr. p.176) The $5,000 included her work for VIP and it also included her work as a care giver for her father. (1/26/26. Tr. p.176)

At some point, relations between Dolly and Peter became strained. Peter terminated Dolly in November of 2021, and he took control of his business. Tiffany began taking a more prominent role in the business. (1/26/26. Tr. p.81) Her father was trying to teach her the business. (1/26/26. Tr. p.81) Tiffany was her father's assistant and she did whatever he wanted her to do. (01/26/26 Tr. p. 275). Her father used a contractor named Ivan Purnell to do work on the properties. (1/26/26. Tr. p.81)

**Peter Hired an Outside Property Management Company, Riverside, to Manage his Properties**

In 2021, Dolly had instituted a guardianship proceeding against her father. At this time, Peter's attorney, James Siebert, told Peter that it was in his best interest to get a management company in place because Peter was struggling with his health and Tiffany did not have broker's license, so she could not write leases. (1/26/26. Tr. p.270) Peter signed a two year contract with Mr. Jake McBride of Riverside, with the contract expiring in 2023. (1/26/26. Tr. p.270-271) Riverside is a property management company. (1/26/26 Tr. p.237) Peter delegated certain responsibilities of VIP to Riverside. (1/26/26 Tr. p.237)

Tiffany testified that Riverside was responsible for collecting rents and maintaining the properties. On the other hand, Tiffany testified that she also was involved in the day to day management of the properties. (1/27/26. Tr. p.65) Although Riverside handled the accounting, she was the contact person if Riverside did not show up. (1/27/26 Tr. p.65) In her opinion, the relationship was not working out, and therefore it was her intent to end the contract with Riverside in 2025 and transition back into self-management. (1/27/26 Tr. p.67)

In 2023, Jake purchased Riverside from the previous owner, Chris Shaw. (1/27/26 Tr. p.74) Tiffany asked her father to loan Jake money. (1/27/26 Tr. p.73) Tiffany testified that Jake needed a $120,000 loan from her father to purchase software licensing agreements for the day to day operations of Riverside. (1/27/26. Tr. p.75) In 2023, Peter made a personal loan to Jake McBride. (1/27/26 Tr. p.69) At trial, the court commented that $120,000 seemed like a lot of money for software licensing. (1/27/26. Tr. p.75) Tiffany testified that she agreed, and that her father said it would be fine as long as she placed a lien on Jake McBride's cabin in Wisconsin. (1/27/26. Tr. p.76)

Page **3** of **44**

Jake McBride testified that he acquired Riverside Management for $1.25 million dollars. (1/27/26 Tr. p. 149) He borrowed $120,000 from Peter as the down payment of the acquisition. (1/27/26 Tr. p.150) The $120,000 was not for the purchase of software licenses, but rather it was for 10% of the purchase price. (1/27/26 Tr. p.150)

Tiffany's testimony regarding her misunderstanding as to the purpose for the loan her father gave to Jake McBride highlights her lack of experience in managing a business. Tiffany testified that the purpose of the loan was to purchase software licensing agreements. Her understanding was incorrect. Peter loaned $120,000 to Jake to cover the downpayment for his acquisition of Riverside. Tiffany cannot use the excuse that her father was in control of the business and, therefore, she did not know the intimate details, because she testified that she is the person that facilitated the loan between Jake McBride and her father. As the Director of VIP and the Trustee of the Trust, Tiffany is the primary decision maker. As such, she has a fiduciary responsibility to understand the nature of the loans extended by VIP to third parties. The fact that Tiffany testified confidently under oath that she, like the court, was surprised that Jake McBride needed $120,000 to purchase software licenses demonstrates her failure to either read and understand the terms of the McBride loan document, or even more egregious, a failure to educate herself about the loan. The court relies on this testimony as further evidence that Tiffany has little to no experience with respect to the administration of trusts, operation of business entities, or the management of real properties. (01/26/26 Tr. pp. 76-78).

Tiffany testified that she was displeased with Riverside's work, and she sent Riverside a termination notice on September 19, 2025. (01/26/26 Tr. p. 239). Part of her displeasure is due to Riverside's failure to communicate with tenants and make repairs.

In a move which backfired against the Petitioners, Petitioners called Jennifer Pioch, a former tenant, to testify about problems with her rental unit. Ms. Pioch testified that she had to beg Riverside Management to come out and do something. (01/27/26 Tr. p. 275). She testified it was hard to get Riverside to come and take care of problems. (01/27/26 Tr. p.277). Ms. Pioch tried to get a hold of Tiffany, but Riverside never gave her Tiffany's number. (01/27/26 Tr. pp. 277-278). Ms. Pioch's testimony is consistent with Tiffany's testimony that Riverside was not responsive to tenant repair issues.

**Tiffany Delegated Additional Authority to Jake McBride as Agent of the Trustee**
Tiffany delegated certain responsibilities held by VIP to Riverside. (1/26/26 Tr. p. 237) As Agent of the Trustee, Jake served in an advisory capacity to Tiffany. (1/27/26 Tr. p.239) He initiated, scheduled and attended multiple meetings with accountants and law firms. (1/27/26 Tr. p.239) Jake helped Tiffany process documentation, understand documentation and worked through requests from the law firms. He also compiled things for the estate tax return and for other tax return purposes. (1/27/26 Tr. p.239) He was included on all accounting and legal calls with counsel. (1/27/26 Tr. p.178) Jake was heavily involved in coordinating, fact finding and putting together information that would have been needed by the attorneys or the accountants or Tiffany to help make informed decisions. (1/27/26 Tr. p.178)

Page **4** of **44**

**Tiffany Sold off the Trust's Largest Single Asset and then Made a Distribution to Herself and Tony**

In December of 2023, one day after Peter died, the Trust sold off its largest single asset, Chemblend, for $1,300,000. (1/26/26 Tr. p.189) By selling the Chemblend building, the Trust lost the rental income stream it enjoyed from the building. (1/26/26 Tr. p.190) Tiffany was aware that the loss of the rental from Chemblend would impact the portfolio, thus, she purchased another commercial property named Ashely to make up for the lost Chemblend income. (1/26/26 Tr. p.191) Ashly generates about $45,000.00 per year in income whereas Chemblend generated about $250,000.00 per year in income. (1/26/26 Tr. p.192)

Tiffany made a distribution to herself in the amount of $600,000 and to her brother in the amount of $600,000. (1/26/26 Tr. p.151)

**Tiffany Cannot Recall Why She Issued a Cashier's Check Made Payable to Herself in the Amount of $100,00 Shortly after her Father's Death**

Two days after her father died, Tiffany made a distribution to herself in the amount of $100,000 via a cashier's check from the VIP Trust account. (1/26/26 Tr. p.153) She testified that she could not recall the purpose for which she withdrew the money. (1/26/26 Tr. p.153) She testified that she could not, "(r)ecall if I cashed it or if it went to something else." (1/26/26 Tr. p.153) Tiffany's reason that she could not recall was because, "My dad died two days before (the transaction)." The transcript cannot capture tone, but the court made a note that Tiffany's tone was one of righteous indignation when she testified, "My apologies that I don't remember one transaction two days after I watched my father died." (1/26/26 Tr. p.153)

The court finds that Tiffany was not credible in her inability to recall why she withdrew $100,000.00 from the account two days after her father's death. The cashier's check was made payable to her. That is a large amount of money, and, while the death of a parent is traumatizing, it is unbelievable to this court that Tiffany Vole cannot recall the purpose for the withdrawal. Moreover, because Tiffany has failed to provide an accounting, she has never accounted for the $100,000.00. If Tiffany elected to give herself a six figure distribution, two days after taking control of the company, that decision raises the question why she would have given herself a distribution, but not one to Tony, considering they have an equal ownership interest. The court concludes that, in her capacity as the trustee of the Trust and in her capacity as the President of VIP, Tiffany put her hand into the company till and helped herself to $100,000.00 without any documentation or explanation as to why.

As of February 25, 2025, the trust account held $5,039.16. (1/26/26 Tr. p.230) Tiffany did not know whether the Trust made any money in 2024 or 2025. (1/26/26 Tr. p.195) In the Spring of 2025, Riverside did not have any assets available for an owner's draw. (1/26/26 Tr. p.198) (1/27/26. Tr. p.263)

**Tiffany Failed to Account for the Properties She Sold**

Tiffany is the president and secretary of VIP. (01/27/26, Tr. p. 104 ).Tiffany has sold between 10-12 properties since she became president. (1/26/26 Tr. p.218) With respect to sales that occurred after her father's death, Tiffany did not give any of those closing statements to Tony. (01/26/26, Tr. p.218).

**Tiffany's Failure and Refusal to Provide Required Accountings**

Tiffany testified that she owes a "specific reporting" to a shareholder of VIP. (01/26/26 Tr. p. 76-216). When counsel asked her what specific reporting is owed, Tiffany said that her corporate attorneys handled that. (01/26/26 Tr. p.216). In response to the question, "What obligations does VIP and its management owe to a shareholder in terms of books and records and reporting?" Tiffany responded that she did not fully know. (01/26/26 Tr. p. 216). She explained further, "So what I understand is exactly what I was taught, that our corporate attorneys handle that portion along with the trust attorneys who administer the trust. And I was to focus on the business." (01/26/26 Tr. p.216). She explained that her father taught her that, as she was the only one improving the business, and her father wanted her to focus on it. (01/26/26 Tr. p.216).

Petitioner Tony Vole is a beneficiary of the Trust, under both the currently disputed Second Restatement and the preceding First Restatement. (01/26/26 Tr. p.88; 01/27/26 Tr. p.135; 1/28/26 Tr. p.6; PEX. 21; PEX. 22). Tony is also a shareholder of VIP. (01/27/26 Tr. p 135; 01/28/26 Tr. p. 6). Tony testified that, during the pendency of these proceedings, and while Tiffany was serving as both trustee of the Trust and as President/Secretary and director of VIP, Tony requested an accounting of Tiffany's administration of the Trust, as well as access to books and records of VIP. (01/28/26 Tr. pp.47-48). Tiffany refused to provide such information, telling Tony that she was "too busy" to account and stating that Tony "wasn't entitled to" the information he was seeking. (01/28/26 Tr., pp. 44, 48). Tony further testified that, when he pressed the point with Tiffany, she stated that he ". . . would never receive an accounting." (01/28/26 Tr. p. 46). When Tony indicated that he might involve his attorney, Tiffany stated that if his attorney got involved, she would ". . . never allow [Tony] to be in any meeting regarding VIP Holding Company." (01/28/26 Tr. p. 49). Tony's testimony was credible on this issue. His frustration with his sister and her lack of response to his legitimate queries rang true. For the reason explained in the section entitled, "A Key Moment at Trial," the court finds that Tony's testimony bolsters the court's conclusion that Tiffany exploited her perceived position of power.

On or about August 22, 2025, Tony's counsel sent correspondences to: (1) Tiffany's counsel in her capacity as trustee of the Trust; and (2) Tiffany's separate counsel in her capacity as President/Secretary President/Secretary and director of VIP. (01/26/26 Tr. p. 100; 01/28/26 Tr. pp. 49-50; Pet. Ex. 1; Pet. Ex 2). In those correspondences, Tony's counsel made written demands on Tony's behalf for a trust accounting from Tiffany, as well as access to books and records including, but not limited to shareholder and owner records/certificates, financial statements, balance sheets, account ledgers and the like for VIP. (PEX. 1; PEX 2). In response, Tiffany provided neither, and her attorneys subsequently withdrew from representing her both with respect to the Trust and VIP. (01/26/26 Tr. pp. 100, 240-41). Tiffany admitted at hearing that she does not know if Tony was ever provided with access to any of the corporate records of VIP. (01/26/26 Tr. p. 215). Tony testified he was never afforded access to Trust or VIP records. (01/28/26 Tr. p. 50).

During her testimony at hearing, Tiffany admitted that she had not produced numerous documents demanded in discovery. (01/26/26 Tr. pp. 101, 114, 116, 129-30, 150, 159-60, 233, 235). Tiffany asserted that she provided responsive documents to her prior counsel, and that her prior counsel apparently failed to circulate such documents. (*Id*). Nevertheless, Tiffany admitted to possessing her own copies of relevant and responsive documents, yet she provided no clear explanation as to

how or why she did not produce such documents through her current counsel, particularly given that multiple Court orders required her to do so. (*Id*).

At the hearing, Tiffany admitted that she never personally prepared an annual accounting and further admitted that no annual accounting has been given to Tony for the years 2024 or 2025. (01/26/26 Tr. pp. 93-94). When asked if she kept track of the income and expenses for VIP and the Trust properties, Tiffany responded that "[t]he income and expenses are reported every month from Riverside . . . ." (01/26/26 Tr. p. 82). Tiffany also admitted that she does not know whether the Trust or VIP made money in 2024 and 2025. (01/26/26 Tr. pp. 189, 195). She further testified that there was no money going from end of 2024 into 2025 to pay 2025 VIP and Trust taxes, including estate, corporate and real estate taxes. (01/27/26 Tr. pp. 131-132). In fact, she stated that "We had not received the funds to be able to even accumulate that much money."

**Co-Mingling of Trust Income with VIP Income into the Huntington Account**
Tiffany testified that she never opened any checking account for the Trust, and she permitted Trust income to be deposited into a VIP account, thereby commingling Trust and VIP assets. (01/26/26 Tr. p. 97; 01/27/26 Tr. pp. 129-131.) She deposited payments from debtors into the VIP checking account because she did not have a trust checking account. (01/26/26, Tr. p.211). She testified that she suggested to her father that they should put debtor payments back into the VIP Money Market account, but her father "just wanted to do stuff his way." So, the deposits went into the VIP checking account, and she followed suit. (01/26/26, Tr. p211.). Tiffany thought that there might be a better way, but it was her father's business. (01/26/26, Tr. p. 212). Tiffany testified that if a payment is made on a loan that was due to her father, that she thought it was appropriate to put that collection into the VIP account instead of into the trust account. (01/26/26, Tr. p. 213). Her reasoning was that she continued to do things the way her father had them set up. (01/26/26 Tr p. 97)

**A Key Moment at Trial Revealed Tiffany's Belief that There are no Checks in Place to Curb her Authority**
Sometimes at trial, a key moment happens where a witness unintentionally drops his/her guard and reveals his/her true motivation. Such a moment happened in this hearing. In general, Tiffany presented herself as submissive and apologetic. She presented herself as a victim: a victim of her attorneys, a victim of her siblings and a victim of Riverside. Yet, in one moment of unveiled honesty, Tiffany's true personality showed when she was questioned about her failure to call a shareholder's meeting in 2025.

Q: Do you know what a shareholder's meeting is?
A: I do.
Q: That is, in this case, a meeting, pretty simple, between you and Tony in your capacity as shareholders.
A: And we have never had one because everyone signed off.
Q: That's what a shareholder's meeting is in this case.
A: I understand.
Q: Did you have a shareholder's meeting in 2025?
A: Not to my knowledge.
Q: Do you know what the purpose of a shareholder's meeting is?

A:    No.

Q:    Do you know that the purpose of a shareholder's meeting is to elect a director?

A:    You wouldn't be able to in this case.

Q:    You probably would be deadlocked, is that what you mean, that you couldn't agree on one person to serve as director?

A:    My father already made me director.

Q:    Do you think that's a lifetime appointment, ma'am, you're the Pope of VIP?

A:    I never said that.

Q:    Do you think you hold that from year to year?

A:    I hold it as long as  - -  I don't even know what that means. Yeah, he put me in that position. He didn't put Tony in that position.

Q:    Do you understand ma'am, that every year you're supposed to have a shareholder's meeting and that at shareholder's meetings, the shareholder's elect the next director? Do you understand that?

A:    I do.

Q:    Is one of the reasons that you didn't you convene a shareholder's meeting was that you thought the parties would deadlocked and that you wouldn't be elected as the sole director?

A:    The parties couldn't be deadlocked.

Q:    Pardon me?

A:    The parties could not be deadlocked.

Q:    Why is that?

**A:    Because, yes, my brother owns 25 percent and, yes, I do, but I am the only trustee who owns 50 percent of the trust.**

Q:    Do you think that you as trustee could objectively vote as to whether or not you should continue on as president?

A:    I do. (1/26/26. Tr.pp.223-225)

The transcript does not record facial expressions or tone of voice.  In this "gotcha" moment, when Tiffany testified that she was untouchable based upon her controlling position as the Trustee of the Trust, her tone of voice was smug and self-satisfied. She smiled sweetly at counsel when she explained her position of power and she smirked when she testified that she could objectively vote as a Trustee to continue her position as president. In that moment, it was clear to the court that Tiffany feels invincible, emboldened and empowered to the exclusion of her brother Tony, which explains much of her decision making.

**Delegations to Riverside Management, Counsel, and Accountants, and Reservation of Discretionary and Supervisory Authority**

Prior to Peter's passing, and continuing thereafter, real property management service Riverside Management & Leasing Corp. ("Riverside") served as property manager for the numerous residential and commercial real properties owned by VIP and the Trust. (01/26/26 Tr. pp. 237-38). Tiffany also delegated responsibilities with respect to the Trust and VIP to: (1) her counsel; and (2) the accounting firm MMA. (01/26/26 Tr. pp. 239-41). Concerning the acts of misconduct and breaches of fiduciary duty alleged by Petitioners, at hearing, Tiffany asserted that such failings were attributable not to her, but rather to the third parties to whom she had delegated her responsibilities. Tiffany admitted at hearing that each of those third parties had been selected to serve by Tiffany, and Tiffany further admitted that she explicitly retained discretionary and

Page **8** of **44**

supervisory authority over all such third parties, be they Riverside, attorneys, or accountants. (01/26/26 Tr. pp. 238-39, 244). Such authority included the authority to terminate for insufficient performance. (01/26/26 Tr. pp. 242-43).

**Failure To File Trust and VIP Income Tax Returns and Pay Estate Taxes**
With respect to income and estate taxes, when asked ". . . do you know, as you sit here today, whether or not VIP has filed a federal income tax return for 2022?" Tiffany responded: "I have not been able to get that information from my accountants. I apologize." (10/26/26 Tr. p. 105). Tiffany admitted that she did not know if the 2023 federal income tax return has been filed for VIP, and as to whether the VIP federal income tax return for 2024 has been filed. Tiffany responded: "I don't believe so." (01/26/26 Tr. p. 106). Tiffany likewise testified that she believed that state income tax returns had not been filed for VIP for tax years 2023 and 2024 (01/26/26 Tr. p. 108). With respect to estate taxes, Tiffany admitted that Peter's estate had incurred ". . . around $141,000-ish" in penalties for failure to pay federal estate taxes in full when due. (01/26/26 Tr. p. 109). Tiffany claimed that she did not learn that federal estate taxes were still overdue ". . . until very recently." (01/26/26 Tr. p. 111). Tiffany did not know if state estate taxes were addressed at all. (01/26/26 Tr. p. 109).

Tiffany also admitted that she had not filed her personal tax return for 2024. (01/26/26 Tr. p. 204). (01/27/2026 Tr. p. 154).

Tony testified that as 25% shareholder of VIP, he was due a K-1 statement. (01/28/26, Tr. p.44). Tiffany told him that he does not get a K-1. Tony told her, "I need that because if there was any profit due to the shareholders or any profit is taken out, that is technically split between the shareholders, that would show up on my K-1, and I would have to pay taxes on it, and I have never seen a dollar of profit from VIP Holding Company." (01/28/26, Tr. p.45). Tiffany told Tony that he was incorrect, and he did not know what he was talking about. (01/28/26, Tr. p.45). Tony has never received a K-1 for 2024 or 2025. (01/28/26, Tr. p.47).

The purpose of a K-1 is to report the shareholder's share of the corporation's income, deductions, credits and other items. (2025 IRS Shareholder's Instructions for Schedule K-1) The court shares Tony's concerns as to why he did not receive a K-1 statement for his interest in VIP. There was no testimony as to whether VIP enjoyed income, deductions, credits or other items that would have necessitated a K-1 for Tony in 2024 or 2025. However, again, because Tiffany failed to provide an accounting, and because VIP did not file its taxes for 2023 or 2024, the court assumes that VIP did not issue a K-1 statement for Tony because the accountants did not have sufficient information to do so. The court finds that Tony is justified in his concern over the failure to receive a K-1 and the court further finds that Tiffany's ignorance about the need for a K-1, and her failure to make sure that 2023, 2024 and 2025 taxes were filed, further highlights her lack of competence in running a company and acting as the Trustee of a Trust. At this point, the parties do not know what tax consequences VIP may be facing.

**Failure to Pay Trust and Vip Real Estate Taxes on Numerous Rental Properties**
As previously noted, the primary holdings of both VIP and the Trust have been and remain residential and commercial real properties. Jake McBride, Executive Property Manager for Riverside, testified that he received no direction from Tiffany to keep liquid reserves on hand to

Page **9** of **44**

pay real estate taxes for the many residential and commercial real properties owned by the Trust and VIP. (01/27/26 Tr. pp. 147, 155, 159, 161). Tiffany, likewise, admitted that she did not ensure that sufficient money was held to pay real estate taxes. (01/27/26 Tr. pp. 130-131).

In 2023, Tiffany relied upon a bank teller at Huntington Bank to prepare a list of 2022 tax payments required for the real properties. (01/26/26 Tr. p. 120). Thereafter, for 2023 real estate taxes, Jake McBride of Riverside began tracking and listing the tax payments owed on the real properties. (01/26/26 Tr. p. 121). Riverside compiled the reporting of real estate taxes due, collected funds from payment from Tiffany, and processed the tax payments through Riverside.

Jake McBride offered to perform the same services through Riverside with respect to 2024 real estate taxes, but Tiffany did not accept the offer. (01/27/26 Tr. p. 157).

In June of 2025, the first installment of 2024 real estate taxes were due for the residential and commercial real properties owned by the Trust and VIP. (01/26/26 Tr., p. 130). Tiffany failed to timely pay those taxes, and Tiffany also failed to pay the second installment on those real estate taxes, which came due in or about September of 2025. (01/26/26 Tr. p. 253).

Tiffany testified that Jake McBride was supposed to make the payments for the 2024 Real Estate taxes. (01/26/26 Tr., p. 123) She testified that he was supposed to make the payment from all the money they get from their tenants. (01/26/26 Tr. p. 123) She testified that Jake did not have reserve set up to pay the real estate taxes in 2025. (01/26/26 Tr. p. 123) Then she testified that Jake put an allocation aside for the taxes. (01/26/26 Tr. p. 127) She testified, "I sent him many emails regarding paying the taxes. He had the tax bills, so he was supposed to be paying the taxes, that was his responsibility this year as allocated in the budget." (01/26/26 Tr. p. 129) When counsel asked Tiffany if she had produced those emails as part of discovery, she said she didn't know. (01/26/26 Tr. p. 130)

Jack McBride testified that Riverside's obligation to reserve funds depends upon the portfolio's ownership, and VIP did not elect to have Riverside reserve for real estate taxes (01/27/26 Tr. pp. 158-159). Jake McBride testified that in 2023, the year that Peter Vole died, Riverside had no involvement in the payment of taxes for 2022. (01/27/26 Tr. p. 153) In 2024, Riverside compiled the reporting of all the taxes that were due at that time. Tiffany gave Riverside the funds for those payments and then Riverside processed the payment. (01/27/26 Tr. p. 154) Tiffany testified that in 2024, Riverside gave her a list of the real estate taxes that had to be paid and then she went and paid the taxes herself. (01/26/26, Tr. p.125). There were not sufficient funds in the Riverside account to pay those taxes. (01/27/26 Tr. p. 155) Jake McBride testified that in 2025, Riverside offered to pull together the spreadsheet and make the payments again, but Tiffany did not accept the offer because she told Riverside that Sean Weppler's office would handle the tax payments. (01/27/26 Tr. p. 157)

The parties agree that in 2023 and 2024, Tiffany in her capacity as director of VIP and trustee of the Trust provided the funds to pay the property taxes and that Riverside did not reserve funds in the budget for property taxes. Tiffany agrees that prior to 2025, the owners were responsible for paying the real estate taxes. Therefore, Tiffany's testimony that in 2025, Riverside was supposed to be reserving funds to pay the property taxes is a deviation from past practice. Whenever there

Page **10** of **44**

is a substantial change in operating procedure, the court would expect to see documentation of the change in procedure. Thus, to the extent that Tiffany elected to change the prior course of conduct, the court would expect to see letters or emails advising Riverside that the operating budget needed to include reserved funds for property taxes. If the parties' relationship was contractual on this issue, the court would have expected to see an addendum to the contract that VIP and Riverside executed in 2021. (01/27/26 Tr. p. 184). And, if Tiffany had made such a request, the court would expect Riverside's revised budget to include a line item for property tax reserves.

The court reviewed Plaintiff's Exhibits 16 and 17 which are the Riverside Management Owner Monthly Reports dated January 2025 and May 2025. The court does not see a line item holding back funds for portfolio expenses to be paid by Riverside. On cross examination, counsel asked Jake McBride if he ever sent an email or any type of communication to Ms. Vole indicating that Riverside was in fact responsible for taxes, to which Jake replied, "I don't recall." (01/27/26 Tr. p. 224) If Tiffany had sent such an email, then the court would have expected defense counsel to either refresh Jake McBride's recollection or to impeach him with the email. As stated earlier in the trial, a document used to impeach is different from a document offered as evidence and the court would not preclude defense counsel from using documents to impeach. (01/26/26 Tr. pp 27-28).

In weighing the credibility of Tiffany versus the credibility of Jake McBride on the issue of which party had the responsibility to pay the 2024 real estate taxes for the properties contained within the portfolio, the court finds that Jake McBride is the more credible witness. Although Tiffany testified that Riverside was responsible for paying the 2024 real estate taxes, her testimony is belied by the undisputed past practice between VIP/Trust and Riverside where the owner was responsible for paying the taxes. Moreover, there was no documentary evidence supporting Tiffany's position that she shifted the responsibility to reserve to Riverside.

Tiffany further admitted that it was her decision to sell "underperforming assets" rather than selling or withdrawing brokerage account assets, and that she did not know how much in penalties and increased costs were accruing while the real estate taxes remained unpaid. (01/26/26 Tr. p. 131).

Presently, the unpaid taxes for the real properties are estimated to total in excess of $320,000, exclusive of interest, penalties, and redemption fees. (01/27/26 Tr. p. 260). To date, the real estate taxes remain unpaid, with interest accruing at a 2% interest rate for every 6 months until September of 2026 at which time the interest rate increases to 12% annually. Tiffany testified that she was aware of the costs and penalties, and she is aware that interest is compounded. (01/26/26 Tr. p. 253-254). Tiffany further testified that a tax lien is placed on the property when the taxes are purchased. (01/26/26 Tr. p. 257). The 2025 taxes are coming due with the first installment due September 2026. Should these taxes remain unpaid it is extremely likely that the tax buyers will purchase 2025 taxes as well. (01/27/26 Tr. pp. 249-5)

**The Investment Accounts**
Tiffany admitted that she first inquired about the brokerage accounts in September and October of 2025. (01/26/27 Tr. pp. 32-33, 105, 258, 267). At the hearing, Tiffany offered evidence regarding her efforts to liquidate investments held in Charles Schwab and 1492 brokerage accounts to

generate funds to pay outstanding real estate taxes. Tiffany testified that she encountered substantial difficulty in doing so. (01/26/26 Tr. p. 132).

With respect to the issues she encountered with the 1492 account, Tiffany testified that Jake McBride suggested that she transfer the funds from the Aegis account to an account called 1492 when they were looking for a different investment firm. (01/27/26, Tr. p.28). She testified that Jake advised her that 1492 is a reputable firm with which he was familiar, and he facilitated the process. (01/27/26, Tr. p.29). The transfer took longer than Tiffany expected. She thought it would be completed in February of 2024, but the account was not opened until September of 2024. (01/27/26, Tr. pp. 28 &30). 1492 emailed account statements to Tiffany. (01/27/26, Tr. p.26). Because 1492 is not associated with a bank, an account was opened at U.S Bank. (01/27/26, Tr. p.29).

Tiffany also testified that VIP had an investment account with Charles Schwab. (01/27/26, Tr. p.31). In October of 2025, Tiffany attempted to access fund from the Charles Schwab account, and the request was denied because her sister, Dolores Vole, rescinded the transfer. (01/27/26, Tr. pp. 32-37). Dolores Vole's access to that account was terminated on November 24, 2021. (01/27/26, Tr. p. 38).

Tiffany called Sara Putz as a witness. Ms. Putz is a financial advisor, a fiduciary with LPL Financial. She has 30 years of experience. (01/28/26, Tr. p. 146). Ms. Putz met with Tiffany in August of 2025. (01/28/26, Tr. p. 147) Ms. Putz testified that the Trust has an account with Aegis and that those assets were moved to US Bank/1492. (01/28/26, Tr. p. 150-151) There was also an account with Charles Schwab. (01/28/26, Tr. p. 151) When Ms. Putz attempted to transfer the assets out of 1492 to an account at LPL Financial, irregularities arose. (01/28/26, Tr. p. 155) The portfolio appraisal and portfolio summary are just internal numbers that do not correspond to an actual account number. (01/28/26, Tr. p. 155) The account numbers on the 1492 statement did not reflect an account number at US Bank. (01/28/26, Tr. p. 156) Ms. Putz asked Tiffany to provide her with the 1099 issued last year that was issued off of this account because the 1099 would show the initiating institution as well as the account number; however, there was no record of a 1099 form. (01/28/26, Tr. p. 157). When Ms. Putz looked at the originating paperwork, the account numbers were blank. (01/28/26, Tr. p. 159) Ms. Putz testified that the paperwork for 1492 is irregular in that it is missing basic customer control information such as: the name of the investment advisor and a phone number to contact that person; an address to whom the statement is being mailed; and the account number. (01/28/26, Tr. p. 164)

Ms. Putz also tried to move the assets from the Charles Schwab account to LPL Financial. (01/28/26, Tr. p. 167) The transaction did not go through. (01/28/26, Tr. p. 169)

Dolly testified that she is familiar with the Charles Schwab account. (01/28/26 Tr. p. 127). She is the one who opened the account. (01/28/26 Tr. p. 127). Dolly was an authorized signatory on the account. (01/28/26 Tr. p. 127). In October of 2025, Dolly received a phone call from David Joseph, an account representative from Charles Schwab. (01/28/26 Tr. p. 128). He told her that there was a transfer made that needed approval and Dolly told him that she did not approve any transaction. (01/28/26 Tr. p. 128). Dolly did not approve the transaction because she felt that Tiffany was taking money out and pilfering the account. (01/28/26 Tr. p. 128). Dolly Vole testified that she

learned she was disinherited at least a month or so after her father passed. (01/28/26 Tr., p. 131). Dolly made no effort to remove herself from the Schwab account (01/28/26 Tr. p. 132). At the time of the attempted transfer in October of 2025, the account had between $470,000 - $500,000 in the account. (01/28/26 Tr. p. 132)

Ms. Putz testified that the account holder has an obligation to notify the financial institution where there is a substantive change such as death. Likewise, a formerly authorized person that continues to receive statements has an obligation to notify the financial institution that he/she is no longer authorized to receive statements. And finally, the financial institution has an obligation to verify whether there has been a change to the accounts. (01/28/26, Tr. pp. 188-189).

Therefore, with respect to this litigation, Tiffany had an obligation to notify Schwab that her father died and that she was the Trustee of the Trust. Dolly had an obligation to notify Schwab that she was no longer an authorized agent on the account and, finally, Schwab had an obligation to contact the identified account holders to confirm whether there have been any changes to the account. Here, Tiffany failed to notify Schwab and Dolly failed to notify Schwab. It is unknown whether Schwab reached out to Dolly to verify whether there had been any changes to the account.

Dolly's gamesmanship with respect to the Charles Schwab account highlights the ongoing dysfunction in this family. Dolly had no authority to refuse to authorize the transfer of the Charles Schwab account. Although Dolly was previously a signatory to the account, that right was extinguished once Peter stripped her of her authority to act on behalf of VIP. Ms. Putz testified that Dolly had an obligation to reach out to Charles Shwab and notify it that she was no longer a signatory to the account. Dolly's fear that Tiffany intended to strip the accounts of their funds does not justify her action. Particularly, because unless and until Dolly prevails in her will contest and trust dispute, her father excluded her from inheriting.

**Tiffany's Compensation**

Tiffany testified about the compensation that she paid herself as trustee of the Trust and as an officer of VIP. Tiffany collectively paid herself an annual salary of approximately $175,000 from VIP and the Trust. 01/26/26 Tr. pp. 84, 188). Tiffany also paid herself a "holiday bonus" of $10,000. (01/26/26 Tr. p. 170). Tiffany admitted that, when she disclosed to Tony—a beneficiary of the Trust and VIP shareholder—the compensation she intended to pay herself, Tony objected to it as excessive. (01/26/26 Tr. p. 173). Tony testified that Tiffany told him that she believed she deserved $250,000 in annual compensation, to which Tony objected, specifically explaining that he could not understand why Tiffany was seeking compensation after delegating her responsibilities to third parties who were themselves already receiving compensation from the Trust and/or VIP. (01/28/26 Tr. pp. 40, 42, 53). Tiffany responded to Tony's objections by stating that Tony was ". . . not the Trustee" and by hanging up on him. (01/28/26 Tr. pp. 42, 55). Tony testified that he told Tiffany that her salary was ridiculous, "especially because the Trust is not bringing in that amount of money now that the one asset was sold for the Trust . . . meaning Chemblend." Tony told his sister that she should not get paid wages if the business can't sustain the salary, to which Tiffany responded, "Whether the business can sustain the salary or not, I should be getting paid for my services." (01/28/27 Tr. p. 54 ). Tony responded, "You don't pay yourself a salary if the business cannot sustain a salary. That is business 101." (01/28/27 Tr. p. 55 ) "I tried to explain that business owners can't always pay themselves right away because you have

to wait until it can sustain that. She did not like my response, and she hung up on me." (01/28/27 Tr. p. 55 ) When Tony later asked Tiffany how much she was paying herself, she told him that it was none of his business. (01/28/27 Tr. p. 55) Tony asked Tiffany at least five times how much she was paying herself, the final time being on July 29, 2025. (01/28/27 Tr. p. 56)

**Tiffany Resides Rent Free at a Property Owned by VIP/Trust**
Tiffany admitted that, since January of 2024, she has and continues to reside rent-free at a residence owned by the Trust and located at 21791 W. Illinois Route 120, Grayslake, IL 60030 ("Grayslake Residence"). (01/26/26 Tr. pp.76,198,203). The Grayslake Residence is approximately 4,000 square feet, located on a more than 47 acre lot. (01/26/26/ Tr. p. 197). Tiffany herself estimated that the income the Grayslake Residence could have generated for the Trust was approximately $5,000-$6,000 per month, totaling $60,000 - $72,000 to rental income to the Trust each year. (01/26/26 Tr. pp. 197, 204). Tiffany admitted that she has and continues to pay no rent for her use of the Grayslake Residence, despite the fact that it is owned by Trust of which she is a trustee. (01/26/26 Tr. pp. 196, 198). Tiffany also admitted that from January of 2024 through the Spring of 2025, VIP paid other expenses associated with the Residence, including electric costs, insurance premiums and Dish Network. (01/26/26 Tr. pp. 198-99). Tiffany also admitted that her rent-free use of the Residence was not a form of compensation for her purported services for VIP or the Trust. (01/26/26 Tr. p. 195-96).

VIP paid for other personal expenses of Tiffany, including auto insurance premiums, vehicle repair expenses, and gas for travel. (01/26/26 Tr. p. 219).

Tiffany also admitted that her former romantic partner, Ivan Purnell, was performing services at the Residence at no cost to her while simultaneously securing contract work with VIP and the Trust. (01/26/26 Tr. p. 199). Tiffany claimed to see no conflict or controversy in these arrangements. (01/26/26 Tr. p. 200).

**Tiffany's Substantial Payments to Gil Bacus**
Tiffany paid substantial sums of money from the Trust and/or VIP to Gil Bacus ("Bacus"), Peter's former caretaker. (01/26/26 Tr. pp. 185-86; PEX 12; PEX 14). According to Tiffany, after her father died, Tiffany hired Bacus to serve as "Director of Operations" for VIP, but she designated him as an "independent contractor." (01/26/26 Tr. pp. 231-32). Tiffany testified that Bacus had a nursing degree, and that he did not have experience in connection with buying selling, renting or leasing real estate. (01/26/26 Tr. p. 181). To justify why she would a hire a nurse to act as "Director of Operations" Tiffany testified that Mr. Bacus, "had been a caregiver for many years to the gentleman who owned and founded Berkshire Hathaway. So just from spending lots of time with that gentleman, he learned a lot. Not obviously education. And he had worked as an accountant briefly, so he knew QuickBooks and things like that." (01/26/26 Tr. p. 181). Tiffany paid Mr. Bacus $37 per hour for his services from the Trust and/or VIP, at an average of 40 hours a week, totaling $85,000 in 2024 alone. (01/26/26 Tr. pp. 185-86).

In terms of work that Mr. Bacus performed for VIP, Tiffany testified that Mr. Bacus scanned VIP records into PDF format (01/26/26 Tr. p. 124). Mr. Bacus also cataloged Peter's personal possessions. (01/26/26 Tr. p. 182). He would help Tiffany with day to day tasks such as dropping off a payment to an accountant or to scan something in and then dropping it off. (01/26/26 Tr. p.

183). Tiffany testified that her plan was to have Gil Bacus perform the accounting after Tiffany did not renew Riverside's contract. (01/26/26 Tr. p. 122). Tiffany testified that Gil Bakus logged his hours on time sheets, and he shared those time sheets with her. (01/26/26 Tr. p. 232). Tiffany did not produce Mr. Bakus' timesheets as part of discovery. (01/26/26 Tr. p. 233).

Tiffany admitted that Mr. Bacus performed personal errands and childcare for her (01/26/26 Tr. pp. 183-85, 233). Tony testified that Bacus ran errands for Tiffany, performed babysitting services for Tiffany, and otherwise served as—in Tiffany's words—the "personal assistant" of Tiffany. (01/28/26 Tr. pp. 57-58). When Tony asked how much Bacus was being paid from the Trust, Tiffany responded that it was none of his business. (01/28/26 Tr. p. 58).

**Tiffany's Failure to Pursue Loans Owed to the Estate and Trust**
Tiffany also admitted that certain loans have been and remain due and owing to the Estate and/or Trust. (01/26/26 Tr. pp. 2078-08). Tiffany's testimony also made clear that she has taken little to no action to pursue certain loans due and owing to the Estate and/or Trust, including loans owed by Steven Vole totaling approximately $100,000. (01/26/26 Tr. pp. 208-10; 01/27/26 Tr. pp. 114-15). Similarly, in one instance, Tiffany asserted that she only recently "got that file" for a particular debtor owing approximately $75,000, notwithstanding that she has been sole trustee of the Trust for more than two years. (01/26/26 Tr. p. 214).

Tiffany also testified that Ivan Purnell has been advancing expenses during the pendency of the TRO in this matter, rather than those expenses being forwarded to and paid by Jake McBride of Riverside, and that she believes that Ivan Purnell is going to record a mechanic's lien on Trust or VIP property after the TRO is resolved. (01/27/26 Tr. p. 119).

## STANDARD FOR A PRELIMINARY INJUNCTION

In order for the court to issue a preliminary injunction, the party moving for the injunction must demonstrate a fair question as to:

a. An ascertainable right in need of protection;
b. A likelihood of success on the merits;
c. Irreparable harm in the absence of injunctive relief, and,
d. The lack of an adequate remedy at law.

*Glancy v. Brown*, 2021 IL App (3d) 200468.

A party seeking a preliminary injunction faces a lower burden of proof than that required to prevail on the ultimate issue; the plaintiff need only prove a *prima facie* case that there is a fair belief that the plaintiff probably will be entitled to relief sought, and that the matters should be kept in the status quo until the case be decided on the merits. *Smith v. Edward D. Jones and*

*Company, LP,* 2017 Ill.App (2d) 170172-U,¶ 28; *Hutsonville Cmty Unit Sch. Dist. No.1 v. Illinois High School Ass'n,* 2021 Ill App (5th) 210308,¶ 1.

Once the trial court establishes the requirements for a preliminary injunction, the court must then balance the equities to determine the relative inconvenience to the parties and whether the burden on defendant should the injunction issue outweighs the burden on the plaintiff should it be denied. *Franz v. Calaco Development Corp.*, 322 Ill. App. 3d 941, 946, 256 Ill.Dec. 413, 751 N.E.2d 1250 (2001).

When considering whether there is a fair question as to a reasonable likelihood of success of the merits of Tony's counterclaim, the court considers the proven facts in conjunction with the language of the Trust, the provisions of the Illinois Trust Code and the provisions of the Illinois Business Act. The relevant sections upon which the court rely are set forth below.

**The Language of the Trust**

The court reviewed the Trust Instrument which Tiffany and Tony argue is the controlling instrument, namely, "The Second Amendment and Restatement of the Living Trust Agreement of Peter Vole, Jr. dated October 30, 2022." (PEX 22) The Trust provides, in pertinent part, as follows:

> (a) That the Trustee shall pay "the estate and inheritance taxes … payable in any jurisdiction by reason of my death…." (Art. III (B) (iv), p. 14).
> * * *
>
> (c) That "the Trustee shall then distribute the remaining Trust principal … as follows: 50% to Tony and 50% to Tiffany." (Art. IV (B), p. 17-19.)
>
> (d) That "any Trustee shall be entitled to reasonable compensation for services rendered in administering and distributing the Trust property hereunder and to reimbursement for expenses related to same." (Art. V (M), p. 26; emphasis added.)
>
> (e) The Trustee shall prepare an annual accounting of the Trust assets, income and disbursements and shall deliver a copy thereof to each person having any interest in any Trust Estate created hereunder (Art. V. (O), p.26)

(f) That "the Trustee of this Trust, … shall send, at least annually, a Trust accounting to all of the current beneficiaries of income and principal…" (Art. VII (J), p. 45-46; emphasis added)
***

(g) "A 'Trust accounting' is a detailed, written document for a specific period of time, which provides detailed information regarding the finances of the Trust that occurred during that period of time. The accounting may be an annual accounting, an accounting from the date of the most recent accounting or an accounting upon the occurrence of an event. The accounting should include: (a) a list of the Trust assets including approximate values, and liabilities as of the first date of the accounting period; (b) a detailed chronological itemization of all the receipts, expenditures, and distributions, including the amount of the Trustee's compensation, occurring since the beginning of the date of the accounting period through the date of the accounting; (c) a list of and value of the Trust assets to the extent feasible, as well as the liabilities and the amounts thereof, on hand at the close of the accounting period; and (d) all other material facts related to the Trustee's administration of the Trust during the accounting period."  (Art. VII (I), p. 45; emphasis added.)

(h) "The term 'current beneficiary' shall mean a beneficiary that on the date of the beneficiary's qualification is determined is a distributee or permissible distributee of Trust income or principal…."  (Art. VII (S), p. 48-49.)

(i) That if Tiffany does not serve as Trustee, then Tony shall serve as successor Trustee.  (Art. VII (A)(2), p. 39.)

## The Illinois Trust Code

The following provisions of the Illinois Trust Code apply to this matter:

**Duty to Inform and Account 760 ILCS 3/813.1**
(2) A trustee shall send at least annually a trust accounting to all current beneficiaries.

**Prudent Administration 760 ILCS 3/804**
A trustee shall administer the trust as a prudent person would, by considering the purposes, terms, distribution requirements, and other circumstances of the trust. In satisfying this standard, the trustee shall exercise reasonable care, skill and caution.

**Recordkeeping and identification of trust property.  760 ILCS 3/810**
(a)  A trustee shall keep adequate records of the administration of the trust.

**Enforcement and defense of claims. 760 ILCS 3/811**
A trustee shall take reasonable steps to enforce claims of the trust and to defend claims against the trust. It may be reasonable for a trustee not to enforce a claim, not to defend an

Page **17** of **44**

action, to settle an action, or to suffer a default, depending upon the likelihood of recovery and the cost of suit and enforcement.

**Removal of trustee  760 ILS 3/706**
(a) A settlor, co-trustee, or a qualified beneficiary may request the court to remove a trustee, or a trustee may be removed by the court on its own initiative

(b) The court may remove a trustee if:
  (1) The trustee has committed a  serious breach of trust

   *
  (3) because of unfitness, unwillingness, or persistent failure of the trustee to administer the trust effectively, the court determines that removal of the trustee best serves the purposes of the trust and the interests of the beneficiaries.

(c) pending a final decision on a request to remove a trustee, or in lieu of or in addition to removing a trustee, the court may order such appropriate relief under section (b) of Section 1001 as may be necessary to protect the trust property or the interests of the beneficiaries.

**Remedies for breach of trust 760 ILCS 3/1001**
(a) A violation by a trustee of a duty the trustee owes to a beneficiary is a breach of trust.

(b) To remedy a breach of trust that has occurred or may occur, the court may:
     (1) compel the trustee to perform the trustee's duties;
     (2) enjoin the trustee from committing a breach of trust;
     (3) compel the trustee to redress a breach of trust by paying money, restoring property, or other means;
     (4) order a trustee to account;
     (5) appoint a special fiduciary to take possession of the trust property and administer the trust;
     (6) suspend the trustee;
     (7) remove the trustee as provided in Section 706;
     (8) reduce or deny compensation to the trustee; or
     (9) subject to Section 1012, void an act of the trustee, impose a lien or a constructive trust on trust property, or trace trust property wrongfully disposed of and recover the property or its proceeds.
     * * *
(d) Nothing in this Section limits the equitable powers of the court to order other appropriate relief.

## The Illinois Business Corporation Act

The Illinois Business Corporation Act is pertinent to the analysis because VIP is a corporation.  The following provisions of the Code apply to this matter:

Page **18** of **44**

**Meeting of shareholders. 805 ILCS 5/7.05**
An annual meeting of the shareholders shall be held at such time as may be provided in the by-laws or in the resolution of the board of directors pursuant to authority in the by-laws.

**Notice of shareholder's meetings. 805 ILCS 5/7.15**
Written notice stating the place, if any, day, hour of the meeting . . . shall be delivered not less than 10 no more than 60 days before the date of the meeting.

**Officers 805 ILCS 5/8.50**
A corporation shall have such officers as shall be provided in the by-laws, each of whom shall be elected by the board of directors at such time and in such manner as may be prescribed by the by-laws.

**Board of directors 805 ILC 5/8.05**
(a) (E)ach corporation shall have a board of directors and the business and affairs of the corporation shall be managed by or under the direction of the board of directors.
*
(c) Unless otherwise provided in the article of incorporation, the board of directors, . . . shall have authority to establish reasonable compensation of all directors for services to the corporation as directors, officers or otherwise, notwithstanding the provisions of Section 8.6.

**Corporate records – Examinations by shareholders. 805 ILCS 5/7.75**
(a) Each corporation shall keep correct and complete books and records of account and shall also keep minutes of the proceedings of its shareholders and board of directors and committees thereof; and shall keep at its registered office or principal place of business in this State, or at the office of a transfer agent or registrar in this State, a record of its shareholders, giving the names and addresses of all shareholders and the number and class of the shares held by each. A record of shareholders certified by an officer or transfer agent shall be competent evidence in all courts of this State.

(b) Any person who is a shareholder of record shall have the right to examine, in person or by agent, at any reasonable time or times, the corporation's books and records of account, minutes, voting trust agreements filed with the corporation and record of shareholders, and to make extracts therefrom, but only for a proper purpose. In order to exercise this right, a shareholder must make written demand upon the corporation, stating with particularity the records sought to be examined and the purpose therefor.

(c) If the corporation refuses examination, the shareholder may file suit in the circuit court of the county in which either the registered agent or principal office of the corporation is located to compel by mandamus or otherwise such examination as may be proper. If a shareholder seeks to examine books or records of account the burden of proof is upon the shareholder to establish a proper purpose. If the purpose is to examine minutes or the record of shareholders or a voting trust agreement, the burden of proof is upon the corporation to establish that the shareholder does not have a proper purpose.

(d) Any officer, or agent, or a corporation which shall refuse to allow any shareholder or his or her agent so to examine and make extracts from its books and records of accounts, minutes and records of shareholders, for any proper purpose, shall be liable to such shareholder, in a penalty of up to ten per cent of the value of the shares owned by such shareholder, in addition to any other damages or remedy afforded him or her by law. It shall be a defense to any action for penalties under this Section that the person suing therefor has within two years sold or offered for sale any list of shareholders of such corporation or any other corporation or has aided or abetted any person in procuring any list of shareholders for any such purpose, or has improperly used any information secured through any prior examination of the books and records of account, or minutes, or records of shareholders of such corporation or any other corporation.

(e) Upon the written request of any shareholder of a corporation, the corporation shall mail to such shareholder within 14 days after receipt of such request a balance sheet as of the close of its latest fiscal year and a profit and loss statement for such fiscal year; provided that if such request is received by the corporation before such financial statements are available, the corporation shall mail such financial statements within 14 days after they become available, but in any event within 120 days after the close of its latest fiscal year.

**Shareholder remedies: Non-public corporations. 805 ILCS 5/12-56**

(a) In an action by a shareholder in a corporation that has no shares listed on a national securities exchange . . . the Circuit Court may order one or more of the remedies listed in subsection(b) if it is established that:
*
*
(3) The directors or those in control of the corporation have acted, are acting or will act in a manner that is illegal, oppressive, or fraudulent with respect to the petitioning shareholder whether in his or her capacity as a shareholder, director, or officer or

(4) The corporation assets are being misapplied or wasted.

(b) The relief which the court may order in an action under subsection (a) includes, but is not limited to the following:

*
*
(3) The removal from office of any director or officer;
*
(5) An accounting with respect to any matter in dispute
(6) The appointment of a custodian to manage the business and affairs of the corporation to serve for the term and under the conditions prescribed by the court.

Page **20** of **44**

**TIFFANY'S POSITION THAT SHE WAS PREJUDICED BY THE COURT CONDUCTING A PRELIMINARY INJUNCTION HEARING IS NOT FOUNDED**

Tiffany argues that Preliminary Injunction hearing is based upon a sham perpetrated upon the court at the TRO hearing. At the TRO hearing, Tony alleged that Tiffany took an alleged draw of $334,413.20 in January of 2025 and an alleged draw of $968,671.22 in May of 2025. In his opening at the Preliminary Injunction hearing, Tony conceded that his representation at the TRO was inaccurate in that he now understands that the entry contained within the record documents the cumulative distributions Tiffany took, rather than a single distribution. Tiffany argues that based upon that misstatement the court should have denied the TRO. However, the alleged draw was only one factor upon which the court granted the TRO. The court also granted the TRO upon Tiffany's refusal to give Tony access to the books and records of VIP, Tiffany's failure to provide a Trust accounting and her failure to pay the real estate taxes on real estate owned by the Trust. (See the Order entered 11-5-25) The court would have granted the TRO even Tony's counsel had not raised the issue of the draws.

Tiffany further argues that the court has unfairly prejudiced her by proceeding to a TRO hearing and a preliminary injunction before she has access to the records that are allegedly being held hostage by her former attorneys. The court has a different perspective. The court believes that Tiffany's perceived crisis is one of her own makings. Once Tiffany refused to allow Tony access to the book and records in the summer of 2026, like a house of cards, the walls began tumbling down. Tiffany has spent (but not accounted for) the financial reserves of VIP and the Trust. On July 16, 2025, the court ordered Tiffany to produce records. About six weeks later, on September 12, 2026, and as Tiffany's actions as the Director of VIP and the Trustee of the Trust finally faced the scrutiny of her siblings and the court, Tiffany and her attorneys parted ways. On September 30, a new law firm filed an appearance on behalf of Tiffany. After the court granted the TRO on

October 31, 2026, and, after the court set the preliminary injunction hearing for January 26-29, 2026, Tiffany again parted ways with her new attorneys. The attorneys withdrew on December 10th. The court granted Tiffany 21 days, or up to December 31, 2025, to seek new counsel. The court retained the hearing date of January 26 for the Preliminary Injunction hearing.

Tiffany argues that she could not be prepared for the preliminary injunction hearing because her former attorneys were holding her documents hostage. Even if that statement is true, it does not provide grounds for continuing the hearing on the Preliminary Injunction. Tiffany has been the Director of VIP and the Trustee of the Trust since 2024, and she has been in control of the books and records for the duration of that time. The reasons articulated by Tiffany as a basis as to why she was prejudiced by holding the preliminary injunction hearing in January of 2026 were conditions manufactured by herself. She refused to allow Tony access to the books and records. She refused to produce records until the court entered an order compelling her to do so. All of those actions happened before her attorneys withdrew. After the court ordered Tiffany to turn over the records on July 16th, her attorney withdrew on September 12th. She had about 6 weeks to produce the records before her attorneys withdrew, but she failed to do so. After Tiffany retained new counsel on September 20, she never came into court to advise the court that she could not produce the records because they were being held hostage by her first firm. Instead, a month later, after the court granted the TRO and set the matter for a Preliminary Injunction hearing, Tiffany's new attorney withdrew. This attorney withdrew before producing the documents. Each time the court took steps to move the litigation forward, Tiffany stalled that progress by another 21 days to obtain new counsel. Frankly, Tiffany should have produced the records well before her opposing counsel had to file a Motion to Compel. Moreover, Tiffany testified at the Preliminary Injunction hearing that she had some responsive documents in her possession that never produced.

The evidence presented at the Preliminary Injunction highlighted the need for an expedited Preliminary Injunction hearing. The Petitioner's presented ample evidence that exposed the outermost layers of Tiffany's poor decision making and mishandling of VIP and the Trust.

**THE ELEMENTS OF A PRELIMINARY INJUNCTION IN CONJUNCTION WITH THE FACTS OF THE CASE AND THE APPLICATION OF THE TRUST INSTRUMENT, THE TRUST CODE AND THE ILLINOIS BUSINESS CORPORATION ACT**

**An Ascertainable Right in Need of Protection**

Tony Vole is a beneficiary of the Trust under both the challenged Second Restatement and the preceding First Restatement. He has rights as beneficiary of the Trust empowering him to seek injunctive relief. Moreover, because the Trust is a VIP shareholder, improper administration of the assets of VIP adversely impacts the Trust which is highly invested in VIP. The court finds that Tony is an interested party and he has an ascertainable right in need of protection with respect to the Trust.

The also court finds that Tony has an ascertainable right in need of protection with respect to VIP because Tony is a direct shareholder in VIP.

The remaining Petitioners, Dolly, Peter III and Robert argue that as beneficiaries of a prior instrument, they are "interested persons" where they seek to set aside a more recently disputed interest. They further argue that the Trust is a VIP shareholder, as such, the improper administration of the assets of VIP, by extension, adversely impacts and constitutes improper administration of the Trust which is highly invested in VIP. This assertion may be true, but a preliminary injunction is always tethered to the underlying complaint. In this matter, the court heard no evidence regarding the Will Contest or the Trust dispute, thus, the granting or denial of the Preliminary Injunction order rests solely upon the counter claim filed by Tony against Tiffany.

**A Likelihood of Success on the Merits**

Here, the request for the entry of a Preliminary Injunction is tethered to Tony's counterclaim, brought individually and derivatively which seeks to remove Tiffany as Trustee for her breach of fiduciary duties and failure to respond to corporate records.

At the close of evidence of the preliminary injunction hearing, the court weighs the credibility of the witnesses and the credibility of the evidence and then stiches the testimony and evidence into a cohesive story. Here, the story is one of a daughter who took her father's multimillion dollar business and, in two short years, transformed it into a business saddled with liens and insufficient income flow to cover expenses.

Peter Vole ran his real estate empire without the assistance of a property management company. As he got older, and he needed more assistance, his daughter Dolly stepped in to help him. Tiffany left Florida and came to Illinois to help care for her aging father. In addition to caring for her father, Tiffany helped Dolly run the business and she would perform the tasks that Dolly directed her to perform.

In 2021, Peter took control of the business from Dolly. Dolly instituted a guardianship proceeding against her father. Peter's attorney suggested that Peter should hire a management company because Peter was struggling with his health and Tiffany did not have broker's license, so she could not write leases. Therefore, in 2021, Peter entered into a management contract with Riverside, with the contract expiring in 2023.

Riverside took over the management of the properties. The management included collecting rents, signing leases and maintaining the properties. Tiffany continued in her role as an assistant, but to her father, instead of Dolly. Tiffany ran errands, delivered supplies to jobs, and made sure tradesmen had transportation to job sites. Tiffany did not run the company or make the business decisions for the company, rather, Peter did, and Riverside managed the portfolio. In this

Page **24** of **44**

position, her father believed a fair salary for Tiffany was $5,000 per month, which amount included compensation for the caregiving of her father. Tiffany acknowledged that her father made the decisions, and he liked to do things his way, even if she disagreed with decisions, like having a singular operating account for VIP and the Trust.

At the time of Peter's death, under the contested Trust instrument, VIP was owned 50% by the Trust, 25% by Tony, and 25% by Tiffany. Tiffany and Peter were equal beneficiaries under the Trust. When Tiffany's father died, she assumed control of the company because her father put her in the position as the Trustee of the Trust and the director of VIP. When Peter was operating VIP, although the Trust owned 50% of VIP, Peter had ownership of the other 50% of VIP and he was the Trustee of the Trust, therefore, he controlled VIP and the Trust.

Tiffany testified that after Peter's death, she continued running the business as her father did. Unfortunately, Tiffany failed to understand that under the disputed Trust instrument, once her father died, the power structure changed. Peter set up his Trust and VIP such that he alone had complete control. During Peter's lifetime, the Trust directed the Trustee (Peter) and the Co-Trustee (Tiffany) to distribute the net income and principal to Peter, even to the extent of exhausting principal. Significantly, Peter's trust assets were not distributed to Tiffany and Tony until the date of Peter's death. Unlike Peter, who effectively enjoyed 100% interest in the trust assets and VIP, upon Peter's death, Tiffany and Tony shared equally: Peter's 50% ownership of VIP was divided equally between Tiffany and Tony and Tiffany and Tony shared equally under the Trust. This new structure is why Tiffany's moment on the stand was pivotal: Tiffany's testimony revealed that she believed that because she owned 25% of VIP and because she was the Trustee of the Trust, such that she controlled the Trust's 50% ownership of VIP, that position of power secured her position as Director and Secretary of VIP for all eternity. She believed that she could hold the

position forever because Tony would never have enough voting power to vote her off as Director. She believed that in her capacity as the Trustee, she could meet her fiduciary duty by always voting for herself to remain as Trustee. As such, Tiffany believed that she was invincible, and, with this belief, she began running the company as if she owed no fiduciary duties to VIP, the Trust or her brother. And, with that belief system firmly entrenched, Tiffany treated the assets of VIP and the Trust as if they were hers to spend without checks or balances. She treated the assets of VIP and the Trust as if she were Peter Vole, 100% owner, instead of her actual status as Tiffany Vole, 50% owner.

Tiffany's breached her fiduciary duty by a number of her actions/inactions. Her first breach of fiduciary duty was her refusal to allow Tony to inspect the books and record of VIP. As a shareholder of VIP, Tony has a right to inspect the records, after making a formal demand. Tony made informal requests, and Tiffany refused. Those informal requests were not actionable. However, once Tony exercised his statutory right as a shareholder of VIP by having his counsel make a formal, written demand to inspect the records, Tiffany breached her fiduciary duty when she refused to allow Tony to review the records. Tiffany admitted that Tony has never had access to the books and records of VIP.

Tiffany also breached her fiduciary duty by failing to provide an annual accounting of the Trust. The Trust instrument requires an annual accounting, and, during her tenure as Trustee, Tiffany never provided an accounting of the Trust. Tiffany argues that the failure to provide an accounting is not her fault because she delegated the task to her attorneys/accountants and the professionals failed to complete the task. Tiffany is the Director and Secretary of VIP. She is the Trustee of the Trust. She had the authority to hire and fire legal counsel and accountants. She had the responsibility to oversee their work. If legal counsel and accountants were not completing the

tasks that Tiffany delegated to them, their failure to perform does not absolve Tiffany of her fiduciary duties. Tiffany is correct that she had authority to delegate tasks, but the responsibility to complete the annual Trust accounting still rests upon her shoulders. Tiffany testified that her father taught her that she should hire professionals to handle legal matters and her job was to focus on growing the business. While that statement is partially true, it is shortsighted of Tiffany to interpret her father's guidance to mean that she can also delegate her fiduciary duties. Tiffany's authority to delegate duties to professionals did not alleviate Tiffany of the fiduciary duties that she owed VIP and the Trust and, therefore, the failure to provide an accounting of the Trust is a breach of her fiduciary duty.

Tiffany's breach of her fiduciary duty to prepare a Trust accounting and the breach of her fiduciary duty to give Tony access to the books and records of VIP leaves many unanswered questions as to how Tiffany was using the funds generated by VIP and the Trust, particularly because the funds were co-mingled into one operating account. For example, days after her father's death, Tiffany made a distribution to herself in the amount of $100,000.00. The act of taking a distribution in and of itself may not have been a breach, but the court cannot make that determination today because Tiffany never accounted for the distribution, and she can no longer allegedly recall why she took the money. Given Tiffany's incredulous testimony that the trauma of her father's death resulted in an inability to recall why she took the $100,000.00, the court draws the inference that Tiffany knowingly made a distribution to herself, for her own benefit. Again, if the Trust and/or VIP had sufficient assets to make the distribution and to continue operating in a fiscally responsible manner after making the distribution, the distribution may not have been a breach, but the court cannot make that inference because Tiffany failed to provide a Trust accounting and she failed to allow Tony access to the books and records of VIP. Additionally,

Tiffany may have breached a duty to Tony by making a $100,000.00 distribution to herself, but not making an equal distribution to Tony, who owns an equal interest in the Trust and VIP.

Another example of the consequences that flow from Tiffany's breach of her fiduciary duty to prepare a Trust accounting and her breach of fiduciary duty in refusing to give Tony access to the books and records of VIP, is the court's inability to understand the full impact of the sale of the Chemblend property. For purpose of this analysis, the court assumes that selling Chemblend was a good business decision made by her father prior to his death. The property sold for $1.3 million dollars. However, the sale of the property also meant that VIP lost $250,000 of rental income per year. It doesn't take an accounting degree to understand that the loss of that rental income would impact VIP and the Trust's future profit. An overly simple math calculation reveals that after 5.2 years, VIP would deplete the funds from the sale of Chemblend if the operating expenses and if the owner's draws remained the same as they were prior to the sale ($1,300,000/$250,000). Knowing that the loss of annual rent in the amount of $250,000 would impact the overall profitability of VIP and the Trust, as the Director and Trustee, Tiffany, should have had a business plan as to how VIP was going to remain profitable and continue to grow given the loss of the rental income before she took owners draws and other distributions. Tiffany testified that VIP purchased a commercial property known as "Ashely," but Ashly only generates about $45,000 per year in rental income, and that amount is clearly insufficient to bridge the financial gap from the lost rental income from Chemblend. Outside of purchasing Ashely, Tiffany offered no testimony as to how the loss of $250,000 per year in rental income would impact the profitability of VIP/Trust and how she planned to make up for the deficit. This is an important detail, because if VIP had no plan for replacing the lost rental income, then as the Director of VIP, perhaps Tiffany should not have been taking an owners draw and making distributions.

Along those same lines, because Tiffany failed to provide a Trust accounting and because she refused to allow Tony access to the books and records of VIP, the court does not know with certainty what happened to the $1,300,000.00 in sale proceeds from Chemblend. The court does know that shortly after the sale of Chemblend, Tiffany made a $600,000 distribution to herself and a $600,000 distribution to Tony. The court assumes, but does not know for certain, that at least some of the funds for the distributions came from the proceeds of the sale of Chemblend. As before, without more context, the court cannot find, as a matter of law, that the distribution of $1.2 million dollars was a breach of fiduciary duty. However, the court questions why Tiffany chose to distribute $600,000 to herself and $600,000 to Tony, which is very close to the sale price of the Chemblend property, when she knew that VIP would no longer enjoy $250,000 per year in rental income from Chemblend. The court lacks this critical information because Tiffany breached her fiduciary duty to provide a Trust Accounting and to give Tony access to the Books and Records of VIP.

In a similar vein, Tiffany had authority under the Trust instrument to sell at public or private sale any real or personal property of the Trust. Tiffany exercised that power by selling 10 pieces of real property owned by the Trust and/or VIP.  The court cannot find as a matter of law, that the sale of the real property was a breach of fiduciary duty. However, given the current financial state of VIP and the Trust, the court has many questions as to what Tiffany did with the sale proceeds. Once again, because Tiffany has failed to provide a Trust account and because she failed to allow Tony to inspect the books and records of VIP, neither the court nor Tony knows how or for what purpose Tiffany used the sale proceeds of 10 pieces of property.

The court finds there is a fair probability that Tiffany refused to provide a Trust accounting and she refused to allow Tony to have access to the corporate records of VIP, because to do so

would document the financial failure of VIP and the Trust while under her control. Tony is entitled to know how VIP started out with over $2 million in its operating account and now has less than $5,000. Tony is entitled to know how VIP allocated the funds from the 10 or more properties that Tiffany sold and whether the properties were owned by VIP or the Trust. Tony is entitled to know how much Tiffany spent on attorneys that she hired to defend her in the Trust dispute and the Probate challenge. Tony is entitled to know how much Tiffany paid her attorneys and other professionals for the services they performed for VIP and the Trust. Tony is entitled to know the amount that Tiffany took in owner's draws. Tony is entitled to know how much Tiffany made in distributions. Tony is entitled to know if Tiffany continued to take Owner's draws when she knew there were insufficient funds to pay the 2024 property taxes. Tony is entitled to an explanation for every withdrawal of funds Tiffany made and for what purpose the funds were used, including the $100,000 Tiffany distributed to herself shortly after her father's death. Tiffany's refusal to provide an accounting is a breach of her fiduciary duty.  Tiffany's failure to allow Tony to inspect the books and records of VIP was a breach of her fiduciary duty.

Tiffany is correct that as the Director of VIP and the Trustee of the Trust, she is entitled to draw a salary. Tony wisely told Tiffany that it is "Business 101" that the owners of the business cannot take an owner's draw if the business is not generating a profit. This truism leads to Tiffany's third breach of fiduciary duty, the determination that she would take $175,000 per year salary. While an owner may draw a salary, the salary must be reasonable. An owner/trustee who pays herself an unreasonable salary breaches her fiduciary duty. Tiffany argues that her attorneys told her that a salary range between $175,000 to $250,000 would be an appropriate salary for the director of the company, and that she satisfied her fiduciary duty by taking the lower end of the scale.

Tiffany cites to *The Estate of Ross Workman v. Flanary*, 2018 Ill App (1st) 180249 ¶10 for the proposition that her salary was reasonable. This case sets forth the factors the court may consider when making a decision as to whether a salary is reasonable. The court may consider the size of the estate, the work involved, the skill evidenced by the work, the time expended, the success of the efforts, and the good faith and efficiency in which the estate was administered.  In applying and giving weight to  these factors, the court finds that Tiffany's salary was not reasonable.

Tiffany has a college degree, but she has never held a job involving the operation of business.  She worked in law firm as clerical staff, and she worked as a waitress.  She took care of her father. She does not have the background or experience that justifies the salary drawn by an experienced executive. Tiffany gained hands on experience on the day to day operations of VIP by following Dolly's instructions and then her Father's instructions to complete certain tasks. Nevertheless,  completing a punch list of specific activities is not akin to running a company. When Peter's lawyer determined that Peter could no longer run the business, the lawyer did not suggest that Tiffany should transition into running VIP, rather, he suggested that Peter should hire a property manager. The responsibility of a property manager includes the day to day responsibilities of running the portfolio such as entering into leases, collecting the rent, and maintaining the properties. Per the contract with VIP, Riverside had discretion to make repairs up to a certain dollar amount, but Riverside needed owner permission to exceed that amount. Thus, Peter/Tiffany retained the authority to make major financial decisions and run the finances of the company, but Riverside handled the day to day work.

When Tiffany testified to the work she performed for VIP after she became Director, curiously, her stated job duties matched exactly what she described when Dolly and/or Peter were

in control before VIP hired Riverside. Tiffany did not identify any job duties she performed as a Director running a multimillion dollar business. Tiffany testified that in her position as Director for VIP she ran errands, spoke with tenants, made sure tradespeople had transportation to job sites, cleaned up, and handled utility issues. Thus, most of her days were filled with running the day to day operation of the rental properties, which were the same tasks she performed for Dolly and Peter. Her description also matches the duties she delegated to Riverside. Thus, the majority of the job duties that Tiffany described she performed for VIP in her role as Director were duties that Peter, prior to his death, delegated to Riverside and that Tiffany extended. At the preliminary injunction hearing, the court commented that it did not have a clear grasp of the tasks Tiffany performed in her position as Director, and despite being given the opportunity to explain in more detail, Tiffany testified that her job duties involve the day to day operation of the portfolio.

Tiffany also delegated certain job duties in her position as Director of VIP to others. After Peter died, Tiffany made Jake McBride an agent of the Trustee, which means she delegated the tasks that traditionally rest upon the shoulder of the director of VIP, to Jake McBride. Tiffany also delegated tasks to outside professionals such as lawyers and accountants. The court is not critical of this outsourcing, as the duties Tiffany delegated required an expertise that Tiffany did not possess. (The fact that Tiffany told Tony that he was not entitled to a K-1 statement highlights her inexperience. The fact that Tiffany did not understand the basis of the loan that she negotiated for Jake McBride highlights her inexperience). Critically, however, when Tiffany described her duties as the Director of VIP, she did not include oversight of outside counsel and other professionals. Tiffany blames her legal counsel for much of VIP's current predicament, and yet, if she had been monitoring and overseeing their work as an experienced Director would do, she would have known that certain tasks were not allegedly being completed.

Page **32** of **44**

In her role as Director of VIP, Tiffany testified that VIP has not filed Income Taxes for 2024 or 2025. Tiffany admitted that Peter's estate had incurred around $141,000.00 in penalties for failure to pay federal estate taxes in full when due. By failing to timely fail federal income tax and by failing to pay the Estate Tax, Tiffany is incurring additional costs and penalties at a time when VIP is struggling financially. These were tasks that Tiffany delagated to others. If Tiffany had been monitoring and overseeing the accountant's work as an experienced Director would do, she would have known that certain tasks were not allegedly being completed. Tiffany was unable to explain why the taxes have not been filed.

The court finds that Tiffany did not have the experience or skill to run the business side of the property folio. That lack of skill is shown by the fact that when Tiffany took control of the company the company had over $2 million in its trust account and generated sufficient income for Peter to lead a comfortable life on his owner's draws. In two short years, only $5,000 remains in the account. The portfolio has not generated a profit since 2024. Tiffany has failed to pay property taxes. She has failed to file Federal Tax Returns. She has failed to fully pay the estate taxes. She has sold ten properties. She paid a salary to Gil Bakus. The sharp decline in profits during her leadership of the company is sufficient evidence that Tiffany lacked the skill and experience to run VIP and, therefore, her decision to pay herself an annual salary of $175,000 plus a $10,000 bonus was not reasonable. The court finds that Tiffany breached her fiduciary duty by drawing a salary that was not commensurate with her skill level or the services she performed on behalf of VIP.

Tiffany also breached her fiduciary duty by living in a property owned by VIP without paying rent. Her rationale for living in the house rent free was that she lived there while she was caring for her father and so when he died, she did not move out of "our" house. (01/26/26, Tr. p. 196 ). Apparently, her justification was that because her father lived in the house rent free,

therefore, she too was entitled to live the house rent free, because it was her "home." Once again, Tiffany falls victim to her incorrect perception that she stepped into her father's shoes and was entitled to everything he had. Tiffany and Tony have an equal interest in the Trust and VIP. Her excuse for living rent free was that she offered Tony the same opportunity, but he declined (01/26/26,Tr. p. 203). This rationale further accentuates Tiffany's misunderstanding of her fiduciary duties. She appears to believe that she did not breach a fiduciary duty because she offered Tony the same deal and he refused. She does not seem to appreciate that she breached her fiduciary to VIP by depriving VIP of income. Offering Tony the opportunity to also deprive VIP of income, does not erase her breach. By using VIP property as her home without paying rent, Tiffany deprived VIP of rental income between $60,000 to $72,000 per year. Tiffany further compounded her breach by having VIP pay for other housing expenses such as utilities and insurance. By 2024, VIP was no longer generating profit. VIP would have benefited greatly from the added inflow of $60,000 - $72,000 rental income per year. By living in an asset of VIP for free and by having VIP pay for expenses related to the home, Tiffany breached her fiduciary duty to VIP.

Tiffany breached her fiduciary to VIP by hiring Gil Backus as her "Director of Operations." Mr. Bakus is a skilled nurse. The fact that he nursed a founder of Berkshire Hathaway and "learned a lot" does not give him the experience necessary to help run a real estate business in the position of "The Director of Operations." (The fact that Tiffany testified that Gil's former position of nursing a founder of Berkshire Hathway qualified him to help run VIP, is further evidence that Tiffany did not have the experience to run VIP.) More disturbing is the fact that Mr. Bakus' stated job duties mirror the job responsibilities that Tiffany described as her job responsibility as Director of VIP, namely, the day to day operations of property management, which VIP had already delegated to Riverside. Taking Tiffany's testimony as true, that means that Riverside, Tiffany and

Mr. Bakus were all managing the day to day responsibilities for the properties in the portfolio. It appears that Mr. Bakus also assisted Tiffany with matters outside of her duties related to VIP such as picking up her daughter and running personal errand. There was no legitimate business purpose that served VIP by hiring Gil Bakus as "the Director of Operations" or as Tiffany's personal assistant, and by placing Gil Bakus in that position, Tiffany breached her fiduciary duty to the Trust and VIP.

Tiffany's mismanagement of the company is best demonstrated by her failure to pay the 2024 real estate taxes on the properties owned by the portfolio. By failing to do so, she placed at risk the assets of VIP and the Trust. Tiffany's testimony that Jake McBride was supposed to reserve the funds is not credible for the reasons stated within the fact section. Tiffany failed to reserve sufficient funds to pay the 2024 property taxes. By failing to reserve funds to protect the assets of VIP and the Trust, Tiffany has placed the entire business model of VIP in jeopardy. Despite knowing when the real estate taxes were due, and despite knowing that there were insufficient funds in the operating account to pay the taxes, Tiffany waited until October of 2025, after the property taxes were sold to a third party, to investigate whether she could cash out the Charles Schwab account and the 1457 account to pay the real estate taxes. Paying the real estate property taxes should have been her first priority since VIP and Trust's business model is based upon the income stream generated from rental properties. Because Tiffany had a source of funds to pay the real estate taxes, and yet she waited to draw from the funds until after the real estate taxes had already been sold, Tiffany violated her fiduciary duty.

For all of the reasons set forth above, the court finds that Tony has proven that he has a fair chance of a likelihood of success on the merits of his counterclaim against Tiffany for breaches of fiduciary duty and his request to remove her as trustee.

**Irreparable Harm in the Absence of Injunctive Relief, and the Lack of an Adequate Remedy at Law.**

Tiffany argues that the petitioners have an adequate remedy in the form of money damages. *Franz v. Calaco Development Corporation.* 322 Ill.App.3d 941 (2nd 2001). In the *Franz* case a limited partner brought an action against the general partner alleging a breach of contract and breach of fiduciary duty after the partnership sold vacate lots without the consent of the limited partner. The purpose of the limited partnership was to develop and sell vacant land for the construction of single family residences and town homes. The trial court entered a preliminary injunction enjoining the sale or conveyance of lots. The appellate court reversed on the basis that the only reliefs sought was monetary damages and therefore injunctive relief was inappropriate. As a basis for its ruling the appellate court held, "However, Plaintiff's entitlement based on the partnership agreement is to profits in the partnership, not to an interest in real estate." *Id* at. 948.

The holding in *Franz* can be distinguished. Unlike the *Franz* case, where the goal of the partnership was to acquire real property for the sole purpose of selling the lots to make a profit, here, VIP's business model is based upon its continued interest in holding title to the real estate. This is because VIP's income stream is dependent upon the rental income coming from the real property. VIP business model is built upon retaining ownership of the real property and making a profit from the rental stream. When Tiffany sold 10 properties, she forever lost the income stream from those properties. While VIP may have enjoyed a momentary bump in profit from the sales of real property, that enjoyment is heavily offset by the loss of future rental income. The nature of the business of VIP is the reason why Tiffany's failure to pay the 2024 real estate taxes has such a devasting impact upon VIP. Each time Tiffany sells a piece of real property owned by VIP or the Trust, and each year she fails to pay the property taxes, she places VIP at risk of going out of business. An action by a party which will ultimately result in putting another party out of business

constitutes irreparable harm. *Gold v. Ziff Communications Company,* 196 Ill.App.3d 425 (1st Dist. 1989). The testimony and evidence admitted at the hearing support a finding that under Tiffany's leadership, VIP has suffered a downward trend in profitability. Once VIP's right to a piece of real property is extinguished by sale, that sale leaves Tony with no adequate remedy at law. Finally, Tiffany offered no testimony that she has the financial ability to satisfy a future money judgment. Currently she is borrowing money from Ivan Purnell. The continued operation of VIP is at a critical juncture, and without judicial oversight and redemption of the real estate taxes, real property may become victim to a future tax sale.

The court finds that Tony shall suffer irreparable harm in the absence of injunctive relief because due to Tiffany's mismanagement, VIP is facing the loss of the real property, which is the foundation of its business model. Additionally, the court finds that Tony has an inadequate remedy at law because Tiffany does not appear to have the ability to pay money damages, and, as stated above, money damages is not adequate compensation for the loss of real property.

**Balancing the Equities**

The court finds that Tiffany's interest in continuing her position as Director and Secretary of VIP as well as her position as Trustee of the Trust is outweighed by the Petitioner's concern that her continued control of VIP and the Trust will result in the complete loss of the real estate empire developed by Peter. Based upon the evidence admitted at the Preliminary Injunction hearing the court finds that the balance of the equities favors the entry of the injunction.

**THE REMOVAL OF TIFFANY AS THE DIRECTOR OF VIP**

Tony's counterclaim seeks more than monetary damages. He also seeks to remove Tiffany in her role as Director of VIP, as Trustee of the Trust and as Executor of the Estate based upon her mismanagement.

Page **37** of **44**

Under the Business Act, 805 ILCS 5/12-56, as a shareholder, Tony has the right to ask this court to remove a Director where, "(3) The directors or those in control of the corporation have acted, are acting or will act in a manner that is illegal, oppressive, or fraudulent with respect to the petitioning shareholder whether in his or her capacity as a shareholder, director, or officer or (4) The corporation assets are being misapplied or wasted."

Under the Business Corporation Act, where the court finds that directors have acted, are acting, or will act in a manner that is illegal, oppressive, or fraudulent or where corporation assets are being misapplied or wasted, the court may order relief by ordering an accounting and appointing a custodian to manage the business and affairs of the corporation to serve for the term and under the conditions prescribed by the court.

The evidence at the preliminary injunction hearing supports a finding that under Tiffany's leadership and control, she has misapplied and wasted the corporation assets of VIP and the Trust. VIP has not made a profit in 2024 or 2025. VIP has insufficient funds to pay the property taxes for 2024. There are no funds reserved to pay the 2025 taxes. Tiffany has made distributions to herself and to Tony, such that the operating account which held over $2 millions dollars upon the death of her father, now contains only $5,000 dollars. VIP owes the government estate taxes. Tiffany has not filed the 2024 or 2025 Federal or State income taxes for VIP. Tiffany has never provided an accounting for the Trust. Tiffany refused access to Tony to review the corporate records.

These facts support a finding that Tiffany, in her capacity as the Director of VIP has acted, is acting or will act in a manner such that corporation assets are being misapplied or wasted. Therefore, the court grants the Petitioner's request to move Tiffany as the Director and Secretary of VIP and the court shall appoint a Receiver to run VIP.

**THE REMOVAL OF TIFFANY AS THE TRUSTEE OF THE TRUST**

Pursuant to the Trust Code, Tony, a beneficiary, has the right to file an interim petition to remove the Trustee. 760 ILS 3/706 As part of the relief sought in the Preliminary Injunction, Tony asks this court to relieve Tiffany as the Trustee because she committed a serious breach of trust by: failing to provide a Trust Accounting; co-mingling trust income into the VIP operating account; and mismanaging Trust Assets including VIP. Given that this court has found that Tiffany has committed a serious breach of trust, the court has the authority to take action under Section 1001, which includes the right to remove Tiffany as a trustee.

Under the Trust Code, pending a final decision on a request to remove a trustee, the court may order such appropriate relief under subsection (b) of section 1001 as may be necessary to protect the trust property. 760 ILCS 3/706. The remedies for breach of trust include appointing a special fiduciary to take possession of the trust property and administer the trust. 760 ILCS 3/1001

For the reasons stated above, the court grants the Petitioners' request to remove Tiffany as the Trustee of the Trust and the court shall appoint a Special Fiduciary.

**THE REMOVAL OF TIFFANY AS THE EXECUTOR OF THE ESTATE**

On the petition of an interested person, or on the court's own motion, the court may remove a representative if the representative wastes or mismanages the estate or for other good cause. 755 ILCS 5/23-2. *Estate of Abbott v. First National Bank of Woodstock,* 38 Ill.App.3d 141 (2nd Dist. 1976) and *Estate of O'Brien v. Hartigan* 166 Ill.App.3d 285 (1st Dist. 1988). For the reasons set forth above, the court finds that there was sufficient evidence presented at the Preliminary Injunction hearing to find that Tiffany has wasted and mismanaged the estate. She has failed to pay the full amount of the estate taxes. She has failed to pay the real estate taxes on the properties owned by VIP and the Trust and, as a consequence, the taxes were sold to third party buyer. In

order to redeem them, the Estate and the Trust will incur penalties. Tiffany has lived in one of the properties owned by the Estate and or VIP without paying rent. The estate has paid living expenses when those expenses were not included in Tiffany's compensation. Tiffany has paid herself a wage which is not reasonable, in that she has no prior experience running a corporation. Tiffany co-mingled the assets of VIP and the Trust into one operating accounting. Under Tiffany's control, the balance of the operating account dropped from over $2 million dollars to $5,000 dollars. All of these facts support a finding that Tiffany has wasted and mismanaged the assets of the estate.

Tiffany is correct that the court cannot remove her as the executor of the estate for failing to file an inventory or accounting until the court first orders her to do so. 755 ILCS 5/23-2(a)(7). The court, however, is not removing her based upon her failure to account, although she has unquestionably failed to do so.

Based upon the testimony and evidence presented at the preliminary injunction hearing, the court grants the Petitioners' request to remove Tiffany as the Executor of the Estate and to appoint a Special Fiduciary.

**THE APPOINTMENT OF A SPECIAL FIDUCIARY AND A RECEIVER**

Tony asks the court to appoint him as the Executor of the Estate, the Trustee of the Trust and the Director of VIP. Considering that Tony is a 25% owner of VIP and 50% beneficiary of the Trust, the court can understand why Tony would like to be appointed to these positions. Nevertheless, after litigating this case for the past two years, the court is well aware of the deep distrust and anger that runs through the 5 siblings of this family. Tiffany has filed an action against Tony in Federal Court alleging, among other things, that he has committed insurance fraud with respect to the properties owned by VIP. While allegations in a complaint are not proof of wrongdoing, the court finds that elevating Tony to management at this time would likely cause

more problems than it would solve. In a similar vein, Tiffany also testified that Jake McBride and Tony are friends, and that Jake is the one who recommended the investment in 1492. This is the investment that Sara Putz said had irregularities including no account number and no 1099 form. Although Tiffany has not made direct allegations against Tony with respect to this account, her testimony left the implication that Jake and Tony were the architect of this investment and, therefore, were implicitly to blame for Tiffany's inability to transfer the funds. Again, these implications were unspoken and unproven, but given the mistrust between the siblings and the extensive litigation filed between them, the court finds that a neutral third party is necessary.

Provided he has no conflict and provided he is willing to accept the appointment, the court will appoint Jack Mardoian as the Special Fiduciary for the Trust and the Special Administrator for the Estate.

As for VIP, the court has the right to appoint a receiver pursuant to the Business Act as well as the Illinois Receiver Act (765 ILCS 1090). The court has the authority to appoint a receiver before judgment, to protect a party that demonstrates an apparent right, title, or interest in property that is the subject of the action, if the property or its revenue-producing potential: a) is being subjected to or is in danger of waste, loss, dissipation, or impairment. 765 ILCS 1090/6 The appointment of Receiver is an interim solution which takes the issue of trust administration and operation of VIP from the hands of battling siblings into the calm and neutral hands of a disinterested third party.

The court has worked with two receivers in the context of commercial mortgage foreclosures who are highly competent, namely Mathew S. Tarshis of Frontline RE Partners and Matthew Brash of Newpoint Advisors Corporation. Either one would be an excellent choice (if they are willing) but the court is open to hearing suggestions from the parties. The court directs

Page **41** of **44**

the parties to submit their proposed receivers as well as a copy of their Curriculum Vitae to the court before the next hearing date of May 1, 2026. We will discuss the appointment at the next hearing date. Once the receiver has accepted the appointment, the parties will prepare an order that sets the full scope of the Receiver's authority.

In order to save costs, the court will keep Riverside as the property manager. Riverside is familiar with the portfolio. Under the watchful eye of the Receiver, the court is confident that the Receiver will ensure that Riverside is running the business in way that meets industry standards. Riverside will have to make its books and records, including its rent rolls, available for inspection. The Receiver can address Tiffany's concerns that Jake is not making monthly payments on his loan by reviewing the books and records to confirm that Jake is making the monthly payment. The court acknowledges that Tiffany fired Riverside and that she has concerns about Riverside's competency and ethics. The court heard testimony from one renter that Riverside was not responsive to its repair request. By keeping Riverside as the property manager, the court makes no findings on the competency of Riverside. The court is, however, confident that the appointed Receiver will closely monitor the actions of Riverside and that Riverside's familiarity with the portfolio will cut down on the Receiver's costs.

ACCORDINGLY, IT IS HEREBY ORDERED AS FOLLOWS:

1. The Petitioners' Request for a Preliminary Injunction Order against Tiffany is granted.

2. The court shall appoint a Receiver for VIP after the parties submit names and resume of individual they believe are qualified. The parties must provide the court with the names and resumes within 5 business days of the entry of this order so that the court may appoint a Receiver at the May 1, 2026 hearing. The court shall make the decision after reviewing the CV's of the Receivers.

3. Provided he accepts the appointment, the Court shall appoint Mr. Jack Mardoain as the Special Fiduciary for the Trust and the Special Administrator for the Estate. The

court shall provide Mr. Mardoian with a copy of this order and ask if he can appear at the May 1, 2026 1:30 p.m. hearing by Zoom in C-301.

4. Riverside Management Company ("Riverside"), the current real estate manager, shall continue to manage the real estate for the Trust and for VIP with oversight by the Receiver. Riverside shall not incur or pay any expenses which are outside the ordinary course of business without the consent of the Receiver, or if the expense exceeds the Receiver's authority, this Court's further order.

5. Tiffany is removed from serving as the Trustee of the Trust.

6. Tiffany is enjoined from taking any action to obligate the Trust under any contract, agreement or other undertaking, including, but not limited to, the sale of any real estate owned by the trust.

7. Tiffany is enjoined from taking and/or receiving any assets or funds from the Trust.

8. Tiffany is removed as President, Secretary and Director of VIP and from assuming any other office with VIP.

9. Tiffany is enjoined from taking and/or receiving any assets or funds from VIP, including not limited to an owner's draw or distributions.

10. Tiffany is enjoined from taking any action to obligate VIP under any contract, agreement, or other undertaking including, but not limited to, the sale of any real estate owned by VIP.

11. Tiffany is removed as the executor of the estate.

12. Tiffany is enjoined from taking or receiving any assets or funds from the Estate.

14. Tiffany is enjoined from taking any action to obligate the Estate under any contract, agreement, or other undertaking including, but not limited to, the sale of any real estate owned by the Estate.

15. Tiffany is ordered to vacate the Grayslake property on or before July 1, 2026. If she refuses to leave voluntarily, then the Receiver is authorized to initiate eviction proceedings.

16. Tiffany shall deliver a verified inventory and a verified accounting for the Trust for the period beginning December 25, 2023, and ending on October 31, 2025, within 45 days after the date upon which this Order is entered.

17. Tiffany shall deliver a verified inventory for VIP as of December 25, 2023, and as of October 31, 2025, within 45 days of the date on which this Order is entered.

18. Tiffany shall deliver a verified inventory and a verified accounting for the Estate for the period beginning December 25, 2023, and ending on October 31, 2025, within 45 days after the date on which this Order is entered.

19. Tiffany shall retain, assemble and deliver all documents which are in her possession or under her control (which includes documents she provided to her former counsel and accountants) and which are responsive to the document requests served upon her in this consolidated matter within 30 days after the date upon which this order is entered.

20. Tiffany shall retain, assemble and deliver copies all documents upon which she relies in preparation of the accounting for the Trust, the Estate  and VIP to counsel of record in this consolidated matter within 45 days of today's date.


DATED:
ENTERED:

_Janelle K Christensen_
Judge

# EXHIBIT 15

# *(DEFENDANT MCBRIDE MASS EMAIL)*

 Outlook

## Please read



ATTN: Tenant(s),

Attached: **Temporary Restraining Order (TRO)** entered by the **Circuit Court of the Nineteenth Judicial Circuit, Lake County, Illinois – Chancery Division**, in **Case No. 2023 CH 232**

**Date:** November 11, 2025
**From:** Riverside Management Company
**Subject:** Legal Notice Regarding Temporary Restraining Order — Management and Rent Payments

### Background and Legal Authority

Pursuant to a **Temporary Restraining Order (TRO)** entered by the **Circuit Court of the Nineteenth Judicial Circuit, Lake County, Illinois – Chancery Division**, in **Case No. 2023 CH 232 (consolidated with Case No. 24 PR 26)**, the Court has ruled that **Tiffany Vole** is **restrained and prohibited** from engaging in any activity involving the management or financial affairs of **V.I.P. Holding Company ("VIP")** and **The Trust of Peter Vole Jr. ("the Trust")**.

This order was granted upon findings that:

- The Court determined that preservation of the Trust and VIP assets is paramount, and therefore issued direct restrictions on Tiffany Vole's authority and access.

### Key Court Directives

Effective **October 31, 2025**, as reaffirmed in the Court's detailed order of **November 5, 2025**, the following prohibitions are in full effect:

1. **Tiffany Vole is not authorized to take or receive any funds or assets from the Trust or VIP Holdings.**

2. **She may not enter into, modify, or negotiate any lease agreements, rental concessions, or property-related contracts.**

3. **She is prohibited from visiting or being present on any property owned or managed by the Trust or VIP Holdings.**

4. **She is barred from any communication with tenants regarding rent, maintenance, lease terms, or property management matters.**

5. **Riverside Management** remains the **exclusive property manager** for all Trust and VIP properties and will continue to handle **rent payments, maintenance, and tenant communications** as it has for the past four years.

---

**Tenant Responsibilities**

All tenants are hereby **legally required** to comply with this court order. This includes the following obligations:

- **Do not make rent payments** to Tiffany Vole directly or indirectly (including electronic transfers, cash, or checks).

- **Do not discuss** lease or property matters with her or any representative acting on her behalf.

- **Do not allow access** to any property premises under her direction or request.

**All payments, communications, and maintenance requests must continue to be made through Riverside Management.**

Failure to adhere to this notice could result in tenants being **culpable in violating a court order**, which may expose them to legal liability as **aiders or abettors** of a violation of a judicial injunction under Illinois law (see, e.g., *People v. Wilcox*, 237 Ill. 421 (1908); *People ex rel. Peters v. Bowman*, 247 Ill. App. 3d 199 (1993)).

---

**Contact for All Property Matters**

**Riverside Management**
Attn: Property Manager
1391 Saint Paul Ave
Gurnee, IL 60031
(847) 996-3200
info@riverside-mgmt.com

All rental payments and communications should be directed **only** to Riverside Management.

---

**Final Notice**

This notice serves as formal communication of the **court's restraining order**. Continued compliance is required until further order of the court.
Your cooperation ensures the lawful and proper management of all properties under **VIP Holdings** and **The Trust of Peter Vole Jr.**

---

Authorized by Order of the Circuit Court of Lake County, Illinois, dated October 31, 2025, and supplemented November 5, 2025.

---

Regards,

## Jake McBride

President | Managing Broker
Executive Director of Real Estate
Direct: (847) 996-3200  ext. 118
Cell: (847) 200-2718
Email: jake@riverside-mgmt.com
Office: 1391 St. Paul Ave. Gurnee, IL 60031

 



**Integrity, Innovation, and Excellence – Building Trust, One Property at a Time**

Sent from my iPhone